**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**JOHN CHIARELLO, as PRESIDENT OF TRANSPORT WORKERS UNION OF GREATER NEW YORK, LOCAL 100, AFL-CIO;**
**JOHN SAMUELSEN, as PRESIDENT OF TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO;**
**MEDET FIDAN**, individually, and on behalf of a Class of Central Park Horse Carriage Medallion Owners and Central Park Horse Carriage Owners Similarly Situated;
**CHRISTINA HANSEN**, individually and on behalf of all Central Park Horse Carriage Lessees Similarly Situated, and Central Park Horse Owners Similarly Situated; and
**DAVID KOCH**, individually and on behalf of all Central Park Licensed Driver Horse Carriage Drivers Similarly Situated,

**Plaintiffs,**

–against–

**CITY OF NEW YORK**;
**NEW YORK CITY COUNCIL**;
**ZOHRAN MAMDANI, as MAYOR of the CITY OF NEW YORK;**
**SAMUEL A.A. LEVINE, as COMMISSIONER of the NYC DEPARTMENT OF CONSUMER AND WORKER PROTECTION;**
**ALISTER MARTIN, as COMMISSIONER of the NYC DEPARTMENT OF HEALTH AND MENTAL HYGIENE;**
**MIKE FLYNN, as COMMISSIONER of the NYC DEPARTMENT OF TRANSPORTATION;**
**JESSICA TISCH, as COMMISSIONER of the NYC POLICE DEPARTMENT;**
**VILDA VERA MAYUGA, as COMMISSIONER and CHIEF ADMINISTRATIVE LAW JUDGE of the NEW YORK CITY OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS; and**
**YUME KITASEI, as COMMISSIONER of the NYC DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES,**

**Defendants.**

Civil Action No. 26-cv-10154

**VERIFIED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

Plaintiffs, by their undersigned attorneys, Advocates for Justice, Chartered Attorneys, by Arthur Z. Schwartz, and Benjamin J. Kallos, Of Counsel, as and for their Verified Complaint, allege as follows.

## I. INTRODUCTION

1. For the first time in its history, the City of New York is seeking to terminate a profession which was lawful and licensed, and is seeking to do so without any compensation for those who own property connected with the profession (including medallions, horses, carriages, and associated equipment), those who have contracts involved in the profession, and those who make a living from the profession. Additionally, the City is seeking to do so without any declared public health emergency, in a profession which is heavily regulated: the City's horse drawn carriage industry, which largely exists in New York City's Central Park. The law doesn't bar the commercial use of horses, generally, in NY City (like riding stables), including the stable that leases horses to ride in Central Park or the use of horses in parades, circuses, or at a racetrack. (Until it closed this past June, Aqueduct Racetrack in Queens saw an average of 20-30 horses die per year, without any clamor in the NY City Council about banning horseracing.)

2. This is a lawsuit seeking declaratory and injunctive relief, and damages, addressed to Local Law 165 of 2026 (Int. No. 943-A) (the "Local Law") (Ex. 1)[1], which the New York City Council has styled "Romanch's Law," which abolishes the City's licensed horse-drawn carriage trade. Under the terms of the Local Law, every horse drawn carriage license and plate expires on May 31, 2028 (the "Sunset Date").

3. There are presently between 208 and 211 drivers with licenses to drive a horse drawn carriage, and 63 owners who own 68 medallions to operate horse drawn carriages, and between 132 and nearly 160 horses; counting stable workers, the City puts the number of people

---

[1] Int. No. 943-A (FINAL), as passed by the Council on October 22, 2026, https://legistar.council.nyc.gov/View.ashx?M=F&ID=16094088&GUID=47F1B1B7-2DBC-4FCC-8EBF-119094641040. The Council's legislative file for Int. 0943-2026 (Ex. 3) is at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=8067835&GUID=53C552B4-4BC2-41DA-A14A-560E74E7F3E1.

affected at 297 to 309. (See infra Part V.B.) The City's own figures for each of these numbers conflict, and the City never reconciled them. (See infra Part V.J.)

4. The Local Law does not wait for the Sunset Date to take effect and have a negative impact **effective immediately**. The Law:

**a) Bars** the Department of Consumer and Worker Protection ("DCWP") from issuing any horse drawn carriage license or plate (each license with its plate, a "Medallion"), or accepting any application for one — under existing law, the only way a license changes hands (Local Law §§ 25–26) (which we call the "Freeze"); and

**b) Forbids the sale** or transfer of any licensed rental horse "for use in a horse drawn cab business" — anywhere in the country, including to another licensed operator in the City — and requires every owner to certify by June 1, 2027 that the horse will not be transferred for that use, for slaughter, or for "any inhumane purpose as designated by the commissioner" (Local Law § 4, amending Admin. Code § 17-329) (the "Disposition Regime").

5. Furthermore, the new statute addresses compensation only through "[c]onsideration of whether to establish" a program to compensate owners for "the value of their horse drawn cab businesses, horse drawn cab licenses, and equipment," and of whether to establish a horse-disposition program that may include "potential compensation," in a plan due April 1, 2027. For drivers, the plan need offer only workforce services: referrals, counseling, training, hiring events, civil-service resources, educational opportunities and entrepreneurship guidance. The Local Law requires no compensation, appropriates nothing and sets no deadline for a decision. (Local Law § 23) (the "Transition Plan").

6. The City's approach can be summarized in twelve words: immediately cripple the owners, ignore property interests and contracts, and maybe compensate. Two days before signing

the Local Law, the Administration confirmed that approach: it announced "a goal of facilitating medallion buybacks," with a full transition plan to follow "by April 2027." (Ex. 18, at 1–2; ¶ 109.)[2]

7. The City knows what the medallions are worth, because it approves their sale and keeps the bills of sale. Those bills of sale record sales at four to five times the $70,000 figure DCWP gave the Council. (¶¶ 63–67.) Yet, upon information and belief, no one in the bill drafting process costed compensation, and the Office of Management and Budget supplied no estimate; DCWP's witness said only that value was "something we can continue to evaluate with the council." (Hearing Tr., Ex. 10, at 67; Fiscal Impact Statements, Exs. 6–7.)[3] The law makes no provision for compensation of the property it declares unusable, and makes vague promises about a "transition plan" that offers the carriage drivers affected only "help" finding "employment opportunities." In a form letter over her signature to advocates who had written to her in support of the bill, which an advocacy group posted on Facebook on November 10, 2026, City Council Speaker Julie Menin wrote:

> The Council's legislation reflects our commitment to animal welfare, public safety, and worker protections. In addition to phasing out horse drawn carriages, it establishes safeguards to ensure that retired horses are treated humanely and requires a comprehensive transition plan to help carriage drivers and other industry workers pursue new employment opportunities. (Ex. 19.)[4]

---

[2] Office of the Mayor, Press Release, "Mayor Mamdani Announces Plan to Support Horse-Drawn Carriage Workers Through Industry Transition" (Nov. 17, 2026), https://www.nyc.gov/mayors-office/news/2026/11/mayor-mamdani-announces-plan-to-support-horse-drawn-carriage-wor (last visited Nov. 17, 2026).

[3] Transcript, Committee on Health hearing of July 15, 2026 (Ex. 10), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15751620&GUID=0C208BC9-E220-40AD-82A1-43BBAB8A60B2; Fiscal Impact Statement, Int. No. 943 (Ex. 6), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15689754&GUID=3CBEDD3A-042E-4249-BBCC-18E9174A5544; Fiscal Impact Statement, Proposed Int. No. 943-A (Ex. 7), https://legistar.council.nyc.gov/View.ashx?M=F&ID=16082943&GUID=EA5B961C-935B-4841-BA93-F9AB5184E6DC.

[4] Letter of Speaker Julie Menin to "Animal Advocate/Activist," as posted by Michael Petrelli, an administrator of the Equine Advocacy Alliance group, on Facebook (Nov. 10, 2026), https://www.facebook.com/groups/466020752029481/posts/1524264969538382/ (last visited Nov. 17, 2026).

Her message makes no mention of compensation and offers only a plan "to help carriage drivers and other industry workers pursue new employment opportunities." The Local Law mentions compensation only as something the City is to consider; it is not mandated. (Local Law § 23(a)(2)(b)–(c), (a)(3).) Plaintiffs seek the template of the form letter by expedited discovery.

8. The Local Law follows the June 17, 2026 death of Romanch Mahajan, eighteen years old, who was killed after a carriage horse bolted. His death was a grievous loss, and nothing in this Complaint minimizes it. But his family, in notices of claim filed by its attorneys, who include Ali Najmi, Chair of the Mayor's Advisory Committee on the Judiciary,[5] attributes the bolting to stray voltage on City infrastructure — a hazard the Local Law does not touch (Ex. 20)[6]. The City's own witnesses described the horse carriage trade as a trade that has always complied with the City's rules and regulations.

9. For more than eighty years, New York law has permitted a city like New York to prohibit a lawful, licensed trade only "where the abuses are general and difficult to control by regulation." *Good Humor Corp. v. City of New York*, 290 N.Y. 312, 318 (1943). In fact, regulation here is plentiful.[7] It is noteworthy that NYPD collision data through May 2026 indicates that e-

[5] Office of the Mayor, Press Release, "Mayor Mamdani Appoints Ali Najmi as Chair of Mayor's Advisory Committee on the Judiciary" (Jan. 2, 2026), https://www.nyc.gov/mayors-office/news/2026/01/mayor-mamdani-appoints-ali-najmi-as-chair-of-mayor-s-advisory-co (last visited Nov. 18, 2026); Editorial, "Ali Najmi is too sleazy and conflicted to be Mamdani's chief judge-picker," N.Y. Post (July 29, 2026), https://nypost.com/2026/07/29/opinion/ali-najmi-is-too-sleazy-and-conflicted-to-be-mamdanis-chief-judge-picker/ (stating that Najmi "is suing the city over the Central Park carriage crash"); *see also* Hearing Tr. 36 (Sagar Chadha of Liakas Law: "I represent the estate and the family of Romanch Mahajan").

[6] Ed Shanahan, "Stray Voltage Played Role in Deadly Horse Carriage Runaway, Family Says," *N.Y. Times* (Aug. 14, 2026), https://www.nytimes.com/2026/08/14/nyregion/horse-carriage-ban-central-park-voltage.html.

[7] It is noteworthy that NYPD collision data through May 2026 indicates that e-bike-involved crashes overall have injured 17,434 people and killed 133 people (combining pedestrians and riders) since 2019. Ainsley Martinez, "After Deadly NYC E-Bike Crashes, Officials Move To Stop High-Speed Bikes," Patch (July 31, 2026), https://patch.com/new-york/new-york-city/after-deadly-nyc-e-bike-crashes-officials-move-stop-high-speed-bikes.

bike-involved crashes overall have injured 17,434 people and killed 133 people (combining pedestrians and riders) since 2019.[8] But there has been no legislation banning e-bikes, nor is there any license or registration requirement, like there is for horse drawn carriages.

10. Since at least 2007 the City and the Central Park Conservancy (the "Conservancy"), to which the City contracts the maintenance of Central Park, have ignored repeated requests from carriage drivers and owners, and since 2020 from Plaintiffs Local 100 and TWU, for hitching posts which could have prevented the Romanch tragedy (¶ 88; Hearing Tr. 250; Written Test. Pt. 2, at 38, 91; Hansen Decl. ¶ 12 & Ex. A; Chiarello Decl. ¶ 7).[9] On December 19, 2025, the Presidents of TWU and Local 100 asked the Conservancy in writing to install "[a] handful of hitching posts at each of the three carriage stands" so that drivers could "tether their horses and keep them secure." (Ex. 21; Chiarello Decl. ¶ 10 & Ex. A.) In June 2026, following the Mahajan death, Local

[8] Ainsley Martinez, "After Deadly NYC E-Bike Crashes, Officials Move To Stop High-Speed Bikes," Patch (July 31, 2026), https://patch.com/new-york/new-york-city/after-deadly-nyc-e-bike-crashes-officials-move-stop-high-speed-bikes.

[9] Written testimony submitted to the Committee on Health for its July 15, 2026 hearing on Int. No. 943, as posted by the Council in two files attached to the legislative file for Int. 0943-2026 (Ex. 3): "Hearing Testimony 7/15/26 (1of2)" (626 PDF pages) (Ex. 11), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15709496&GUID=F93C67CF-1453-4E96-B284-6902D1394C5C ("Written Test. Pt. 1"), and "Hearing Testimony 7/15/26 (2of2)" (621 PDF pages) (Ex. 12), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15709655&GUID=2D35D915-2040-4990-96E7-A2676F0722B9 ("Written Test. Pt. 2"). The legislative file is at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=8067835&GUID=53C552B4-4BC2-41DA-A14A-560E74E7F3E1. Pinpoint citations are to the PDF page numbers of each file. The Council's video of the hearing is available from its meeting record, https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1425278&GUID=E7D597B7-AFD7-4AB0-B21F-8E4F254CA003.

100 called hitching posts "a commonsense safety upgrade that would enable drivers to tether their horses,"[10] and it has long proposed building a stable inside Central Park.[11]

11. After the Sunset Date, the 2028 date set by the Law for the Horse Drawn Carriage Trade to end, horses may still draw vehicles on City streets under special-event permits; the NYPD's mounted horses will keep working in Midtown traffic for use in far more dangerous situations including for "crowd control at demonstrations, protests," as the carriage horses do not;[12] and riding horses rented by riding stables, at least one of which operates in Central Park, remain lawful and licensed (Hansen Decl. ¶ 11). Only the licensed trade, and the roughly 300 people who work in it (see infra Part V.B), are eliminated.

12. The injury this lawsuit addresses is immediate. The moment the Local Law took effect, the Owner Plaintiffs lost the right to sell their Medallions (which, before the Local Law, sold for $300,000 to $400,000 each) and their lenders, who have a security interest in the Medallions, lost the ability to realize on their collateral. The horses that most Medallion owners own lost great value because of the limits imposed on their resale. Boarding agreements are undercut, and the stables where Central Park carriage horses are housed are left without tenants effectively on May 31, 2028. The drivers, roughly 200 hard-working New Yorkers, face the end

---

[10] Statement of Alexander Kemp, Administrative Vice President, TWU Local 100 (June 22, 2026), *as reported in* "Ahead of Bill Hearing, Carriage Workers Plead Case to Keep Horses," *West Side Spirit* (July 2, 2026), https://www.westsidespirit.com/news/ahead-of-bill-hearing-carriage-workers-plead-case-to-keep-horses-EB5993215; Chiarello Decl. ¶ 14 & nn.3–4. *See also* TWU Local 100, "Statement from TWU Local 100 on the Death of Romanch Mahajan During Central Park Carriage Ride" (June 18, 2026), https://www.twulocal100.org/story/statement-twu-local-100-death-romanch-mahajan-during-central-park-carriage-ride.html (supporting Int. 937's hitching posts "throughout the park").

[11] TWU Local 100, "The Big HEART platform: Improvements for the Iconic NYC Central Park Carriage Horses" (Sept. 2, 2022), https://www.twulocal100.org/story/big-heart-platform-improvements-iconic-nyc-central-park-carriage-horses (platform text at https://www.twulocal100.org/sites/twulocal100.org/files/heart_platform.pdf); Chiarello Decl. ¶ 8 & n.1.

[12] N.Y.C. Police Dep't, *Special Operations*, NYC.gov, https://www.nyc.gov/site/nypd/bureaus/patrol/citywide-operations.page (last visited Nov. 16, 2026) (describing the Mounted Unit's patrol duties, public relations role, crime deterrence function, and use in crowd control).

of their licensed occupation on a fixed date, with no plan in place for future employment. Some, like Plaintiff David Koch, have been operating in the industry since the 1980s, and are being asked to change their employment past the age of 70; Koch is 72. (Koch Decl. ¶¶ 2, 5.)

13. At the same time that the Mayor and City Council claim **no other alternative** but to ban the City's licensed horse-drawn carriage trade in the name of "public safety", their law **allows that public safety threat to continue for years until May 31,** 2028. See DC Pres. *League v. Dep't of the Interior*, No. 1:26-cv-477-ACR, Dkt. 159, at 10 (D.D.C. Nov. 14, 2026) (temporary restraining order) (citation omitted)[13], addressing the Department of the Interior's assertion that safety concerns warranted the immediate closure of East Potomac Park. ("*If safety issues in fact required closure, NPS would have closed the Course months ago. Yet NPS has kept the Course open unabated as usual since May, with conservatively over thirty thousand rounds of golf played. At a minimum, if public safety were at risk, NPS would have taken a step—any step—to address the safety issues it knew about.*"). The Law at issue here is not about public safety; it is a political action addressed to a noisy, politically powerful lobby of loud, wealthy and extremist "animal rights" activists, a ban unprecedented since at least 1943, when the New York Court of Appeals struck down a City law barring itinerant peddling on City streets. See *Good Humor*, 290 N.Y. at 318 ("*It would none the less be a drastic method of ending abuses; — a method that may be used only where the abuses are general and difficult to control by regulation and where they cause or threaten injury to the public so serious that the Legislature might reasonably find it outweighs the harm that would be caused to some by complete prohibition.*"). No such showing can be made here.

[13] Available at https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2026cv0477-159 (last visited Nov. 16, 2026).

14. The record shows what the Local Law is. It is the end point of a nineteen-year campaign to abolish the trade as "cruel to its horses," a charge the City's own regulators did not support; the Council itself convened, broadcast and celebrated the campaign's final rally (Parts V.L–V.P). It was carried to passage on the strength of the first known passenger death in more than 150 years of carriage rides in Central Park,[14] a death that followed years of unanswered requests for hitching posts and that the victim's family and its attorneys attribute to stray voltage on City property (Parts V.E–V.F). The Local Law addresses neither. Instead, it ends a licensed trade that has operated in Central Park since the 1860s, and it places the whole cost on the roughly 300 people who work in it.

## II. JURISDICTION AND VENUE

15. This is both a Class Action (with individuals representing multiple classes) and an action brought by the labor union which represents all of the carriage drivers, including the driver-Medallion holders. The unions involved, Transport Workers Union of America (TWU) and its principal NYC Local, Transport Workers Union of Greater New York, Local 100 (Local 100) represent the drivers and owners in their dealings with the City of New York.

16. Plaintiffs bring this suit under 42 U.S.C. § 1983 and the Contracts, Takings, Due Process, Equal Protection, Bill of Attainder, Commerce and Excessive Fines Clauses of the United States Constitution, as applicable to the City directly or through the Fourteenth Amendment; Article I, Sections 5, 6, 7 and 11, and Article IX of the New York Constitution; the Municipal

[14] Written Test. Pt. 1, at 7–8 (Manhattan Borough President's report: the first carriage-related human death in the record); "New York mayor, other leaders push to end horse carriage industry after Indian teen's death," Associated Press via ABC News (June 18, 2026), https://abcnews.com/US/wireStory/new-york-mayor-leaders-push-end-horse-carriage-134003468 (Conservancy: believed to be the first human fatality involving a carriage since carriages were introduced in Central Park more than 150 years ago).

Home Rule Law; the New York City Charter; the New York Open Meetings Law; and the NY State and NY City Environmental Quality Review Laws.

17. Plaintiffs ask **initially** for narrow relief that preserves the status quo ante: an order enjoining enforcement of the Freeze Regime and the Disposition Regime, so that Medallion transfers can continue under existing law while the Court decides this case. In the alternative, Plaintiffs ask the Court to enjoin the Local Law in its entirety. This Court's intervention is sorely needed. Ultimately Plaintiffs seek to have this Law declared unconstitutional, and arbitrary and capricious, and to have Plaintiffs, and the classes they represent, made whole for any losses they have suffered as a result of the passage and Mayoral execution of this Local Law.

18. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), and may grant declaratory and further relief under 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' claims under New York Law, which form part of the same case or controversy.

19. Plaintiffs challenge the Local Law on its face, and as applied to them and the classes they represent. Plaintiffs need not exhaust any administrative remedy, and need not seek compensation in State court before bringing their federal takings claim. *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982); *Knick v. Township of Scott*, 588 U.S. 180 (2019).

20. Plaintiffs' claims are ripe. The Mayor signed Local Law 165 on November 19, 2026. By its terms the Freeze Regime and the Disposition Regime take effect immediately (Local Law § 27), subject only to its filing with the Secretary of State, which must occur within twenty days of adoption (N.Y. Mun. Home Rule Law § 27(1), (3)); the expiration of every Medallion and horse license on the Sunset Date, and the repeal of driver licensing the next day, are fixed by the text of the Local Law and require no further official action. Where "the inevitability of the

operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974). The City has not disavowed enforcement of any provision of the Local Law. The Mamdani Administration told the Council it did not "have concerns necessarily with the phase-out timeline itself" (Hearing Tr. 48), and two days before signing the Local Law the Mayor announced that the City "moves to bring the horse-drawn carriage industry to a close" (Ex. 18, at 2). The provisions that injure Plaintiffs now need no implementing program, staff or appropriation: §§ 25 and 26 direct DCWP not to issue any new license or plate or accept any application, and § 17-329's bars on transfer and its advance-notice requirement apply by their own terms. The remaining obligations fall on dates the text fixes: the certification by June 1, 2027, on a form due by March 1, 2027, and the expiration of every license and plate on May 31, 2028. Plaintiffs must decide now whether to buy, keep, replace or sell horses and whether to keep drivers, without knowing whether those provisions are valid. (See Hansen Decl. ¶¶ 3, 9, 25–26; Bagirgan Decl. ¶ 21, each submitted herewith.)

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2): the City resides here, the Local Law was enacted here, and the property at issue is located here.

## III. PARTIES

22. Plaintiff Transport Workers Union of Greater New York, Local 100, AFL-CIO ("Local 100") is a labor organization of more than 40,000 members which represents employees in the transportation business, including at the NYC Transit Authority; its principal office is located at 195 Montague Street, 3rd Floor, Brooklyn, New York 11201. John V. Chiarello is its President. Local 100 has represented the Central Park trade's carriage drivers, stable workers and horse handlers, as well as Medallion and carriage owners since 2020. (Written Test. Pt. 1, at 45,

48; Ex. 8, at 3; Chiarello Decl. ¶¶ 2–3.) Local 100 testified at the Council's July 15, 2026 hearing (Written Test. Pt. 1, at 48–51; Chiarello Decl. ¶ 18) and, after the June 2026 accident, voluntarily suspended carriage operations from June 18 through June 22, 2026, resuming June 23, to retrain drivers and review safety procedures (Written Test. Pt. 2, at 38; Chiarello Decl. ¶ 13). Members of Local 100 hold DCWP driver licenses and Medallions and work in the stables — they include the holders of all 68 Medallions, about 150 licensed drivers and 50 to 60 stable workers and horse handlers; each would have standing to sue in his or her own right, because each holds a City-issued license or job that the Local Law ends. Plaintiffs Hansen, Fidan and Koch are members of Local 100. (Chiarello Decl. ¶ 4.) Protecting members' licenses and livelihoods is germane to Local 100's purpose. (*See* TWU Const. art. II(b)–(c) (objects include "improvements in the conditions of employment for the workers in the industry" and promoting legislation "advancing the interests of the Union and its members at the local, state and national levels"); *id.* art. III, § 1 (membership eligibility); Local 100 Bylaws arts. XXIV(a), XXV(a); Chiarello Decl. ¶¶ 5–6.) The City itself treats Local 100 and TWU as the representatives of the trade's workers: on November 17, 2026 it committed to "engage TWU and horse carriage workers at every step of the process" of the transition. (Ex. 18, at 2.) Local 100 seeks only declaratory and injunctive relief, which does not require the participation of individual members; it does not seek compensation or damages on their behalf. (Chiarello Decl. ¶ 21.) *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

23. Plaintiff Transport Workers Union of America (TWU) is Local 100's parent union. It works in coordination with Local 100 to represent the horse carriage drivers and owners. It sues by its President John Samuelsen.

24. Plaintiff Medet Fidan resides in Saddle Brook, Bergen County, New Jersey. He holds NYC Department of Consumer and Worker Protection (DCWP) horse drawn carriage license number 1423099 and plate number 1289 (known as a "Medallion") which he bought in 2021, in a transfer DCWP approved. He owns two horses (which he bought for a total of $15,500), a carriage (which he bought in 2025 for $15,000), and the harness and equipment used for his business, and drives his carriage himself. Since the Local Law was passed by the City Council there is no resale market whatsoever. Prior to 2021, Plaintiff Medet Fidan drove a yellow taxicab for more than two decades, surrendered his taxi medallion (which he had financed for $477,000) to his lender when that market collapsed, and still owes $120,000 on the loan he took to settle that debt. He is also a City licensed sightseeing guide and licensed horse carriage driver.

25. Plaintiff Christina Hansen resides in New York County, New York. She has held DCWP horse drawn carriage driver's license number 1428689 since 2012 and is also licensed by DCWP as a sightseeing guide. She has driven carriages professionally for about twenty years. Since 2021 she has been Local 100's chief shop steward for the Central Park carriage drivers, and since 2024 she has served on the boards of directors of the New York State Horse Council and of the Carriage Operators of North America. She drives under medallion number 1127 owned by Epona Carriages, LLC, which she leases, with a carriage, for $3,200 a month under an oral agreement. She also owns one of the three licensed horses that pull her carriage; Epona or its principal owns the other two. Hansen works only part of the week. For about five years she has engaged Plaintiff David Koch, a licensed driver, to drive her carriage when she is not driving; under their oral agreement, Koch collects the fares for the hours he drives and pays Hansen half. (Hansen Decl. ¶¶ 1–4, 9; Koch Decl. ¶ 4.)

26. Plaintiff David Koch resides in New York County. He has been a licensed horse carriage driver since 1982 and holds DCWP horse drawn carriage driver's license number 778494. He is 72. He has always worked, as a contractor, for a medallion owner. He now works, pursuant to an oral contract, for Plaintiff Christina Hansen, driving her carriage about two days a week, as he has for five years; he collects the fares for the hours he drives, pays her half and keeps his tips. (Koch Decl. ¶¶ 1–5; Hansen Decl. ¶ 9.)

27. Defendants are as follows:

a. Defendant City of New York (the "City") is a municipal corporation. It enacted the Local Law through the Council and the Mayor and enforces it through the agencies named below.

b. Defendant New York City Council (the "Council") is the City's legislative body, N.Y.C. Charter § 21. It passed Int. 943-A on October 22, 2026. The Council is named for declaratory and injunctive relief only.

c. Defendant Zohran Mamdani, Mayor of the City of New York, held the public hearing on the Local Law; his office served as lead agency for its environmental review; and the Mayor approved the Local Law under Charter § 37 on November 19, 2026, and designates the agency that must prepare the "Transition Plan". The Mayor's Office of Animal Welfare ("MOAW"), a unit of the Office of the Mayor, will receive notices under the Disposition Regime.

d. Defendant Samuel A.A. Levine is sued as Commissioner of the New York City Department of Consumer and Worker Protection ("DCWP"); DCWP licenses horse drawn carriages and drivers, issues plates, and approves and completes Medallion transfers. Admin. Code §§ 20-371 to 20-383.

e. Alister Martin is sued as Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH"); Defendant DOHMH licenses horses, Admin. Code §§ 17-326 to 17-334.1, administers the Disposition Regime, and acts through a commissioner who may designate an "inhumane purpose."

f. Mike Flynn is sued as Commissioner of the New York City Department of Transportation; Defendant New York City Department of Transportation ("DOT") administers the Central Park horse carriage "hack stands," Admin. Code § 19-174, and issues special-event permits under § 19-175.

g. Jessica Tisch is sued as Commissioner of the New York City Police Department ("NYPD"); Defendant NYPD enforces traffic and carriage rules and maintains a mounted unit whose horses remain in Midtown Manhattan traffic after the Sunset Date.

h. Vilda Vera Mayuga is sued as Commissioner and Chief Administrative Law Judge of the New York City Office of Administrative Trials and Hearings ("OATH"); OATH will adjudicate the civil penalties the Local Law imposes.

i. Yume Kitasei is sued as Commissioner of the New York City Department of Citywide Administrative Services ("DCAS"). Defendant DCAS publishes the *City Record* and maintains *City Record Online*, where notice of the Mayor's hearing on the Local Law was published.

28. The defendants other than the City and the Mayor are the "Agency Defendants." Unless the context requires otherwise, "the City" includes them.

## IV. CLASS ACTION ALLEGATIONS

29. The Plaintiffs other than the unions bring this action on behalf of four classes of Central Park Horse Carriage Industry participants, pursuant to Fed. R. Civ. P. 23(b)(1)(B), (b)(2) and (b)(3) as follows:

30. Medet Fidan brings his claims individually, and on behalf of the similarly situated Class of Central Park Horse Carriage Medallion Owners and Central Park Horse Carriage Owners (the Medallion and Carriage Owners Class);

31. Christina Hansen brings her claims individually and on behalf of all the similarly situated Central Park Horse Carriage Lessees (the Carriage Lessees Class), and Central Park Horse Owners (the Horse Owners Class); and

32. David Koch brings his claims individually and on behalf of all similarly situated Central Park Licensed Driver Horse Carriage Drivers (the Non-Owner Licensed Drivers Class).

33. Plaintiff Fidan and the members of the Medallion and Carriage Owners Class are referred to as the "Owner Plaintiffs," and Plaintiffs Fidan, Hansen and Koch, each of whom holds a DCWP driver's license, and the licensed drivers in the classes they represent, are referred to as the "Driver Plaintiffs."

34. Plaintiffs allege that:

a. the classes are so numerous that joinder of all members is impractical;

b. there are questions of law or fact common to the classes;

c. the claims or defenses of the representative parties are typical of the claims or defenses of the classes;

d. the representative parties will fairly and adequately protect the interests of the classes;

e. the party opposing the classes has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the classes as a whole.

## V. FACTS RELEVANT TO ALL CLAIMS

### A. The History of Horses in NYC and in Central Park.

35. Horses arrived in 1625, the year the City's seal and flag mark as its founding, when a livestock fleet chartered by the Dutch West India Company brought 103 head of livestock, including stallions and mares, to New Amsterdam, and for the next three centuries powered the city's transportation, construction, law enforcement, firefighting, street cleaning, ambulance, and delivery services. With related occupations and businesses—saddlers, blacksmiths, carriage manufacturers, harness makers, feed suppliers, stables, auction houses, etc.—the City was dense with horses.

36. The Dutch brought horses to New Amsterdam to carry heavy loads and operate gristmills and sawmills. English settlers imported horses for racing. Soon after their arrival, references to horses appear in official records, most often as the subject of assorted regulations and taxation. An entry from *The Minutes of the Common Council* for October 15, 1670, provides a typical citation: "Ordered that all and every person that should ship from this place any horses, mares or geldings to Virginia, Maryland or any other outward plantations should pay for every horse, mare or gelding one shilling in silver or two guilders in wampum...."[15]

[15] Kenneth R. Cobb, "Horsepower: The City and the Horse," For the Record, NYC Municipal Archives (Oct. 20, 2023), https://www.archives.nyc/blog/2023/10/20/horsepower-the-city-and-the-horse.

37. Subsequent records document regulations about where and how horses could be bought and sold, watered and fed. And many rules focused on horse racing—most often the prevention thereof. Horse-drawn vehicles for hire followed. As early as 1697, John Clapp, an innkeeper on the Bowery, kept a hackney coach for hire and claimed to be the first in New York to do so, and in 1813 the Common Council enacted "A law to regulate hackney coaches."

38. In 1832 the New York and Harlem Railroad began the nation's first horse-drawn street railway service, along the Bowery in Manhattan from Prince to 14th Street. Horse-drawn passenger vehicles continued to ply city streets until 1918. Beginning in the 1860s, fire companies adopted horses to pull fire-fighting apparatus. Similarly, the Street Cleaning Department, and the Department of Public Charities and Hospitals hitched horses to their equipment.

39. When Central Park was created, a number of plans related to features of Central Park specifically dedicated to horses in the Department of Parks drawing collection, point to their importance for leisure activities.

40. Central Park actually included a stable for carriages and horses for more than six decades. The historic stone-and-slate Central Park stable complex—designed by architect Jacob Wrey Mould and built between 1869 and 1871—was converted into a New York Police Department (NYPD) precinct house in 1936.[16] See Central Park, shelter for carriages and horses, preliminary study, front elevation. Jacob Wrey Mould, 1871. Department of Parks & Recreation

[16] "From horse stables to police station, the evolution of one of the oldest buildings in Central Park," *Ephemeral New York* (May 5, 2025), https://ephemeralnewyork.wordpress.com/2025/05/05/from-horse-stables-to-police-station-the-evolution-of-one-of-the-oldest-buildings-in-central-park/.

Drawings Collection, NYC Municipal Archives, below:




41. By the early twentieth century, the number of horses in NY City began to diminish. Technology, in the form of motor vehicles—cars and trucks, gradually reduced the city's reliance on horse powered vehicles. Between 1910 and 1920, the number of horses in the City declined from 128,000 to 56,000. (Cobb, *supra* ¶ 36.)

42. Although much reduced in number, the horse is not entirely absent from the City scene today. Until it closed on June 28, 2026, Aqueduct Racetrack in Queens, the only racetrack located within New York City limits, operated, generally from late October through April. Closure of the Claremont Riding Stables on Manhattan's Upper West Side in 2007 greatly reduced, but did not entirely eliminate, people enjoying horseback rides along Central Park's bridle paths. Today, Miller's Horse Company rents horses to riders who utilize Central Park's bridle paths, with horses transported in from an outer-borough or regional facility.

43. Central Park was designed for horse-drawn carriages: Olmsted and Vaux laid out its drives for them and carried the drives over and under the footpaths on arches and bridges. The park first opened to the public in December 1858, when the Lake opened for skating, and the first sections of its drives opened in 1859. Horse drawn carriages in Central Park go back as far as the 1860s. Over the decades, the city imposed various restrictions, including daily working hour caps, required pasture vacations, temperature limits (banning work above 90°F), and mandatory diapers.

The restrictions included the requirement of a Medallion, a piece of private property which entitles its holder to operate a horse drawn carriage. Additionally, carriages need license plates, horses need to be licensed, and drivers must have a license (much like a driver's license), which must be renewed every two years.

44. New Yorkers for Clean, Livable and Safe Streets ("NYCLASS"), whose co-founder and president is Steve Nislick, was formed in 2008 "with the core mission of saving New York City carriage horses and protecting animals." (Ex. 24, at 36.) For the next eighteen years NYCLASS and affiliated organizations spent heavily in City elections and on lobbying to abolish the carriage horse trade. (Part V.N.) Then-Mayor Michael Bloomberg and then-City Council Speaker Christine Quinn consistently rejected total ban legislation. NYCLASS spent heavily in the 2013 Mayoral race, with a particular focus against Christine Quinn. NYCLASS spearheaded the **"Anybody But Quinn" Campaign:** NYCLASS partnered with a coalition called *New York City Is Not for Sale* to run intense television, radio, and mailer ad campaigns. NYCLASS donated $220,000 directly to the anti-Quinn super PAC *New York City Is Not For Sale*, paid the PAC's political consultant $137,000, and spent another $124,000 on direct anti-Quinn efforts.[17]

45. Bill de Blasio, who beat Quinn, campaigned for Mayor in 2013 on a promise to ban the industry as his first order of business,[18] but he repeatedly failed to secure City Council votes. At his request, Intro. 573 was introduced in December 2014 to abolish the horse carriage trade. In February 2015 his staff reported that City Hall and NYCLASS were focused together on six "persuadable" members of the Committee on Transportation, three of whom they needed for a

---

[17] Chris Bragg, "De Blasio Headlines Fundraiser for Anti-Quinn Group," Crain's N.Y. Bus. (Nov. 18, 2013), https://www.crainsnewyork.com/article/20131119/BLOGS04/131119880/de-blasio-headlines-fundraiser-for-anti-quinn-group/.

[18] "A brief history of New York City's never-ending horse carriage controversy," *City & State* (July 2026), https://www.cityandstateny.com/policy/2026/07/brief-history-new-york-citys-neverending-horse-carriage-controversy/414767/.

committee majority. (¶ 144.) In January 2016 his administration and the then-Speaker of the City Council instead agreed in concept to confine a smaller trade to Central Park, with a stable in the Park; in February 2016 the vote was canceled, and the bill expired at the end of 2017.[19][20] Toward the end of his 8-year term, de Blasio pushed unsuccessfully to replace the horses with vintage-style electric vehicles.

46. In August 2025, the Central Park Conservancy dropped its neutrality and called for a ban.[21] Earlier, City Council Member Bob Holden had twice introduced "Ryder's Law" (named after a carriage horse that collapsed and was euthanized): Int. 573-2022, which would have replaced the horses with electric carriages and was never heard, and Int. 967-2024, which would have barred new licenses and banned operation from June 1, 2026.[22] On November 14, 2025, the Committee on Health voted Int. 967 down. (Part V.L.)

---

[19] *See* legislative files for Int. 573-2014 (Dromm), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=2080746&GUID=0D50DEF7-90D7-4B73-9BF3-25BB8520CEEC (introduced Dec. 8, 2014; heard and amended by the Committee on Transportation Jan. 22, 2016; filed at the end of the session Dec. 31, 2017), including Proposed Int. No. 573-A (Jan. 22, 2016), https://legistar.council.nyc.gov/View.ashx?M=F&ID=4226298&GUID=8B0244DC-59B7-4EA1-9532-29A0CD8690DA, which would have confined carriage horses to Central Park and provided for a stable "certified as operational" there; the Committee on Transportation's report for the Jan. 22, 2016 hearing, https://legistar.council.nyc.gov/View.ashx?M=F&ID=4216703&GUID=61D5B786-ED09-474D-809A-6175F6DA65C1, which describes the reduction of the license cap "[o]nce the Central Park stable is operational"; and Proposed Int. No. 573-B (Jan. 29, 2016), https://legistar.council.nyc.gov/View.ashx?M=F&ID=4226244&GUID=593BF911-4CBA-4F29-8E17-C817BC283FE0.

[20] The Mayor, the Speaker and the Teamsters announced the agreement in a joint statement on January 17, 2016, which described "an agreement in concept on the future of New York's horse carriage industry." "Deal reached to keep some horse-drawn carriages," *FOX 5 New York* (Jan. 18, 2016), https://www.fox5ny.com/news/deal-reached-to-keep-some-horse-drawn-carriages. *See also* "NYC Officials Reach Agreement To Keep Carriage Horses In Central Park," *CBS New York* (Jan. 17, 2016), https://www.cbsnews.com/newyork/news/nyc-carriage-horse-agreement/; "City Officials Strike Deal on Carriage Horses in Central Park," *WNYC* (Jan. 2016), https://www.wnyc.org/story/city-officials-strike-deal-carriage-horses-central-park; "De Blasio praises carriage horse deal, but still wants ban," *amNewYork* (Jan. 18, 2016), https://www.amny.com/news/de-blasio-praises-carriage-horse-deal-but-still-wants-ban-1-11337815/.

[21] "For the First Time, Central Park Conservancy Calls for End of Horse-Drawn Carriages in the Park," West Side Rag (Aug. 12, 2025), https://www.westsiderag.com/2025/08/12/for-the-first-time-central-park-conservancy-calls-for-end-of-horse-drawn-carriages-in-the-park.

[22] Legislative file for Int. 573-2022, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5725261&GUID=08B70306-1523-4CCB-A8AB-1C506CB58635 (introduced July 14, 2022; referred to committee; never heard; filed Dec. 31, 2023), with bill text at

47. In June 2026, after the tragic death of 18-year-old tourist Romanch Mahajan, who jumped from a carriage whose horse, his family says, had been shocked by stray voltage (Part V.F), the push to ban the horse carriage trade, which resulted in the Local Law terminating the industry, picked up support, especially from City Council Speaker Julie Menin, who announced her support for a ban on July 14, 2026. It passed the City Council on October 22, 2026. (Parts V.G, V.M.)

### B. The Current Trade and the People Who Work in It

48. Licensed horse-drawn carriages carry passengers on rides that begin at "hack stands" either at the edge of Central Park, or within the Park's boundaries. DCWP licenses each carriage, issues its numbered plate and licenses each driver; DOHMH licenses each horse. Admin. Code §§ 17-326 to 17-332, 20-371 to 20-382.

49. The number of Medallions is fixed by law. The Administrative Code ("Admin. Code") declared, before the Local Law, that the present number "should be preserved, unless the commissioner finds that additional licenses are necessary and advisable," and permitted new licenses only after a public hearing noticed in the City Record, allocated pro rata to existing licensees. Admin. Code §§ 20-371, 20-374(c). The Local Law deletes that language effective June 1, 2028 (§§ 12, 15, 27(a)), and § 25 forbids any new license now. The 68 Medallions are held by 63 holders. (EAS, Ex. 13, at B-5 n.3, B-10; Hearing Tr., Ex. 10, at 66.)[23]

---

https://legistar.council.nyc.gov/View.ashx?M=F&ID=11055754&GUID=3859150D-BE32-4BA5-83B1-476CC6DEC5E5; legislative file for Int. 967-2024, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6730709&GUID=B8A7A0AC-DD58-4517-8DBA-08A36AEFD5ED (introduced June 20, 2024; defeated by the Committee on Health Nov. 14, 2025), with bill text at https://legistar.council.nyc.gov/View.ashx?M=F&ID=13041945&GUID=2790213C-3CA7-410E-967D-E38ED70A895B.

[23] Environmental Assessment Statement and Negative Declaration, CEQR No. 27OOM001Y (Ex. 13), https://legistar.council.nyc.gov/View.ashx?M=F&ID=16085091&GUID=BA5DEF2A-E1D9-4C2A-A829-899F9F1064C0.

50. DCWP licenses approximately 208 drivers (Hearing Tr. 48); the City's Environmental Assessment Statement ("EAS") counts 211, of whom 199 do not also hold a Medallion (Ex. 13, at B-10 to B-11). DOHMH reported "just under 160" licensed horses at the end of June 2026 (Hearing Tr. 50); the EAS counts 132 horses owned by 65 owners (Ex. 13, at B-10).

51. The administrative record is thus uncertain and contradictory on the most basic question the environmental review had to answer: how many people and horses the Local Law displaces. The City's own sources count 52 or 63 owners (Ex. 8; Ex. 13, at B-10)[24], 208 or 211 drivers (Hearing Tr. 48; Ex. 13, at B-10 to B-11), and 132 or "just under 160" horses (Ex. 13, at B-10; Hearing Tr. 50), and nothing in the record explains or reconciles the differences. SEQRA defines the "environment" to include "existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character," N.Y. Envtl. Conserv. Law § 8-0105(6), and the potential displacement of residents and businesses is an effect the lead agency must consider, *Chinese Staff & Workers Ass'n v. City of New York*, 68 N.Y.2d 359, 366 (1986). The lead agency must "thoroughly analyze the identified relevant areas of environmental concern" and set forth its determination "in a written form containing a reasoned elaboration and providing reference to any supporting documentation." 6 NYCRR 617.7(b)(3)–(4). A determination resting on figures the record itself contradicts has no reasoned elaboration, and an agency that acts on those figures without reconciling them acts "without regard to the facts." *Pell v. Bd. of Educ.,* 34 N.Y.2d 222, 231 (1974). An uncertain and contradictory record on the size of the affected population is a hallmark of the failure to take the hard look that State and City environmental review laws require. (See infra Part V.J.)

---

[24] Committee Report 7/15/26 (Ex. 8), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15691102&GUID=EADC59FE-1BC4-466A-B577-B964EE317032.

52. The horses live in three stables on Manhattan's West Side: Clinton Park Stables, at 612–618 West 52nd Street, built in the 1880s as a stable for the City's Department of Street Cleaning and converted to a warehouse and garage in the 1920s, which, upon information and belief, now houses about two-thirds of the horses and has been owned since 2003 by Park View Realty Associates LLC, a company of carriage operators (Ex. 23, at 1–10)[25]; West Side Livery, at 538 West 38th Street; and Central Park Carriages, at 547 West 37th Street (Byrne Decl. ¶ 1). According to the EAS, the stables employ 24 to 36 workers.

53. Carriage horses spend little of their working day in street traffic. The City closed Central Park's drives to private vehicles on June 27, 2018,[26] and the carriages continued to use them. At DOHMH's request, DOT then moved all passenger boarding off Central Park South and Grand Army Plaza to designated areas inside the park, to reduce the time horses spend alongside vehicular traffic, a rule the Appellate Division sustained. 34 RCNY § 4-12(t); *Matter of Malone v. City of New York*, 192 A.D.3d 510, 510–11 (1st Dep't 2021). On weekdays from 10:00 a.m. to 9:00 p.m., carriages may operate in Manhattan only in or immediately adjacent to Central Park, and they may never operate below 34th Street, on a bridge or in a tunnel. Admin. Code § 20-381.1. A carriage horse's time on City streets is therefore ordinarily one trip each day from its stable to the park and one trip back, or sooner when weather sends it home: just over a mile from Clinton

---

[25] The deed (CRFN 2003000392192), Company Lease Agreement (CRFN 2003000392194) and Lease Agreement (CRFN 2003000392195) are recorded in the City Register's Automated City Register Information System, https://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=2003082801537004, https://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=2003082801537006 and https://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=2003082801537007. The certificates of occupancy (Nos. 103458740 and 103458740-T) are kept in the Department of Buildings' Building Information System, https://a810-bisweb.nyc.gov/bisweb/.

[26] N.Y.C. Department of Transportation, Notice of Adoption, Horse Drawn Cab Passenger Boarding Areas (amending 34 RCNY §§ 4-01, 4-09, 4-11 and adding § 4-12(t)), *The City Record* (Jan. 4, 2019), https://a856-cityrecord.nyc.gov/RequestDetail/20190103106. The notice states that the rule was adopted at the request of the Department of Health and Mental Hygiene to reduce the time horses spend alongside vehicular traffic, and that the Central Park drives were permanently closed to unauthorized traffic as of June 27, 2018.

Park Stables on West 52nd Street, and about a mile and three-quarters from West Side Livery on West 38th Street and from Central Park Carriages on West 37th Street. (Hansen Decl. ¶ 8.) The rest of its day is spent on drives closed to cars and at boarding areas inside the park.

54. Most, if not all, carriage owners have a number of horses which they rotate throughout the week. Plaintiff Fidan owns two horses and one carriage. Plaintiff Hansen keeps three horses for one carriage, two in the City and one always on furlough on a farm, so that each spends about four months of every year on pasture, more than three times the five weeks the law requires; when she drives more than nine hours in a day, she changes horses. (Hansen Decl. ¶¶ 5–6, 8.) By the City's own figures, there are between 132 and "just under 160" licensed horses for only 68 Medallions, more than two horses for every Medallion. (Ex. 13, at B-10; Hearing Tr. 50.) That rotation answers the charge, made to the Committee and repeated from the Council's own podium, that the horses are "forced to pull carriages" by people who "wring every last cent out of their bodies." (¶¶ 189, 190(a).) No horse works the nine-hour maximum (¶ 76(a)) seven days a week year-round, and the equine surgeon who examines many of them told the Council so directly: "They are not overworked." (Hearing Tr. 147; ¶ 200.)

55. The EAS counts 297 to 309 owners, drivers, horse owners and stable workers as "potentially affected participants." (Ex. 13, Table B-7.)

56. Fares are set at $72.22 for the first twenty minutes and $28.89 for each additional ten minutes. (Ex. 13, at B-12.) The EAS estimates carriage revenue at $9.3 million to $39.7 million a year, and stable boarding revenue at a further $1.3 million to $3.0 million. (*Id.* Tables B-4, B-5.) Drivers earn roughly $65,000 to $70,000 a year, seasonally, some as W-2 employees and most as 1099 contractors. (Hearing Tr. 154, 163.) Drivers work under several arrangements. Some, like Plaintiff Fidan, own the Medallion and carriage they drive and work alone. Others lease a

Medallion and carriage from its owner for a fixed rent: Plaintiff Hansen pays Epona Carriages, LLC $3,200 a month, or $38,400 a year, under an oral lease, and in turn engages a licensed relief driver, Plaintiff Koch, who drives her carriage for half of the fares he collects. Some owners employ drivers directly for a negotiated portion of the fares. (Hansen Decl. ¶¶ 3, 9; Koch Decl. ¶ 4.)

**C.** The Medallion: Property the City Created, Prices and Approves

57. It is "unlawful to operate or permit another to operate for hire a . . . horse-drawn cab within the city unless the owner shall have first obtained a license therefor." Admin. Code § 20-373(a). DCWP issues the license "together with a license plate," affixed to the carriage and bearing the license number. *Id.* § 20-375.

58. Medallions are transferable. A Medallion "may be transferred with the approval of the commissioner": the seller surrenders the license, the buyer applies, and "[a] new license shall then be issued by the commissioner in place of the license so surrendered." Admin. Code § 20-374(b). DCWP's witness confirmed that licenses change hands by private agreement with notice to DCWP. (Hearing Tr. 66–68.) Because the number is capped, a new owner ordinarily must buy an existing Medallion.

59. Medallions may be suspended or revoked only "upon due notice and hearing," for violations of law, Admin. Code § 20-104(e)(1), and, before the Local Law, could be denied renewal only for non-operation or repeated violations, *id.* § 20-373(c)–(d) (deleted by Local Law § 14).

60. Medallions trade in a market the City supervises and records. DCWP keeps transfer files, including bills of sale, and its witness testified that, based on them, a Medallion is worth, "on average . . . over the many years, . . . maybe $70,000 approximately," a figure he said "could

fluctuate." (Hearing Tr. 67.) At that figure, the 68 Medallions were worth about $4.8 million in license value alone, before counting the businesses, horses, carriages and equipment. Before the Local Law, Medallions sold for $300,000 to $400,000 each. In transfers DCWP approved, buyers paid $350,000 in 2016 and $300,000 in 2017, and Medallion owners know personally of other sales at $300,000 to $400,000, and as high as $500,000 to $600,000. (¶¶ 63–65.) At those prices the 68 Medallions were worth $20.4 million to $27.2 million in license value alone, four to nearly six times the City's figure, before counting the businesses, horses, carriages and equipment.

61. Before the Local Law, the City charged $50 for an original or renewal license, Admin. Code § 20-373(b), which ran for two years, *id.* § 20-108(b). The gap between that fee and the price of a Medallion, $70,000 by DCWP's figure and $300,000 to $400,000 in actual sales, is value created by the scarcity the City itself imposes and protects.

62. DCWP's figure understates the market. Committee Chair Schulman opened the hearing by acknowledging that "the significant investments [the drivers and workers] have made in their carriage licenses" (Hearing Tr. 20); Medallion owner Conor McHugh told the Committee that "[t]here are 68 horse-drawn cab medallions in New York City, and collectively we have invested millions of dollars over the years in our business" (id. at 140–41); and TWU International President John Samuelsen told the Council, in a statement also read into the record at the hearing (id. at 213–15), that Medallion owners "paid in some cases several hundred thousand dollars for right to work in this industry" (Written Test. Pt. 1, at 53).

63. On May 30, 2017, Medallion owner Fatih Bagirgan and his partner Yalcin Ozcelik paid $300,000 for a Medallion, together with the carriage for which it was issued, two horses, and harness and equipment. They bought it under a notarized bill of sale, which they submitted to DCWP with their transfer application, and DCWP approved the transfer. (Bagirgan Decl. ¶¶ 5–8,

13–14 & Ex. A.) The carriage, horses and harness were of de minimis value in that transaction — together, worth no more than about $6,000 — and the price was paid for the Medallion. (Id. ¶¶ 9–12.)

64. On April 11, 2016, Skyline Carriages, LLC sold the Medallion its bill of sale identifies as "New York City Medallion #1026" to NYC Carriage, LLC, whose sole member was Medallion owner Alberto Virzi, for $350,000, together with the carriage operating under it, two sets of harness and miscellaneous supplies. The sale included no horses. Mr. Virzi financed the purchase with a mortgage on his home. The buyer submitted the bill of sale to DCWP with its transfer application, and DCWP approved the transfer and issued the Medallion to the buyer as Medallion number 1142. DCWP issues a new Medallion number to each new owner on a transfer. The carriage, harness and supplies, worth no more than about $12,000 in total, were of de minimis value; the price was paid for the Medallion. (Virzi Decl. ¶¶ 3, 6–13 & Ex. A; see Admin. Code § 20-374(b).)

65. Medallion sales are rarely simple license transfers. A sale may carry with it horses, a carriage, harness and equipment, the seller's stall and boarding arrangements at a stable, existing business relationships with drivers, relief drivers and stables, and the settlement of debts between buyer and seller. (Bagirgan Decl. ¶ 20.) The trade's interests are intertwined: Medallion owners own the stables (Hearing Tr. 184), and drivers negotiate with owners how fares are split (id. at 164–65). The value in each sale lies in the Medallion, because no carriage may operate for hire without one and the City issues no new ones (Bagirgan Decl. ¶ 9), but the price stated in a bill of sale submitted to DCWP may not reflect the full consideration paid for the Medallion or how the parties allocated it. DCWP's witness acknowledged as much: the figure "could fluctuate," because "there could be different negotiating terms in each contract." (Hearing Tr. 67.) An average of bills

of sale is therefore not a reliable measure of what a Medallion was worth. Mr. Bagirgan knows personally of other Medallion sales before the Local Law at prices of $300,000 to $400,000, and Mr. Virzi of sales at prices as high as $500,000 or even $600,000. (Bagirgan Decl. ¶ 19; Virzi Decl. ¶ 16.) The transfer files on which DCWP's witness based his estimate are in DCWP's possession. They are not part of the Legislative Record, and the EAS calls value information "limited" and relies on a single 2014 news article. (Ex. 13, at B-19.) Plaintiffs seek those files **by expedited discovery.** These figures are a baseline. The relationships in the trade — among Medallion owners, lessees, relief drivers, horse owners and stables — are complex, and fair compensation for the interests each holds is correspondingly complex. An independent valuation should have been done before the Council acted. None was.

66. DCWP's own files do not bear out its witness's figure. The Bagirgan bill of sale records a price of $300,000. DCWP received it and acted on it when it approved that transfer in 2017, and, upon information and belief, it remains in DCWP's transfer file, where it had been for more than nine years when DCWP's witness testified. That price is more than four times (about 4.3 times) the $70,000 figure DCWP's witness gave the Council — $230,000 more on a single Medallion. The Virzi bill of sale records a price of $350,000: five times DCWP's figure, and $280,000 more on a single Medallion. DCWP received that bill of sale, too, with the transfer application, and approved the transfer. Every DCWP-approved transfer price Plaintiffs have been able to document exceeds DCWP's figure. DCWP's witness named the bills of sale in DCWP's files as the basis for the figure; none of those bills of sale is in the Legislative Record; and, upon information and belief, DCWP has not corrected the figure. (Bagirgan Decl. ¶¶ 13–18 & Ex. A; Virzi Decl. ¶¶ 6–13, 15 & Ex. A; Hearing Tr. 67.)

67. Upon information and belief, one of two things is true, and either is a defect in the enactment that warrants this Court's intervention. Either (a) DCWP gave the Council its valuation without examining the files on which its witness said it rested, and no City agency studied what the Medallions were worth — although the lead agency was required to take a hard look at the Local Law's effects on a specific industry that the City's own Short Form said the action would affect (¶¶ 125, 127; Part V.J), and although § 23 of the Local Law directs consideration of whether to compensate owners for "the value of their horse drawn cab businesses, horse drawn cab licenses, and equipment" and lists "[t]he relevant fair market value" as a factor; or (b) DCWP knew that its files recorded approved sales at several times its figure and gave the Council that figure anyway without disclosing those sales, although they were material to the harm the Council was weighing. Either way, the only valuation before the Council put the 68 Medallions at about $4.8 million (¶ 60); DCWP-approved sales in DCWP's own files place a Medallion at four to five times the figure on which that total rests; and the EAS valued nothing (Ex. 13, at B-19). The facts that show which is true are in DCWP's licensing files, not in legislative deliberations, and Plaintiffs ask the Court to order them produced. (Prayer ¶ 5(a).)

68. The City treats Medallions as property in every other setting: it approves their sale, records the price, and charges a sales tax. Medallions pass through estates. **Under the Law being challenged, the City does not regard Medallions as property for which compensation is owed.**

69. A Medallion has a single authorized use: operating a licensed horse drawn carriage for hire.

**D. Plaintiffs' Investments and Contracts**

70. The Owner Plaintiffs acquired their Medallions in arm's-length transactions at market prices, in transfers DCWP approved. In reliance on the City's licensing scheme, they

bought horses, carriages, harness and equipment, and they pay for boarding, veterinary care, farriers and insurance. They have not recouped their investment. Plaintiff Fidan, for example, bought his Medallion in 2021, paid about $18,000 for three horses (one of which he has since sold to a farm upstate) and $5,500 for a carriage, and in 2025, while the City continued to license his carriage, bought a new carriage for $15,000.

71. Plaintiffs are parties to existing contracts that depend on the lawful operation and transfer of Medallions and horses, including:

j. *Boarding agreements* between stables and horse owners. For example, Plaintiff Fidan boards his horses at Clinton Park Stables, and Plaintiff Hansen boards hers at West Side Livery, 538 West 38th Street. Plaintiff Hansen pays West Side Livery $3,300 a month for two stalls, a Pennsylvania farm $240 a month for the horse on furlough, and a farm in Wallkill, New York, $800 a month to board two retired carriage horses. (Hansen Decl. ¶¶ 5–6, 10.)

k. *Medallion and carriage leases and driving arrangements.* For example, Plaintiff Hansen leases a Medallion and carriage from Epona Carriages, LLC, under an oral agreement, at $3,200 a month, and engages a licensed relief driver, Plaintiff Koch, who drives her carriage for half the fares he collects. Owners also employ drivers. Each arrangement exists only to operate a carriage under a Medallion. Hansen has leased the Medallion and carriage since about 2019 under an oral agreement renewed from year to year, and Koch has driven for her for about five years. (Hansen Decl. ¶¶ 3, 9; Koch Decl. ¶ 4.)

l. *Any future agreements to buy or sell Medallions* that cannot close because of the Freeze.

m. Multi-year insurance, farrier, veterinary, feed and vendor contracts.

72. The written record confirms these arrangements. Local 100 told the Council that "[m]any in the horse-carriage industry still carry significant debt associated with purchasing these businesses," and that ending the trade "will not eliminate their mortgages, business loans, or financial obligations." (Written Test. Pt. 1, at 49.) One owner, a driver for more than twenty years, told the Council that he paid for his carriage and horses "in installments for 7 years." (Written Test. Pt. 2, at 591.) The Mayor has acknowledged the same. (¶ 201.)

73. The Driver Plaintiffs spent years learning and practicing a licensed trade, obtained and renewed City driver licenses, and built their households' finances around it. Plaintiff Hansen has driven carriages professionally for about twenty years and has been licensed in the City since 2012 and is also a licensed sightseeing guide; Plaintiff Koch has been driving since 1982; and Plaintiff Fidan has driven a carriage since 2021, after more than two decades behind the wheel of a yellow cab. (Hansen Decl. ¶ 2; Koch Decl. ¶ 2.)

74. No law had ever prohibited the trade. At least six bills to prohibit, phase out or confine it were introduced between 2007 and 2024 — among them Int. 658-2007 and Int. 573-2022 ("Ryder's Law") — and none was enacted. (Part V.L.)[27] On September 17, 2025, then-Mayor

[27] The legislative files are on the Council's legislative website. Each lists the bill's history and links to its text and, where the bill was heard, its committee report and transcript. The bill descriptions quoted in this Complaint are the titles the Council gives the bills there. Int. 44-2006, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=450252&GUID=111D921D-F9AB-4F6C-9EA1-F6263DD6DCF9 (introduced Feb. 15, 2006; filed Dec. 31, 2009, without a hearing); Int. 658-2007, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=451564&GUID=E501379B-7205-4BE5-8024-2AAC2849F83D (introduced Dec. 11, 2007; heard by the Committee on Consumer Affairs Jan. 30, 2009; filed Dec. 31, 2009); Int. 86-2010, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=652689&GUID=1F3959F3-5F33-48E8-89B3-2E925666348D (introduced Mar. 3, 2010; heard Mar. 12, 2010; filed Dec. 31, 2013); Int. 92-2010, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=652679&GUID=6C0CDB63-456D-4224-B4A9-03CDF090BEB5, and Int. 93-2010, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=652538&GUID=A567D531-5B6F-4F43-932B-3A313156B8FC (same history); Int. 670-2011, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=972168&GUID=36CA6671-3F3D-4AEC-A917-

Adams issued Executive Order 56 and a Message of Necessity for Int. 967-2024; on November 14, 2025, the Council's Committee on Health voted Int. 967 down, one vote in favor, four against and two abstentions. Through the date of enactment, the City kept approving Medallion transfers, renewing Medallions and driver licenses, licensing horses and collecting fees. In 2010 the Council chose regulation over prohibition: Local Law 10 of 2010, sponsored by Council Member Gennaro, required a five-week annual furlough for every carriage horse, barred carriages below 34th Street and between 3:00 and 7:00 a.m., raised the fare from $34 for the first half-hour to $50 for the first twenty minutes and $20 for each additional ten, and indexed the fare to the Consumer Price Index every three years — the mechanism that produced today's fare of $72.22. In 2019 the Council again chose regulation, enacting Local Law 203 of 2019, which bars working carriage horses in specified heat conditions.[28] And in 2003, the New York City Industrial Development Agency ("NYCIDA") financed the purchase and renovation of Clinton Park Stables on the finding that public assistance was necessary to keep that business in the City, under a lease that requires the building to remain a carriage-horse stable through June 30, 2029. (Ex. 23, at 13, 33, 35–36, 51.)

### E. The City's Animal-Welfare Regime and the Compliance Record

3F0AB702DB16 (introduced Sept. 8, 2011; never heard; filed Dec. 31, 2013); Int. 573-2014 (n. 16); and Int. 573-2022 and Int. 967-2024 (n. 19).

[28] Local Law 10 of 2010 (Int. 35-A-2010, Gennaro), https://legistar.council.nyc.gov/View.ashx?M=F&ID=994972&GUID=B82D5CD8-0E2B-4F69-8AE9-98881158A2B3 (signed Apr. 27, 2010; legislative file at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=649931&GUID=A94F649F-F5BA-4F19-AE0A-69866F5E697C); Local Law 203 of 2019 (Int. 1425-A-2019, Powers), https://legistar.council.nyc.gov/View.ashx?M=F&ID=7989451&GUID=540C326D-1020-408D-BC58-24E141356908 (signed Nov. 25, 2019; legislative file at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3860318&GUID=13DA12A3-FDAA-4ED4-B102-9C6E3C19A350).

***1. The protections the City requires for every carriage horse.***

75. The City licenses every carriage horse and requires that each horse be cared for under standards set by the Administrative Code, the Health Code and DOHMH's rules. No horse may be used in the trade unless DOHMH has licensed it, and DOHMH will not issue or renew a license unless those standards are met. (Admin. Code § 17-327(a); 24 RCNY § 4-02(a)(5).) The veterinary and health requirements include:

n. *Veterinary examination every four to eight months.* Each horse must be examined by a licensed veterinarian before it is first used, before each license renewal, "and thereafter at intervals of not less than four months and not greater than eight months." (Admin. Code § 17-330(n).)

o. *A complete examination, including the teeth and hooves.* Each examination must cover "the general physical condition of the horse, its teeth, hoofs and shoes, its stamina and physical ability to perform the work," and must record any injury, disease or deficiency, together with its treatment. (*Id.*)

p. *Five vaccinations.* Each examination must confirm that the horse is current on vaccinations "for rabies, Eastern/Western equine encephalitis, West Nile virus, Rhinopneumonitis virus, and tetanus," and on any others DOHMH requires. (*Id.*)

q. *Health certificate, posted on the stall.* The veterinarian's signed health certificate must be displayed on the outside of the horse's stall, and the original must be sent to DOHMH. (*Id.*) Without a timely certificate, the horse may not be licensed or work.

r. *Hoof care every three to six weeks.* Each horse must be "suitably trimmed or shod," and DOHMH's rules require that its hooves be trimmed or shod at least

every three to six weeks, or sooner if necessary. (Admin. Code § 17-330(i); 24 RCNY § 4-04(e).)

s. *Parasite control.* Each horse must be examined and treated for internal parasites and kept on an external-parasite control program. (24 RCNY § 4-04(c), (e).)

t. *Removal from work when unfit.* DOHMH or its designee may order any lame or ill horse off work until it recovers. A horse found working within 48 hours of such an order, while disabled by the same condition, is presumed to have been returned to work unlawfully. (Admin. Code § 17-330(m).)

u. *Age limits.* No horse may enter service younger than five, and no horse older than 26 may be licensed. (*Id.* § 17-330(q).)

v. *Death reporting.* A death at work or under suspicious circumstances must be reported to DOHMH within 12 hours, and DOHMH may order a necropsy. (24 RCNY § 4-02(c).)

76. The Code limits how, when and in what conditions a carriage horse may work:

w. *A nine-hour limit on time away from the stable, including the commute and rest.* A carriage horse may not be "at work for more than nine hours in any continuous twenty-four hour period." That is not nine hours of pulling a carriage. A horse is "at work" from the time it leaves its stable in harness, so the limit includes the trip between the stable and the park and back, and the time the horse stands at an in-park boarding area waiting for a fare. It also includes mandatory rest of at least fifteen minutes, with fresh water, after each two hours, about an hour over a full nine-hour day. (Admin. Code §§ 17-326, 17-330(g)(1).)

x. *Food and water while working.* Owners must ensure that each horse is permitted to eat and drink at reasonable intervals while working. (*Id.* § 17-330(e).)

y. *No work in extreme heat.* No carriage horse may be worked when the air temperature is 90°F or above, or 80°F or above when the equine heat index is 150 or above. A horse working when a limit is reached must be rested, walked directly to its stable, unharnessed, and kept there until conditions improve. (*Id.* § 17-330(o)(2), (4).)

z. *No work in extreme cold.* No carriage horse may be worked when the air temperature is 18°F or below. (*Id.* § 17-330(o)(1).)

aa. *No work in adverse weather.* No horse may be worked on a public street "during adverse weather or other dangerous conditions," and a horse working when such conditions develop must be returned to the stable by the most direct route. (*Id.* § 17-330(f).)

bb. *Blankets.* From November through April every carriage must carry a heavy winter blanket, used in cold weather, and a waterproof blanket must be used in wet weather at 55°F or below. (*Id.* § 17-330(r).)

cc. *A five-week annual furlough on pasture.* Each carriage horse must receive "no less than five weeks of vacation or furlough every twelve months at a horse stable facility which allows daily access to paddock or pasture turnout," with proof provided to the City on request. (*Id.* § 17-330(g)(2).)

dd. *Pace and equipment.* A carriage horse may not be driven faster than a trot. Its harness and equipment must be properly fitted and maintained. Its manure catcher

must be attached to the carriage and "at no time" to the horse. (*Id.* § 17-330(h), (i), (p).)

ee. *Limits on time in traffic.* Horse drawn cabs may not operate on any street between 3:00 a.m. and 7:00 a.m. On weekdays in Manhattan they may operate between 10:00 a.m. and 9:00 p.m. only in or immediately adjacent to Central Park, and never below 34th Street or on any bridge or in any tunnel. (*Id.* § 20-381.1.) Since 2019, passengers board only at designated areas inside Central Park, which the City located at DOHMH's request to reduce the horses' time alongside traffic. (34 RCNY § 4-12(t); Notice of Adoption, City Record, Jan. 4, 2019.)

77. The City also regulates where and how carriage horses live:

ff. *Stall size.* Stalls must be "sixty square feet or larger, with a minimum width of seven feet," and configured to permit the horse "to turn around and safely lay down within the stall." Horses must be untied when stabled. (Admin. Code § 17-330(c).)

gg. *Clean, dry quarters.* Stables and stalls must be kept clean and dry. Bedding must be changed at least daily and be at least three inches deep. Stables must be heated to at least 35°F in winter and ventilated without exposing horses to drafts. (*Id.* § 17-330(d); 24 RCNY § 4-03(b), (f).)

hh. *Feeding.* Horses must be fed at least twice daily, and watering troughs must be cleaned daily. (24 RCNY § 4-04(b).)

ii. *Sanitation.* Stables must meet the Health Code's construction, cleaning and manure-removal standards. (Health Code § 161.21(a)–(h).)

jj. *Inspection and records.* Stables must be open for inspection by DOHMH, its designees, the police and DCWP. Owners must keep a daily record of each horse's movements and written emergency protocols at the stable. (Admin. Code § 17-330(j), (l).)

78. The City regulates the people who handle carriage horses:

kk. *Training and examination.* Every driver must complete a DOHMH training program and pass a written examination covering, among other subjects, "proper horse care and grooming" and "proper fitting of the bit, bridle and harness to the horse." DCWP may not issue or renew a driver's license without DOHMH's certificate. (Admin. Code §§ 17-334.1, 20-381(d).)

ll. *Probation.* A new driver holds a six-month probationary license, which may be revoked for any violation of the rules governing rental horses and horse drawn cabs. Until the driver logs 80 hours, the driver may operate only at staging areas next to Central Park and on roads wholly within a park. (*Id.* § 20-381(f).)

mm. *A duty of humane treatment.* "All carriage horses shall be treated in a humane manner." The owner is responsible for the horse's care, and the driver is responsible for its care while it is under the driver's control. (6 RCNY § 2-212(h), (p)(7).)

nn. *Daily equipment inspection.* The licensee must inspect the cab and harness daily. DCWP must inspect every licensed cab at least once every four months. (6 RCNY § 2-212(d), (f); Admin. Code § 20-378.)

oo. *Owner liability and sanctions.* An owner is jointly liable for violations the owner knew or should have known of. Violations are punishable by fines, by suspension

or revocation of the license, and by suspension of the horse from work. (Admin. Code §§ 17-330(k), 17-332.)

pp. *Humane disposition.* A licensed horse may be disposed of only "in a humane manner," and New York law bars the sale, transfer or transport of any horse for slaughter. (*Id.* § 17-329; N.Y. Agric. & Mkts. Law § 385.)

79. The Council itself wrote most of these protections. In 2010 it set the stall-size minimum, the five-week furlough, the four-to-eight-month veterinary schedule and five-vaccination requirement, the age limits and the blanket requirements (Local Law 10 of 2010). In 2019 it added the equine heat-index limit (Local Law 203 of 2019). (n. 25.) The Council has never found that these standards were inadequate, and the Local Law does not purport to make that finding.

***2. No other horse in New York has these protections, and the Local Law takes them away.***

80. No other horse in New York has the protections the Code gives carriage horses:

qq. *Riding horses* rented to the public in the City are licensed and examined on the same schedule. But they may work up to eight hours and are subject to no heat or cold limit, no furlough, no age limit and no blanket requirement. (Admin. Code § 17-330(g), (h).)

rr. *Privately kept horses in the City* need no license, no veterinary examination and no vaccination other than an annual rabies shot. They are subject to no limit on working hours, no heat or cold limit, no stall-size minimum and no furlough. (Health Code § 161.21(i).) A stable that houses them needs no DOHMH permit if a person or family owns it solely to house its own horses for its exclusive recreational, noncommercial use. (Id. § 161.09(d).)

ss. *NYPD mounted-unit horses*, which patrol Midtown traffic, are outside the rental-horse subchapter. No Code provision sets their hours, temperature limits or furloughs. (*See* Admin. Code § 17-326 (defining "rental horse").)

tt. *Every horse outside the City* — on farms, in sanctuaries, in private barns, or working in harness or in the fields — is protected only by the general provisions of the Agriculture and Markets Law. Those provisions prohibit overdriving, overloading, cruelty, deprivation of "necessary sustenance, food or drink," abandonment, and slaughter. (N.Y. Agric. & Mkts. Law §§ 353, 355, 385.) No law of the State requires any of them to receive a veterinary examination on any schedule; dental, hoof or vaccination care; a limit on working hours; a rest period; protection from heat or cold; a minimum stall; or a single day of pasture.

81. The Local Law leaves every one of these horses worse off. On June 1, 2028, it repeals every protection specific to carriage horses: the nine-hour limit and mandatory rest, the heat and cold limits, the five-week furlough, the age limits, the blanket and manure-catcher requirements, and the training requirement for those who handle them. (Local Law §§ 5, 9, 27(a).) The day before, it ends every carriage horse's license. (*Id.* § 24.) It then bars these horses from the one work for which they are trained, anywhere in the City, except under a special-event permit. (Admin. Code § 17-327(a)(2), as added by Local Law § 2.) Without a license, a former carriage horse falls outside the subchapter that requires veterinary examinations, stall-size minimums and stable inspection. (*Id.* §§ 17-327(a)(1), 17-330.) Wherever the horses go after the Sunset Date — a City stable, a farm, a sanctuary or another State — no law will require that any of them ever again see a veterinarian on a schedule, rest after hours of work, be kept out of extreme heat or cold, or spend a day on pasture. The Local Law provides no funding for their care. It requires only a

program to "assist" owners with disposition and the "[c]onsideration of whether" to compensate them. (Local Law § 23(a)(2).) The City's environmental review did not analyze where the horses would go. (¶¶ 118, 128.) Plaintiff Hansen's horse is an example. She bought Sherman in 2022 from an Amish farm family in the Finger Lakes. In the City he has water at all times, works no more than nine hours a day and never in the heat or cold the Code forbids, must see a veterinarian every four to eight months, and spends about four months a year on pasture. Sold back to a farm, he would be owed none of it. (Hansen Decl. ¶¶ 4–7; ¶ 80(d).)

82. Nor does the record identify a single sanctuary, its capacity or its funding; the one pledge in the record, $25,000 from Friends of Animals, came with the concession that "[c]learly that is not enough to support 150 horses." (¶ 119.) PETA's $50,000 pledge, announced at a news conference just before the vote (¶ 161(d)), does not change that: together the two pledges would pay for about one year of sanctuary care for a dozen horses. The cost of care thus falls on the owners, who may not sell their horses to a carriage business anywhere: about $6,000 a year per horse at a sanctuary that already has its land and barns and about $40,000 a year for one owner, or roughly $0.8 million to $6.4 million a year for the herd. (¶ 118; Hearing Tr. 158, 304, 420.)

***3. No law gives New York City's workers comparable protections.***

83. No law of the City, the State or the United States guarantees any adult worker in New York City the protections the Code guarantees every carriage horse:

uu. *Vacation.* No law requires any employer to provide paid vacation. Nationally, one in five private-industry workers has none. Only 2 percent receive more than 24 days of paid vacation after a year of service, and even after twenty years of service two-thirds do not. (U.S. Bureau of Labor Statistics, National Compensation Survey, *Employee Benefits in the United States, March 2025* (USDL-25-1464),

& *Paid Vacations* fact sheet, tbl. 1.) A carriage horse receives five weeks on pasture each year from its first year of service.

vv. *Hours, including the commute.* No law limits the daily working hours of most adult workers, and none counts their commute. New York City residents have the longest average commute of any large American city, about 40 minutes each way. (U.S. Census Bureau, American Community Survey 2023 table S0801 / 2024 1-year.) A worker on a standard eight-hour shift with a thirty-minute meal period is away from home nearly ten hours. A carriage horse's nine-hour limit includes its trip to and from the park, its time waiting for fares and about an hour of rest.

ww. *Rest breaks.* New York requires only a meal period, generally thirty minutes for a shift of more than six hours. It requires no rest breaks. (N.Y. Lab. Law § 162.) A carriage horse must rest at least fifteen minutes after every two hours, with water.

xx. *Heat and cold.* There is no enforceable federal, State or City standard that stops work at any temperature. The federal heat rule proposed in 2024 has not been adopted. (Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings, 89 Fed. Reg. 70698 (proposed Aug. 30, 2024).) The State's proposed TEMP Act has not been enacted. (S. 3412, 2025–2026 Reg. Sess. (N.Y.).) The Mayor's June 22, 2026 executive order directs the development of heat-illness guidance and plans and does not impose a temperature limit on private employers. (N.Y.C. Exec. Order No. 17, Protecting Workers from Extreme Heat (June 22, 2026).) Construction, delivery and other outdoor workers in New York City work above 90°F and below 18°F. A carriage horse does not.

yy. *Medical and dental care.* No law requires that any worker receive a medical or dental examination. About 8 percent of New York City residents, or more than half a million people, have no health insurance.[29] Nationally, about one in four adults did not see a doctor for a routine checkup in the past year.[30] About one in three New York adults did not visit a dentist in the past year.[31] A carriage horse must be examined, including its teeth, every four to eight months.

84. These are the ordinary conditions of work in New York City:

zz. A worker on a standard shift with an average commute is away from home longer than a carriage horse may lawfully be at work away from its stable, and has no legal right to a single rest break.

aaa. An outdoor worker on a construction site, a delivery route or a sanitation truck works through heat and cold that would require a carriage horse to be taken off the street and returned to its stable.

bbb. Whether a worker gets a vacation, a regular checkup or a dental visit depends on an employer's benefits, insurance coverage or the worker's own means. No law guarantees any of them.

The City has chosen to guarantee these protections to carriage horses and not to its workers. The Local Law extends none of them to anyone. It repeals them.

---

[29] U.S. Census Bureau, American Community Survey, 2024 1-Year Estimates, tbl. S2701 (New York City), https://data.census.gov/table/ACSST1Y2024.S2701?g=160XX00US3651000 (last visited Nov. 16, 2026).
[30] Ctrs. for Disease Control & Prevention, PLACES: Local Data for Better Health (2022 data), https://www.cdc.gov/places/ (last visited Nov. 16, 2026).
[31] United Health Found., *Dental Visit in New York*, America's Health Rankings, https://www.americashealthrankings.org/explore/measures/dental/NY (last visited Nov. 16, 2026).

***4. The compliance record.***

85. The City regulates every aspect of the trade. The Administrative Code fixes the temperatures beyond which horses may not work, working hours, mandatory furloughs, age limits, blanket requirements, manure catchers and designated hack stands, and forbids leaving a horse "untethered or unattended" outside a stable. Admin. Code §§ 17-330(b)(1), (g), (o)–(r), 19-174, 20-381.1. The City enforces those rules through inspections, violations, weather suspensions, and the suspension and revocation of licenses.

86. The City's own witnesses described the result at the Council's July 15, 2026 hearing (Ex. 10):

ccc. DCWP knew of no suspension or revocation of a driver license or Medallion "in recent years" (Hearing Tr. 40–41);

ddd. DOHMH reported 102 weather-related suspensions over three years and testified, "We have not issued violations for violating the suspension" (id. 53, 55);

eee. the only DOHMH violations reported were 29 summonses from 2023 through April 2026 — 17 for lacking a record of a timely medical examination and 12 for missing proof of the five-week furlough (*id.* 89); and

fff. asked whether the Administration would also end tour helicopters and pedicabs, the City's witness said that "we are past the point of reform of the industry," without identifying any requirement the trade was failing to meet (*id.* 97).

87. Council Member Gennaro asked the City for "actual data, facts, violations, episodes" and received none. (Hearing Tr. 42.) Drivers had asked the City for hitching posts; one testified that the trade "begged and pleaded for them and never got them." (*Id.* 250.) The City never installed them. Local 100 met repeatedly with the Central Park Conservancy about hitching

posts, and TWU and Local 100 renewed the request in a December 19, 2025 letter to the Conservancy's President, asking for "[a] handful of hitching posts at each of the three carriage stands." (Written Test. Pt. 2, at 38, 91; Ex. 21; Chiarello Decl. ¶ 7.) The Conservancy did not respond. (Chiarello Decl. ¶¶ 10–11 & Ex. A.) The City and the Conservancy have improved the stands at the trade's request before: in or about 2022, after years of requests, representatives of Local 100, the Conservancy and DOT worked together to install a permanent water trough for the horses at the Seventh Avenue carriage stand. (Chiarello Decl. ¶ 9; Ex. 21.)

88. The City has known since at least 2007 that the carriage stands lack hitching posts. In a June 27, 2007 audit of the City's oversight of the trade, the Comptroller reported that carriage owners, drivers and ASPCA officials had raised the absence of "hitching posts where horses could be tethered while they are waiting." The auditors also reported that, when they accompanied an ASPCA inspector and DOHMH's veterinary consultant to the stables, neither found any serious violation concerning the horses' health and safety, and that the City relied on the ASPCA to inspect the stables and the horses, drivers and carriages in the field.[32] In 2022, Local 100's "Big HEART" platform again called for hitching posts at the carriage stands so that drivers could tether their horses. (n. 9.) On March 20, 2023, Local 100's carriage drivers met with two Conservancy vice presidents about the park drives, and on April 6, 2023 Plaintiff Hansen emailed them the drivers' written proposal that asked for hitching posts in every designated carriage stand, so that if anything frightened the horses they "will stay safe in their stands instead of potentially running out into traffic," and that acknowledged the industry would probably have to pay for them. (Hansen Decl.

---

[32] Office of the N.Y.C. Comptroller, *Audit Report on the Licensing and Oversight of the Carriage-Horse Industry by the Departments of Health and Mental Hygiene and Consumer Affairs*, Report MH07-092A (June 27, 2007), at 2, 9, 11, https://comptroller.nyc.gov/wp-content/uploads/documents/MH07_092A.pdf. *See also* Follow-Up Audit Report, FS09-124F (Sept. 21, 2009), https://comptroller.nyc.gov/wp-content/uploads/documents/FS09-124F.pdf.

¶ 12 & Ex. A at 5, 18.) No hitching post was installed. (*Id.*) The proposal also asked for a lower speed limit at the carriage stands and for signs telling park users that horses have the right of way. Plaintiff Hansen does not recall any response, and, apart from the removal of some traffic signals on the drives, she is not aware that any of its requests was carried out. (Hansen Decl. ¶ 12 & Ex. A at 10, 19.) In 2026, before the accident, a Council Member's bill, Int. 937, would have required them; the Council never heard it. (¶ 100.) After the accident, Council Member Gennaro wrote that "[t]he industry has been asking for years" for hitching posts, and that prior administrations and the Conservancy had failed to act.[33]

89. On the morning of June 17, 2026, hours before the accident, TWU International President John Samuelsen urged support for Int. 937's hitching posts.[34] (Chiarello Decl. ¶ 12.) On June 18 and June 22, 2026, Local 100 renewed its call for hitching posts in the park and asked the City to work with it to identify locations for them, which it said could begin immediately. (n. 8; Chiarello Decl. ¶ 14.) On August 21, 2026, Local 100 wrote to every Council Member that the Mahajan family's notice of claim faulted the City for failing to install hitching posts despite years of requests by the industry and Local 100, and for failing to maintain underground power cables to prevent stray voltage, and it asked the Council not to ban the trade on that record. (Chiarello Decl. ¶ 15 & Ex. B.)

## F. The June 2026 Incidents

---

[33] James Gennaro, "Opinion: NYC's proposed horse-carriage ban is driven by emotion and propaganda," *City & State NY* (July 17, 2026), https://www.cityandstateny.com/opinion/2026/07/opinion-nycs-proposed-horse-carriage-ban-driven-emotion-and-propaganda/414839/.

[34] John Samuelsen, "NYC activists' carriage-horse threats prove they'll use any excuse to force a ban," N.Y. Post (June 17, 2026), https://nypost.com/2026/06/17/opinion/nyc-activists-carriage-horse-hate-reveals-their-mania-for-a-ban/. (TWU International President John Samuelsen, who called the accident "a terrible tragedy," urged the Council to support Int. 937 and its "immediate commonsense reforms — like installing hitching posts to safeguard horses from straying," and wrote that "safety reforms like those in Intro 937 can address such incidents and help prevent them from occurring again.")

90. On June 9, 2026, a carriage horse named Deniz died in Central Park after ingesting what the Comptroller called "the highly toxic Japanese yew plant along the carriage route" (Written Test. Pt. 1, at 103) — upon information and belief, planted along the carriage drive by the Central Park Conservancy without warning to the trade (*id.* at 50; Written Test. Pt. 2, at 91).

91. On June 17, 2026, a horse bolted and Romanch Mahajan was killed.[35] (Hearing Tr. 28, 32, 36, 107.) The record reflects that the driver had stepped away from the carriage to take a photograph — conduct the City's rules already prohibit, Admin. Code § 17-330(b)(1), and a risk a hitching post could have addressed directly.

92. Counsel for the Mahajan family told the Council that the family would "hold the City accountable for the decades of failures in enforcing and preventing this action from taking place," citing the absence of "[h]itching posts, tethering points, [and] safety devices." (Hearing Tr. 36.) On August 14, 2026, Mr. Mahajan's parents filed four notices of claim against the City and its Parks, Health, Transportation and Consumer and Worker Protection departments, which, as reported, seek $105 million and assert that stray voltage "caused, precipitated, contributed to and/or was a substantial factor in" the horse's becoming agitated and running off. (N.Y. Times article, Ex. 20.)

93. The horse involved in the Mahajan incident bolted from the carriage concourse at "Cherry Hill," an area which the Conservancy maintains. In early February 2025 the Conservancy covered the concourse's crushed-stone footing with what is, upon information and belief, a sand-

[35] The horse broke away near the Cherry Hill fountain, near West 72nd Street, shortly after 2:45 p.m. *See* "18-year-old in critical condition after falling out of runaway horse carriage in Central Park," *West Side Rag* (June 17, 2026), https://www.westsiderag.com/2026/06/17/18-year-old-in-critical-condition-after-falling-out-of-runaway-horse-carriage-in-central-park-police-video (horse broke away near Cherry Hill fountain near West 72nd Street); "Teen Tourist Dies When Central Park Horse Carriage Overturns," *West Side Spirit* (June 22, 2026), https://www.westsidespirit.com/news/teen-dies-in-central-park-after-fall-from-horse-carriage-GH5955109 (shortly after 2:45 p.m.).

and-clay material, which conducts electricity when wet.[36] Plaintiff Hansen complained to the Conservancy about the new footing in writing in March 2025, in person or by telephone that spring, and by telephone again that December. The Conservancy's Vice President for Park Use and Stewardship acknowledged the problem in writing on March 18, 2025 ("Confirming that we recognize this problem, and we are actively seeking a solution") and again, in a recorded voicemail to Plaintiff Hansen on December 17, 2025 ("Cherry Hill: totally aware, we've got a big problem up there"), and the Conservancy posted notice five days before the accident that the area would be closed for construction; no construction has been done since. (Hansen Decl. ¶¶ 13–19, 22–23 & Exs. B–G.) After March 2025, the Conservancy twice spread more of the same footing, in October 2025 and on March 31, 2026, and the same problems returned; about two minutes after carriages began using the reworked surface on March 31, their wheels had already cut ruts into it. Through the winter of 2025–26 the concourse flooded with any rain or snowmelt and was often closed to carriages because of ice, and in January 2026 a sergeant of the NYPD's Mounted Unit told Plaintiff Hansen that the Mounted Unit had inspected the carriage stands and park drives and found them fine except for the ice at Cherry Hill. (Hansen Decl. ¶¶ 17, 19–21 & Exs. E, G–I.) The Cherry Hill fountain, whose pump is in a room beneath the concourse, had been off through the spring of 2026 and had not stayed running when turned on; two days before the accident, Plaintiff Hansen saw Conservancy workers climbing out of the pump room, and the fountain was turned on. (Hansen Decl. ¶ 22.) The lights can clearly be seen as powered and operating at Cherry Hill in a video of

[36] See M.A. Mojid & H. Cho, *Wetting Solution and Electrical Double Layer Contributions to Bulk Electrical Conductivity of Sand–Clay Mixtures*, 7 Vadose Zone J. 972, 972 (2008), https://doi.org/10.2136/vzj2007.0141 (explaining that wet sand–clay mixtures conduct electricity through interconnected pore water and along clay–water interfaces).

the accident. Upon information and belief, the sand-and-clay material was wet following a week with 1.38 inches of rainfall, and a trace amount on June 17, 2026 itself.[37]

94. After Cornelius Byrne, an owner of Central Park Carriages, a stable at 547 West 37th Street, asked Con Edison to test the site, Con Edison reported finding stray voltage at Cherry Hill on July 16 and July 23, 2026, and stated that neither originated from its equipment.[38] (Chiarello Decl. ¶¶ 15, 17 & Ex. B.) Mr. Byrne, who had testified at the Committee's July 15 hearing, made that request on or about July 16, 2026. The Con Edison employee handling it called him back that day, and Mr. Byrne then twice asked him by text for the results. On July 21, 2026, the employee answered: "We found the problem and cut the power," and "[t]he park depart[ment] should be making permanent repairs soon." Later that day he added, "I killed the power that's all I know." (Byrne Decl. ¶¶ 1–5 & Ex. A.) In late July 2026 the Cherry Hill street lamps, the fountain and its lights all went dark, and for several weeks the area was pitch black at night. When power was restored, two lampposts remained dark and taped off, and the fountain has not run since. On or about August 12, 2026, Conservancy workers pumped a large volume of water out of the pump room onto the concourse. (Hansen Decl. ¶ 23; Chiarello Decl. ¶ 17.) The Conservancy responded

[37] Nat'l Ctrs. for Env't Info., Nat'l Oceanic & Atmospheric Admin., *Daily Summaries: NY City Central Park, NY US, Station USW00094728, June 10–17, 2026*, NOAA precipitation records, https://www.ncei.noaa.gov/access/past-weather/40.981066,-74.423783,40.481066,-73.923783 (last visited Nov. 15, 2026) (reporting daily precipitation amounts totaling 1.38 inches for June 10–17, 2026, inclusive). The 1.38-inch total is calculated by adding NOAA's daily measurements: June 11 (0.21″), June 12 (0.90″), June 14 (0.25″), and June 15 (0.02″). June 10 and 17 recorded trace precipitation, which adds no measurable amount to the total. NOAA identifies trace precipitation with the flag "T."

[38] "New questions emerge over what may have led to Central Park deadly horse carriage accident," *ABC7 NY* (July 30, 2026), https://abc7ny.com/post/central-park-horse-drawn-carriage-accident-could-stray-voltage-have-contributed-deadly-incident/19599167/; "Electric shock may have caused Central Park carriage horse to bolt in fatal crash, union says," *FOX 5 NY* (July 30, 2026), https://www.fox5ny.com/news/central-park-horse-carriage-crash-stray-voltage-claim; "Stray voltage may have caused fatal Central Park horse carriage crash, union argues," *amNY* (July 30, 2026), https://www.amny.com/nyc-transit/stray-voltage-fatal-central-park-horse-carriage-crash/ (reporting drivers' complaints to the Conservancy about the surface material on the turnaround).

that electrical conditions in the park are not within its jurisdiction, and it renewed its call for a ban.[39] The Local Law does not address the footing, the wiring, or the stray voltage.

95. The Local Law does nothing about electrical hazards on City streets or banning the use of conductive materials as footing, which threaten NYPD mounted horses, horses working under special-event permits, pedestrians and animals alike.

96. The Local Law does nothing to address the decades-old request for hitching posts, which could have prevented this death, and whose absence remains a threat to both animal welfare and public safety.

97. Each hazard the record identifies is one the City can control by regulation without ending the trade: (a) hitching posts at the boarding areas and at Cherry Hill, which Int. 937 would have required DOT to survey for and install (¶ 100), and which the carriage drivers asked the Conservancy in writing in 2023 to install at the designated carriage stands (Hansen Decl. ¶ 12 & Ex. A); (b) removal of the sand-type footing at Cherry Hill and resurfacing with asphalt, as the Conservancy itself did on the concourse's approach ramps after the same kind of material failed there (¶ 93; Hansen Decl. ¶ 14), which is what Plaintiff Hansen asked the Conservancy to do in March 2025 (Hansen Decl. ¶ 16 & Ex. D at 3); and (c) periodic testing for stray voltage at the fountains, lampposts and other electrical fixtures along the carriage routes, a practice the State already requires of electric utilities for their own publicly accessible facilities.[40] The City has adopted none of these measures. The Local Law requires none of them, either for the carriage

---

[39] Central Park Conservancy, "Statement on Electrical Conditions in Central Park" (July 29, 2026), https://www.centralparknyc.org/press/statement-on-electrical-conditions-in-central-park.

[40] N.Y. Pub. Serv. Comm'n, Case 04-M-0159, *Proceeding on Motion of the Commission to Examine the Safety of Electric Transmission and Distribution Systems*, Order Instituting Safety Standards (Jan. 5, 2005), https://dps.ny.gov/electric-service-and-safety-standards (requiring regulated utilities to test all publicly accessible transmission and distribution facilities for stray voltage annually).

horses that will work until the Sunset Date or for the horses that will remain in the City's service and under special-event permits after it.

## G. The Legislative Record

98. Int. 943 was introduced on June 11, 2026. (Exs. 2, 3, 5.)[41] The Committee on Health heard it on July 15, 2026, from 10:06 a.m. to 7:31 p.m.; the transcript runs 440 pages, and the record includes about 1,250 pages of written testimony. (Exs. 8, 10–12.)

99. Everyone at the hearing promised protection for the people in the trade; no one delivered it:

ggg. Speaker Menin pledged: "we will ensure strong worker protections in this bill." (Hearing Tr. 16.)

hhh. The Administration testified that it "supports the intent" of the bill but was "critical of the insufficiencies of the worker protections" (Hearing Tr. 39–40; *see* Written Test. Pt. 1, at 1 (MOAW), 5 (DOHMH)), and did not "have concerns necessarily with the phase-out timeline itself" (Hearing Tr. 48). DCWP testified that workforce development "is not necessarily something that DCWP engages in now," and proposed no language. (*Id.* 47.)

iii. Council members acknowledged the owners' investment: Council Member Schulman said the Council should recognize "the significant investments they have made in their carriage licenses," and the sponsor, Council Member Marte,

[41] Int. No. 943, as introduced (Ex. 2), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15573898&GUID=2F624419-3951-4501-8114-7D32B523BFFB; Summary of Int. No. 943 (Ex. 5), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15573897&GUID=E5C58088-BFCF-4988-8875-5C498921FB32. The legislative file (Ex. 3) is at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=8067835&GUID=53C552B4-4BC2-41DA-A14A-560E74E7F3E1.

said "we can pass this bill, compensate the owners, let the horses live their lives on open pastures." (Hearing Tr. 20, 24.) Council Member Narcisse asked about "a real pipeline into union jobs," and Council Member De La Rosa asked why the bill treated the trade differently from tour helicopters and pedicabs. (Hearing Tr. 80, 96–98.)

jjj. The Mamdani Administration, MOAW, Manhattan Borough President, Comptroller, Friends of Animals (which pledged $25,000 toward a horse buyout fund) and Equine Rescue Resource (which proposed a "fair buyback plan") supported compensation or transition funding. The Borough President urged that the workforce program be "funded and staffed before drivers lose their routes," and the Comptroller called for "a just transition." (Written Test. Pt. 1, at 1, 8, 35, 102–03; Written Test. Pt. 2, at 425.)

100. The record also placed alternatives short of abolition before the Council: attrition; park-only operation; an in-park stable, which Local 100 proposed (Chiarello Decl. ¶¶ 8, 18); hitching posts; Int. 937, a regulatory bill introduced the same day as Int. 943 by eight Council Members, led by Council Member Gennaro and including the Committee's Chair, Council Member Schulman, that would have required DOT, with the Parks Department, to survey the need for hitching posts each year and install them within a year; required the industry advisory board to meet, report and study, among other things, the safety of street infrastructure on the carriage routes, "[a]lternative locations for carriage horse stables, including on city property," and "carriage lanes"; and fixed temperature readings to the National Weather Service's Central Park station;[42] and

[42] Legislative file for Int. 937-2026 (Gennaro et al.), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=8067779&GUID=91764453-1371-41EA-8A4A-E0297BE784E8 (introduced June 11, 2026; referred to the Committee on Health; status "Committee"; never heard),

conversion of the carriages to electric vehicles, which one proposal priced, for all 68 operators and with an income stipend, at about $1.7 million. (Hearing Tr. 226–27, 250, 298; Written Test. Pt. 1, at 14, 17, 20, 46, 50; Written Test. Pt. 2, at 90, 261–63.) Neither the Council nor the Mamdani Administration analyzed any of these proposals; the Committee never heard Int. 937, which remains in committee (n. 39). Supporters cited polling showing that 68 percent of respondents supported ending the trade (Written Test. Pt. 1, at 8). A written submission dated October 14, 2026 likewise urged permanent hitching posts and other improvements to the park in place of prohibition, and noted that the bill offered only to "consider" compensation. (Ex. 16, at 6.)[43]

101. The Administration offered one reason why regulation could not work. MOAW told the Council that "[t]he conditions of Midtown Manhattan streets and Central Park, including dense traffic, loud and unpredictable noise, extreme weather, air pollution, and constant interaction with vehicles and pedestrians, cannot be altered through licensing and operating rules to meet the needs of horses." (Written Test. Pt. 1, at 1.) MOAW cited no study, data, veterinary finding or incident analysis for that conclusion, and neither the Council nor the Committee made any finding of its own. MOAW's description also does not fit the licensed carriage horses' working day, most of which is spent on drives **which are closed to cars** and at boarding areas inside the park. (¶ 53.) The Director of MOAW, appointed in July 2026, had been the Director of NYCLASS from 2013 to 2016 and, until April 2026, the founder and president, and until June 2026 a board member, of a registered lobbying organization that lobbied the Council for a carriage ban. (Part V.O.)

---

with bill text at https://legistar.council.nyc.gov/View.ashx?M=F&ID=15573746&GUID=0DC35B57-8AD2-403D-9B9F-C0AAA8D3BC8B.

[43] "Hearing Testimony 10/22/26" (Ex. 16), https://legistar.council.nyc.gov/View.ashx?M=F&ID=16114511&GUID=A3F247D0-CBC7-44F9-9B13-E2A3E8877C4E.

102. The City's own conduct, and the Local Law itself, contradict its conclusion about regulation:

a. *The City alters these conditions by rule, and has said so.* Central Park's drives have been closed to private vehicles since June 27, 2018, while horse-drawn carriages continue to use them.[44] At DOHMH's request, DOT then moved all passenger boarding off Central Park South and Grand Army Plaza into designated areas inside the park, 34 RCNY § 4-12(t), to reduce the time horses spend alongside vehicular traffic (n. 41) — a rule the Appellate Division sustained on exactly that ground. *Matter of Malone v. City of New York*, 192 A.D.3d 510, 510–11 (1st Dep't 2021). On weekdays from 10:00 a.m. to 9:00 p.m., horse-drawn carriages may operate in Manhattan only in or immediately adjacent to Central Park; they may not operate on any street from 3:00 a.m. to 7:00 a.m., or on any bridge or tunnel at any time. Admin. Code § 20-381.1. DOT closed the park drives to cars, moved passenger boarding into the park to keep the horses away from traffic, and confined the carriages by area and hour. (¶ 53.) Temperature, heat-index, hours and furlough limits led DOHMH to suspend operations 102 times in three years, and the trade complied each time. (Part V.E.) And State law requires motorists to approach a horse being ridden or led at a reasonable and prudent speed so as not to frighten it and to pass it at a reasonable distance, and forbids sounding the horn when approaching or passing any horse. N.Y. Veh. & Traf. Law § 1146-a(2)–(3).

[44] *See* n. 23.

b. *The City divides street space, and has planned to take the horses off the streets.* The City allocates street space by mode, time and purpose — exclusive bus lanes, protected bicycle lanes, pedestrian plazas and car-free streets — but has never designated a route or lane for horse-drawn carriages. Its rules instead apply bus-lane restrictions to them, 34 RCNY § 4-12(m)(4), and exclude them, like other vehicles, from bicycle lanes, *id.* § 4-12(p)(2). In 2016 the Administration and the Council Speaker agreed in concept to build a stable for the carriage horses on City property inside Central Park and to confine the horses on City streets to DOT-designated routes between stable and park. (nn. 16–17.)

c. *The NYPD's horses.* The NYPD's mounted horses work the same Midtown streets, in the same traffic, noise, crowds, air and weather, and, according to testimony before the Council, share a veterinarian, a farrier and a stable neighborhood with the carriage horses — without the carriage horses' temperature limits or five-week furlough. (Written Test. Pt. 1, at 166; Written Test. Pt. 2, at 97, 113.) The conditions MOAW described are the conditions in which the City works its own horses. The NYPD's mounted horses patrol City streets, including Midtown's, in traffic, and the NYPD uses them for crowd control at "demonstrations, protests, concerts, sporting events, and parades": the densest traffic, the loudest noise and the least predictable crowds in the City.[45] No provision of the Administrative Code limits their hours, keeps them in from heat or cold, or gives them a furlough. Parks Department horses continue to work in

[45] N.Y.C. Police Dep't, Special Operations, https://www.nyc.gov/site/nypd/bureaus/patrol/citywide-operations.page (describing the Mounted Unit) (last visited Nov. 16, 2026).

Central Park. (Written Test. Pt. 1, at 166.) The City has never suggested that the conditions MOAW described require it to retire its own horses.

d. *Weddings, film shoots and parades.* After the Sunset Date, horses may still draw vehicles on City streets under special-event permits for filming, weddings, parades and any other event DOHMH defines by rule (Part V.I). Those horses will be in more traffic, not less: a wedding carriage goes where the wedding is. As of June 1, 2028, the Local Law repeals the area-and-hour limits that now keep carriage horses in and next to Central Park and off the streets below 34th Street, bridges and tunnels (Admin. Code § 20-381.1; Local Law §§ 20, 27(a)); the statutory hack stands (§ 19-174; Local Law § 10); and the carriage-horse limits on working hours, heat and cold (§ 17-330(g)(1), (o); Local Law § 5). Nothing in the Local Law or the record explains how conditions that "cannot be altered" for a licensed carriage confined to the park can be managed by permit for a wedding carriage on a City street.

e. *Measures aimed at the conditions themselves.* Park-only operation, an in-park stable that would take horses off Midtown streets, hitching posts, and the "carriage *lanes*" and City-owned stable sites that Int. 937 would have studied each address the conditions MOAW identified. None was analyzed. (n. 39.)

103. The rest of the hearing record on animal welfare did not fill the gap:

kkk. *The City Bar.* The New York City Bar Association's Animal Law Committee rested its account of regulatory failure on audits by the Comptroller from 2007 and 2009 — seventeen and nineteen years before the vote — and acknowledged that the 2009 follow-up audit "noted implementation of many of

its recommendations." (Written Test. Pt. 1, at 30.) Since those audits, the Council has itself amended the rules, including by Local Law 10 of 2010 and Local Law 203 of 2019. (n. 25.) The Committee's statement that "there appears to be virtually no enforcement" (Written Test. Pt. 1, at 31) is contradicted by DOHMH's own testimony about weather suspensions and summonses (Part V.E).

lll. *The Manhattan Borough President.* The Manhattan Borough President counted 96 "serious" incidents and 40 horse deaths over the forty-four years from 1982 to 2026 — about two a year — from records he did not place before the Council, and projected future incidents from a forecasting model that is also not in the record. (Written Test. Pt. 1, at 7–8.) His count, which, again, was not supported by any data, does not identify any violation of the rules the Local Law repeals or compare the carriage horses with the NYPD's or the permit horses. It should be noted that an average of roughly **20 to 30+ horses died per year** from racing and training injuries at Aqueduct Racetrack during its later years of operation, with no calls to shut down the track. (New York State Gaming Commission Equine Death and Breakdown Database).[46]

mmm. *The City.* No agency presented incident data, and Council Member Gennaro's request for "actual data, facts, violations, episodes" went unanswered. (Part V.E.)

nnn. *The Committee.* Neither Committee report made a finding that regulation had failed or identified any study, data or analysis showing that it had. The July 15 report recounted recent incidents from press accounts and concluded only that the

[46] N.Y. State Gaming Comm'n, *Equine Death and Breakdown*, NY Open Data, https://data.ny.gov/Government-Finance/Equine-Death-and-Breakdown/q6ts-kwhk/about_data (last updated Nov. 5, 2026) (maintaining statewide records of horses that died, sustained injuries, or experienced breakdowns at New York State racetracks, with incident data beginning March 4, 2009).

Committee "looks forward to hearing feedback from the Administration and interested stakeholders on the proposed legislation." (Ex. 8, at 4–7, 19.) The October 22 report added one paragraph stating that "[l]egal experts and scholars" consider regulation inadequate. (Ex. 9, at 8–9.)[47] That paragraph rests on two secondary sources, neither of which is annexed to or incorporated in either Committee report or, so far as the record shows, was submitted as testimony: a 2023 report of the New York City Bar Association's Animal Law Committee, cited only by web address (id. at 8 n.52),[48] and a Student Comment published in 2010, cited without a volume number (Ex. 9, at 9 nn.55–56)[49], which predates the in-park boarding rule and Local Law 203 of 2019. The Committee report presents the author of the Student Comment, then a law student, among the "[l]egal experts and scholars" and "animal law experts" on whom it relies, and attributes to the 2023 City Bar Report, by "Id.," two quotations that do not appear in that report — that the trade maintains "municipal regulations are sufficient to protect the horses from mistreatment and the public from the perils of accidents involving carriages," and that regulation has "historically proven to be inadequate and ineffective" — both of which come from the Student Comment's abstract. (Ex. 9, at 8–9 & n.53; Comment, 17 Animal L. at 171.) The 2023 City Bar Report

[47] Committee Report 10/22/26 (Ex. 9), https://legistar.council.nyc.gov/View.ashx?M=F&ID=16084065&GUID=F11D366F-0A0C-4671-9608-47A9E1D7251A.

[48] N.Y.C. Bar Ass'n, Animal Law Comm., Report on Horse Drawn Carriage Legislation (Mar. 23, 2023), https://www.nycbar.org/reports/report-on-horse-drawn-carriage-legislation/ (the "2023 City Bar Report").

[49] Katherine Hutchison, Comment, Should They Go the Way of the Horse and Buggy? How the New York City Horse-Drawn Carriage Industry Has Survived Thirty Years of Opposition, 17 Animal L. 171 (2010) (the "Student Comment").

supported a different bill, Int. 573-2022, which would have replaced horse-drawn carriages with City-licensed electric carriages, given former owners and drivers priority for them, and required a prevailing wage for drivers; the Local Law contains none of those provisions. Its justification runs three paragraphs. It cites no judicial decision, no study of New York City carriage horses and no agency inspection or violation data; its legal citations are to the bill, the Administrative Code and rules, a Council drafting manual and the City Bar's own prior reports. Its veterinary sources are a pet-care website, a horse magazine and a university report on transporting horses by road and air, and its figure of 68 licensed carriages comes from a newspaper article. Its evidence of danger is an exhibit of 30 "Selected Incidents" from 2006 to 2022 that, by its own terms, "lists only incidents reported in media outlets targeting a general audience," supplemented by links to an advocacy group's website, a blog and a 2014 police response to a Freedom of Information Law request hosted on the advocacy group's site. Twenty-five of the 30 incidents predate 2019, and so predate the in-park boarding rule and Local Law 203 of 2019; eight occurred in 2010 or earlier; at least four describe a motor vehicle striking the carriage or horse; and the exhibit gives no count of rides, trips or working hours from which a rate could be computed. A record of this kind does not show that the "abuses are general and difficult to control by regulation," *Good Humor*, 290 N.Y. at 318, and because the Committee's sources rest largely on conditions that predate the current rules, the Local Law's factual predicate may be challenged by showing "that those facts have ceased to exist," *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153

(1938); *see Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547–48 (1924). Nor may the City, to the extent the Local Law impairs its own Medallion contracts, "impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 31 (1977). Neither report mentions the Borough President's count, the City Bar's testimony, MOAW's conclusion or the Comptroller's 2009 follow-up audit; both mention the 2007 audit only as history, followed by the statement that the Council, "[p]artially in response to the audit," enacted Local Law 10 of 2010. (Ex. 8, at 15; Ex. 9, at 16–17.) The October report cites the July 15 hearing transcript only for counts of licenses and horses. (Ex. 9, at 3 nn. 3–4, 6.) The Council commissioned no study, and the bill that would have required one, Int. 937, was never heard. (n. 39.)

104. The final text of Int. 943-A bears a drafting time stamp of 5:35 p.m. on October 14, 2026, and is word-for-word the text enacted. It ends with the legend "LS# 6327 / Int. #0967-2024" — the number of the bill the Committee on Health had voted down on November 14, 2025. (Exs. 1, 3.) The same day, the Speaker announced that "[t]he Council will bring the bill to vote on October 22."[50] The fiscal impact statement, dated October 16, 2026, said the cost of the Transition Plan "would depend on the resources needed to implement the plan, including any assistance or compensation programs," and that the Office of Management and Budget "did not provide an estimate." (Ex. 7; *see* Ex. 6.)

[50] Press Release, N.Y.C. Council, "Speaker Julie Menin Announces New York City Council Will Vote on Romanch's Law" (Oct. 14, 2026), https://council.nyc.gov/press/2026/10/14/3297/. The release states that "[t]he Council will bring the bill to vote on October 22" and quotes NYCLASS President Steve Nislick thanking the Speaker for "leading this coalition."

105. On October 20, 2026, the Mayor's Office signed a Negative Declaration under the City Environmental Quality Review rules. On October 22, 2026 the EAS file was created at 9:17 a.m., according to its embedded metadata; the Committee on Health amended and approved the bill at 10:15 a.m.; and the Council passed it at its 1:30 p.m. Stated Meeting, 40–7–2. (Exs. 13, 14, 15; Stated Meeting Video at 02:52:25[51].)[52]

106. On the floor, the Speaker described the bill as requiring "the administration to consider establishing a compensation program." (Stated Meeting Video at 00:44:17.) Council Member Gennaro reminded colleagues that on July 16, 2026 the Speaker had promised "more robust language" on compensation, and said: "That never actually happened." (*Id.* at [01:03:14].) Council Member Farías abstained because the transition lacked "concrete commitments." (*Id.* at 02:03:34.) Council Member De La Rosa voted yes while calling for a "just transition." (*Id.* at 01:57:25.) Council Member Shirley Aldebol voted yes, "optimistic that we will hold the administration accountable to and ensure that the transition plans will include compensation." (*Id.* at [01:53:11].) An amendment to extend the phase-out by eighteen months, offered at 01:03:14, failed 6–43. (*Id.* at 01:13:19–01:20:20.)

107. The Local Law does not carry out what the Speaker promised the workers.

---

[51] Video recording of the Stated Meeting of the New York City Council, October 22, 2026, posted by the Council on its official YouTube channel as "LIVE: Watch New York City Council's 10/22 Stated Meeting, Featuring Vote to Ban Horse Carriages," https://www.youtube.com/watch?v=z2B7P8dZt_k (the "Stated Meeting Video"). The Council's official record of the meeting, which links to its own recording, is at https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1456738&GUID=8ACD8286-9404-4AAE-89A6-8EABAF1E8949. Citations are to elapsed time in the YouTube recording (hours:minutes:seconds). A cited moment can be opened directly by adding "&t=" and the elapsed seconds to the address; for example, 02:52:25 is https://www.youtube.com/watch?v=z2B7P8dZt_k&t=10345.

[52] October 22, 2026 – Stated Meeting Agenda (Ex. 14), https://legistar.council.nyc.gov/View.ashx?M=F&ID=16091401&GUID=BD0F962A-1969-4229-92DA-E576C56B87FB; roll call on Int. No. 943-A (Ex. 15), https://legistar.council.nyc.gov/HistoryDetail.aspx?ID=37958245&GUID=ABC40324-45AE-4543-9A6E-EFBFC1D3E7B5.

ooo. At the hearing she committed "to chart a path forward to protect the workers and ensure that they have good-paying jobs." She promised "strong worker protections in this bill." (Hearing Tr. 15–16.)

ppp. Later that day she acknowledged that "right now the language in the bill talks about worker training" and that "there needs to be additional language negotiated." (*Id.* 155–56.)

qqq. The language later added provides no compensation and no employment. The Local Law offers workers referrals, counseling, training, hiring events, civil-service resources, educational guidance and entrepreneurship guidance, and it requires only "[c]onsideration of whether to establish a program to compensate" owners. (Local Law § 23(a)(1), (a)(2)(c).)

rrr. Asked on October 22, 2026 why the bill treated compensation only as something to consider, the Speaker answered that "that was language that was worked out with the administration." (Press Conference Video at 30:41.)

sss. The Administration had testified that it was "critical of the insufficiencies of the worker protections in the bill" and that "workforce development is not necessarily something that DCWP engages in now." On City jobs, it testified that drivers "can sign up for civil service exams right now" and that "this option already exists for workers across the city." (Hearing Tr. 39–40, 47, 101.)

108. Notice of the Mayor's public hearing on the bill appeared once in the print City Record, on Friday, October 30, 2026, under the heading "LATE NOTICE," for a hearing at 10:00 a.m. on Wednesday, November 4, combined with an unrelated bill, Int. 905-A. It asked anyone needing a sign-language interpreter to ask "no later than five days prior to the public hearing" —

that is, by the day of publication. (Ex. 17, at 1–2.)[53] On City Record Online, the notice — titled "Mayoral Pubic [sic] Hearing" — bore the status "Archived" on November 1, did not state the hearing's date, time or place on its face, and did not appear in a search of the Mayor's current notices, which returned "NO RESULTS FOUND!" (Ex. 17, at 3–6.) A Landmarks Preservation Commission notice published the same day stayed "Current" through the eve of its hearing. (Ex. 17, at 7.) Each speaker at the Mayor's hearing was limited to two minutes. (Ex. 17, at 8.)

109. On November 19, 2026, the Mayor signed the bill, which became Local Law 165 of 2026. Two days earlier, on November 17, 2026, the Office of the Mayor announced what it called a "framework" for the Transition Plan. (Ex. 18.) The announcement:

ttt. Confirms the Local Law's object. It states that the City "prepares to sunset the horse-drawn carriage industry" and, in the Mayor's words, "moves to bring the horse-drawn carriage industry to a close." (Ex. 18, at 1–2.)

uuu. Commits to no payment. For owners, it describes "financial assistance for medallion owners" and "a goal of facilitating medallion buybacks for owners." It states no amount, price, method or date of valuation, appropriation or source of funds, or date of payment; it does not say who would pay for any buyback; and it gives no owner any right to be paid. (*Id.* at 2.)

vvv. Defers the plan. "A full transition plan will be released by April 2027, in partnership with the City Council and in accordance with the timeline established in the legislation" (*id.*) — that is, as late as April 1, 2027, the statutory deadline:

[53] *The City Record*, Vol. CLIII, No. 209 (Oct. 30, 2026), https://www.nyc.gov/assets/dcas/downloads/pdf/cityrecord/cityrecord-10-30-26.pdf; City Record Online, "Mayoral Pubic [sic] Hearing" (Oct. 30, 2026), https://a856-cityrecord.nyc.gov/RequestDetail/20261028015; City Record Online, advanced search, https://a856-cityrecord.nyc.gov/Search/Advanced; NYC.gov, Hearing Testimony Registration, https://on.nyc.gov/billhearing.

more than four months after the Mayor signed the Local Law, a month after DOHMH's deadline to publish the Disposition Regime's certification form (March 1, 2027), and two months before every owner must certify (June 1, 2027). (¶ 115; Local Law § 23(a).)

www. Offers drivers and stable hands training, not work. Its "Horse Carriage Worker Industry Program" for "approximately 200 affected workers" offers "career advisement, job training, entrepreneurship support, connections to employers, educational opportunities and tuition assistance" — the services § 23(a)(1) already requires — together with "stipends" of unstated amount and duration. (Ex. 18, at 1–2.) It promises no employment and no replacement income.

xxx. Narrows what § 23 directs the City to consider. Section 23 requires a program to assist owners with the humane disposition of the horses, and consideration of a program that could include "potential compensation payable to such horses' owners" and of compensation for owners' "horse drawn cab businesses, horse drawn cab licenses, and equipment." (Local Law § 23(a)(2)(a)–(c).) The announcement mentions only "medallion buybacks." It does not mention the horses at all, or carriages, harness and equipment, going-concern value, the stables, Medallion lessees such as Plaintiff Hansen, or lenders that hold security interests in Medallions. (Ex. 18.)

yyy. Proposes to study an alternative only after the prohibition. The Mayor "will also direct the Administration to commission a feasibility study examining electric carriages and electric pedal-assist bicycles as potential alternatives within Central Park, as well as electric carriages along the park's perimeter." (*Id.* at 3.) It sets no

date for the study, and neither it nor the Local Law gives current Medallion holders or drivers any priority to operate any such alternative, as Int. 573-2022 would have. (¶ 103(d).)

zzz. Recognizes Plaintiffs' unions. The Administration "will work to engage TWU and horse carriage workers at every step of the process." (*Id.* at 2.)

The announcement followed the Mayor's public acknowledgment, on November 4, 2026, that many owners "are still in debt from buying their medallion." (¶ 201 89& n. 86.) Plaintiffs welcome the Administration's stated commitment to the workers. But a goal announced in a press release is not law: it binds no agency, appropriates nothing, and may be revised or abandoned by this or any later Administration or Council. The Local Law the Mayor signed still requires only "[c]onsideration of whether to establish" a compensation program. (Local Law § 23(a)(2)(c).)

110. On the record, before enactment, the City did not: (a) estimate the cost of compensating owners, drivers or stables; (b) obtain an independent valuation of the Medallions or of the other interests the Local Law extinguishes, relying instead on its witness's testimony and a 2014 news article; (c) analyze any alternative to abolition; (d) explain the choice of the Sunset Date, or why the Freeze and the Disposition Regime had to take effect immediately when the same Medallions, horses and drivers may operate until 2028; or (e) analyze whether stables elsewhere could absorb the displaced horses. The Administration has since committed to study one alternative — electric carriages and pedal-assist bicycles in and around Central Park — but only on November 17, 2026, after the Council had acted. (¶ 109(f).)

## H. What the Local Law Does

111. The Local Law took effect immediately, except for the sections listed in § 27(a), which take effect on June 1, 2028. Sections 2, 4, 14 (in part) and 23 through 26 operate now. (Ex. 1, § 27.)

112. ***The Freeze***. **Section 25** provides: "The Department of Consumer and Worker Protection shall not issue a new license to operate a horse drawn cab nor accept an application for such a license. No such license that is valid on or after the effective **[sic]** of this local law shall require renewal. Any license valid on or after the effective date of this local law shall expire on May 31, 2028." Section 26 applies the same rule to plates.

113. Section 20-374(b), which the Local Law leaves on the books until 2028 (§ 15), completes a transfer only when DCWP accepts the buyer's application and issues the buyer a new license. Sections 25 and 26 forbid both steps. On enactment, therefore, no Medallion can be transferred. Horses remain transferable (§ 2), but not to a carriage business (§ 4).

114. The Freeze serves no safety or animal-welfare function. Until the Sunset Date the same 68 Medallions operate, with the same horses and the same drivers, under the same welfare rules, whether or not any Medallion changes hands. The Freeze affects only who may own a Medallion, and whether it can be sold.

115. ***The Disposition Regime***. Section 4 amends Admin. Code § 17-329, which requires an owner to notify DOHMH and MOAW "at least 10 business days prior to" disposing of a licensed horse; forbids its sale or transfer for slaughter or "for use in a horse drawn cab business"; and requires every owner to certify by June 1, 2027, on a form DOHMH must publish by March 1, 2027, that the horse will not be sold or transferred for any of those purposes "or any inhumane purpose as designated by the commissioner." The certification is broader than the prohibition, and

it looks forward: it binds each owner's future dispositions to purposes the commissioner has yet to designate. **The bar on transfers to a carriage business has no geographic limit,** and it applies now, while the trade is lawful: an owner may not sell a horse to another Medallion holder in the City, although § 17-327(e)(1), also in force now, lets a "new owner" license a cab horse through June 1, 2028. The Disposition Regime reaches every licensed rental horse, including riding horses that remain licensed after the Sunset Date. **The Local Law does not define "inhumane purpose," states no standard for designating one, and provides no notice, hearing or review before or after a designation.** Before the Local Law, § 17-329 required only that DOHMH be notified of a disposition "within ten days thereafter," and that a horse not be "sold or disposed of except in a humane manner." The Local Law converts that after-the-fact notice into a regime of prior notice, prohibition and certification, without defining "dispose" (sale, gift, retirement or euthanasia). The Local Law does not say whether § 17-329 continues to bind owners after May 31, 2028, when no horse used in a horse drawn carriage will hold a license. DOHMH licenses riding horses under the same subchapter, see Admin. Code § 17-327(a); 24 RCNY § 4-02(a)(1), and, upon information and belief, licensed riding horses are kept and rented to the public at several riding stables in the City, including at least one that operates in Central Park (¶ 11; Hansen Decl. ¶ 10). Nothing in the Committee reports shows that the Council determined how many riding horses or riding stables the Disposition Regime would reach. Neither report states that number; the July 15 report describes the disposition requirements as applying to "carriage horse owners," and the October 22 report does not mention riding horses in describing the amended § 17-329. (Ex. 8, at 18; Ex. 9, at 19–20.) The Health Department's testimony at the July 15 hearing addressed only its licensing of "the carriage horses."[54] Violations of § 17-329 are punishable now. Any violation of the subchapter is

[54] N.Y.C. Dep't of Health & Mental Hygiene, Testimony on Int. No. 943 (July 15, 2026), https://www.nyc.gov/assets/doh/downloads/pdf/public/testi/testi-20260715-intro-0943-2026.pdf

a criminal offense punishable by a fine of $100 to $500, imprisonment for up to fifteen days, or both, or, in lieu of prosecution, by a civil penalty of $25 to $500, suspension or revocation of a license, suspension of the horse from work, or a combination. Admin. Code § 17-332(a)–(b).

116. ***The Transition Plan***. Section 23 requires an agency the Mayor designates to deliver a plan by April 1, 2027, including workforce referrals, counseling and training, and a program to assist owners "with the humane disposition of carriage horses." **As to money, § 23 requires only "consideration of whether to establish" a program** that could pay owners for horses and a program to compensate owners for "the value of their horse drawn cab businesses, horse drawn cab licenses, and equipment," under factors that include "any other" factor. It sets no deadline for a decision, appropriates nothing and identifies no funding source. The EAS expressly does not rely on the Transition Plan or on any compensation. (Ex. 13, at B-30, B-32, B-35, B-38.) The Administration's only public description of the plan to date, issued two days before signing, commits to no payment, states only "a goal of facilitating medallion buybacks," and does not mention the horses. (¶ 109(b)–(e).)

117. ***The Sunset Date***. Effective June 1, 2028, the Local Law repeals the carriage-horse welfare rules, the hack stands (§ 19-174) and DCWP carriage and driver licensing (§§ 20-380 to 20-382). Anyone who then uses a horse "for the purpose of drawing a horse drawn vehicle or for use in the operation of a horse drawn vehicle for hire" without a temporary-event permit (§ 17-327(a)(2)) may be prosecuted criminally — punishable by a fine of $100 to $500, imprisonment for up to fifteen days, or both — or, "in lieu of criminal prosecution," held liable for "a civil penalty of not less than $10,000," with no maximum, adjudicated at OATH. Admin. Code § 17-332(c)–(d), as amended by Local Law § 7. The $10,000 floor applies only to operation without a permit

after the Sunset Date; violations of the Disposition Regime remain subject to the penalties described above. The floor is about 138 times the regulated fare for a twenty-minute ride.

118. ***The Horses***. The Local Law makes no provision for the horses after the Sunset Date. The record places the cost of caring for a horse at about $6,000 a year at a sanctuary that already has its land and barns, about $40,000 a year for one owner, and, according to Council Member Gennaro, "somewhere between $25,000 and $30,000 a year per horse." (Hearing Tr. 158, 304, 420; Stated Meeting Video at 02:09:15.) Caring for 132 to 160 horses would thus cost roughly $0.8 million to $6.4 million a year — a cost that falls entirely on owners who may not sell their horses to a carriage business anywhere. The EAS did not analyze it. The Administration's November 17, 2026 framework does not mention the horses either. (¶ 109(e).)

119. The City did no due diligence on where the horses would go or who would pay. MOAW told the Council that sanctuaries, rescues and private adopters "have already offered to provide lifelong care for the carriage horses – at no cost to their current owners" (Written Test. Pt. 1, at 1), and the Borough President referred to an offer by "two dozen equine rescues and sanctuaries" to "place every horse this industry retires" (*id.* at 8). Neither that offer nor any list of sanctuaries, their capacity or their funding is in the record. The offers that are in the record are limited or conditional: one sanctuary offered homes for "several" horses (*id.* at 27); Equine Advocates offered to help place the horses "[w]hether money is raised privately and/or the city works out a financial arrangement with the carriage horse operators to purchase the animals" (*id.* at 122); and Friends of Animals pledged $25,000, conceding that "[c]learly that is not enough to support 150 horses" (Written Test. Pt. 2, at 425). Other witnesses warned that "[m]ost sanctuaries are struggling to maintain the animals they currently have" and that supporters "do not have a plan

for sanctuary placement or long-term care for displaced horses." (*Id.* at 447, 471.) The EAS does not identify a single sanctuary, its capacity or its finances.

120. ***Drafting defects***. The Local Law contains no provision ending the issuance or renewal of carriage driver licenses before June 1, 2028, when § 20 repeals driver licensing, although its plain-language summary, fiscal impact statement, committee report and EAS all say that driver licenses will expire or cease to issue. (Exs. 4, 7, 9, 13.)[55] The bill as introduced contained one, § 19 of Int. 943 (Ex. 2); the enacted bill dropped it. Sections 25 and 26 refer to "the effective of this local law"; § 24 refers to the "effective of the local law that amended this section"; § 27(b) refers to a subdivision of § 20-373 that the Local Law deletes; § 17-327(e)(1) sets an expiration date of June 1, 2028, while § 24 sets May 31, 2028; and the repeal of the transfer language in § 20-374 is deferred to 2028 while §§ 25–26 bar transfers now. The summary on the Council's legislative website describes a ban on issuing licenses "on or after June 1, 2028," not the immediate Freeze the text imposes. (Exs. 3, 4.)

121. Because the enacted text contains no provision ending the issuance or renewal of driver licenses before June 1, 2028, nothing in the Local Law authorizes DCWP to stop issuing or renewing them now. The plain-language summary, fiscal impact statement, committee report and EAS thus described a different law from the one the Council enacted.

## I. What the Local Law Leaves in Place

122. After the Sunset Date, horse-drawn vehicles may continue to operate on City streets under two overlapping special-event permit schemes — DOHMH's, for filming, weddings, parades and any "other special event as defined by the commissioner by rule" (Admin. Code § 17-

---

[55] Summary of Proposed Int. No. 943-A (Ex. 4), https://legistar.council.nyc.gov/View.ashx?M=F&ID=16066473&GUID=D4F195B1-207F-4728-994C-D39E5498528A.

327(a)(2), as added by § 2), and DOT's (§ 19-175, as amended by § 11). Neither fixes a fee: § 19-175(c) leaves any fee to be "established by rule," and § 17-327 states none. Section 17-327(c) cross-references a permit under subdivision (a) of Health Code § 161.01, which governs the exhibition of wild and other prohibited animals and does not reach domesticated horses (Health Code § 161.01(b)(16)); upon information and belief, the Health Code provides no permit for a horse-drawn vehicle at a temporary event; and § 19-175 still refers to a "horse drawn cab" after the Local Law repeals the definition.

123. The NYPD's mounted horses remain in Midtown traffic and on crowd-control duty. (¶ 102(c).) Riding horses remain licensed and continue to be rented to the public, including for riding in City parks. (Hansen Decl. ¶ 11.) And, upon information and belief, a privately owned horse may still draw a private, not-for-hire vehicle on City streets with no City license and free of the area and hour limits that bind licensed carriages. *See* N.Y. Veh. & Traf. Law § 1261; Admin. Code § 20-381.1. Pedicabs and tour helicopters are untouched.

124. The same horses, drawing the same vehicles, may share the same streets — under a permit rather than a Medallion, and without the area, hour, heat and cold limits that bind the licensed trade today. (¶ 102(d).) The only thing the Local Law removes is the licensed trade, and it places the entire cost of its policy on the roughly 300 people who own, drive and care for the horses.

**J. The Environmental Review**

125. The Office of the Mayor acted as lead agency. It classified the Local Law as an "Unlisted" action, used the Short Form EAS, and on October 20, 2026 signed a Negative Declaration (CEQR No. 27OOM001Y). (Ex. 13, Short Form at 1; Neg. Dec. at 8–11.) The EAS and Negative Declaration do not mention the Council, which under the City's rules is co-lead

agency for local laws, 62 RCNY § 5-03(d); identify no involved agency; and reflect no coordination with any agency other than a separate October 15, 2026 Landmarks Preservation Commission sign-off issued under a different project number (15OOM002Y). (Ex. 13, App. B.) No record of any coordination appears on the Council's legislative website or elsewhere in the public record; upon information and belief, none occurred.

126. The Local Law governs an activity conducted in and next to Central Park, a National Historic Landmark. SEQRA treats as Type I any Unlisted action exceeding 25 percent of a Type I threshold that occurs in or substantially contiguous to public parkland or historic resources, 6 NYCRR 617.4(b)(9)–(10), and Type I status "carries with it the presumption that it is likely to have a significant adverse impact on the environment," *id.* § 617.4(a)(1). The lead agency classified the action as Unlisted without explanation.

127. The EAS concedes that the Local Law eliminates the licensed horse-drawn carriage category, but it treated that category as "one specialized component of a broader and diverse sightseeing and visitor-serving market," benchmarked against the City's entire sightseeing sector — about 2,838 licensed guides, 163 sightseeing buses and 463 pedicabs — and found no impairment of "a broader industry or category of businesses." (Ex. 13, at B-24, B-34, B-38 to B-39; Neg. Dec. at 10.) Yet the City's own Short Form answers "YES" to whether the action would "[d]irectly displace more than 100 employees" and "[a]ffect conditions in a specific industry." (Ex. 13, Short Form at 4, item 2(a).)

128. The EAS also: did not value the Medallions (*id.* B-19); relied on ridership data from 2011, reasoning that "it is unlikely that carriage ridership has substantially changed since 2011" (*id.* B-33); concluded without data that any shift in visitor spending "would be expected to be modest" (*id.* B-34, B-38), while conceding that the Transition Plan's effect "cannot be determined

at this time" (*id.* B-32); assumed that all three stables "could cease operations" without analyzing the buildings' reuse, zoning or the indirect effects of closure, because the Local Law does not itself "authorize" redevelopment (*id.* B-31, B-35); asserted that other stables would keep boarding available "within the relevant trade area" without analyzing their capacity or the disposition of the horses (*id.* B-36, B-38); did not analyze the period between enactment and the Sunset Date; screened out open space, transportation and public health by checkbox and disposed of neighborhood character in one paragraph (Short Form items 4(a), 13(a), 17(a), 18(a); *id.* A-7); checked "Yes" for the coastal zone without any Waterfront Revitalization Program consistency assessment; misdescribed the action as ending driver licenses and allowing horse licenses to be renewed (*id.* B-30); did not review the Transition Plan, the certification form or the permit schemes together with the Local Law; and considered no alternative or mitigation, including changes in timing or financial assistance.

129. The EAS's treatment of the stables matters because the largest of them — Clinton Park Stables, which, upon information and belief, houses about two-thirds of the horses — has been owned since 2003 by a company of carriage operators, under a lease to NYCIDA that runs through June 30, 2029 and whose only approved use is a stable for the horse-drawn carriage livery business. (Ex. 23, at 1–10, 13–14, 35–36, 51.) The EAS assumed that the stables "could cease operations" without asking who owns them, what becomes of an owner-occupied, single-purpose building when its only use ends, whether that use could lawfully resume, or what redevelopment would follow — although the record before the Council included testimony that real-estate interests were "eyeing the carriage stable properties" and a proposal to convert a stable into an electric-vehicle charging hub. (Ex. 13, at B-31, B-35; Written Test. Pt. 2, at 113, 263.)

130. The Negative Declaration does not appear in the Environmental Notice Bulletin, which lists nineteen negative declarations for New York City from January 1 through November 2, 2026, none concerning Intro. 943. (Ex. 22.)[56] It was not published in the City Record either.

131. The record before the Council on October 22 did not agree with itself, and no one reconciled it. The July 15 Committee Report counted 52 "licensed horse carriage owners" (Ex. 8); the October 22 report counted 68 owner licenses (Ex. 9); the EAS counted 68 licenses held by 63 holders, and 132 horses owned by 65 owners (Ex. 13, at B-10), while DOHMH had testified to "just under 160" licensed horses (Hearing Tr. 50); and DCWP testified to 208 licensed drivers (*id.* 48), while the EAS counted 211 (Ex. 13, at B-10). The committee report, the fiscal impact statement and the EAS each described a law ending driver licenses, which the enacted text does not do. (Exs. 7, 9; Ex. 13, at B-30.) Had the EAS been available to the Council and the public before the morning of the vote, rather than fifty-eight minutes before the committee acted, these conflicts could and should have been identified and resolved. That they were not shows that neither the lead agency nor the Council took the hard look the law requires. Acting on counts of the affected population that do not agree, without reconciling them, is a hallmark of that failure. See Kahn v. Pasnik, 90 N.Y.2d 569, 574–75 (1997) (no hard look where negative declaration issued "[w]ithout waiting for the information identified as necessary by [the agency's] own consultants").

**K. Defects in the Enactment Process**

132. ***Seven-day aging***. No Local Law may be passed "until it shall have been in its final form and upon the desks of the council members at least seven calendar days, exclusive of

[56] N.Y. State Dep't of Env't Conservation, Environmental Notice Bulletin, negative declarations, Region 2, published Jan. 1 through Nov. 2, 2026 (Ex. 22), https://dec.ny.gov/news/environmental-notice-bulletin?text=&field_enb_type%5B3826%5D=3826&field_enb_publish_date%5Bmin%5D=2026-01-01&field_enb_publish_date%5Bmax%5D=2026-11-02&field_ny_locations%5B5416%5D=5416.

Sundays, prior to its final passage," unless the Mayor certifies the necessity of immediate passage and two-thirds of the Council vote for it. N.Y.C. Charter § 36. A bill is deemed to be upon the members' desks when it is set forth in a legible electronic format and available for review in that format at their desks. *Id.* State law imposes the same seven-day requirement on every local legislative body. N.Y. Mun. Home Rule Law § 20(4). The Mayor issued no certificate of necessity.

133. The final text of Int. 943-A was completed and bears the time 5:35 p.m. on Wednesday, October 14, 2026; it could not have been upon members' desks, on paper or electronically, before then. (Exs. 1, 3.) The Council's legislative website records no time at which the text was uploaded or made available; every action it records is dated October 22, and the plain-language summary bears the stamp "10/14/2026 6:12 PM." (Exs. 3, 4.) The Stated Meeting of October 22 was called for 1:30 p.m. (Ex. 14), and the final vote was announced two hours, fifty-two minutes and twenty-five seconds into the meeting (Stated Meeting Video at 02:52:25) — before 5:35 p.m. Written testimony the Council received that afternoon confirms that the roll call was under way well before 5:35 p.m.: an email delivered to the Council's hearings mailbox at 4:08:50 p.m. on October 22 describes a member's explanation of his votes on the matters then being called. (Ex. 16, at 2.) Measured from the earliest moment the final text existed to the vote, and excluding Sunday, October 18, the text could have been available to members for at most six days and about twenty-three hours — less than seven days. The final text also differed in substance from the bill as introduced: it made the Local Law, including the Freeze, effective immediately rather than ninety days after enactment; rewrote the Disposition Regime, adding the certification deadline and the commissioner's power to designate "inhumane" purposes; added the $10,000 penalty floor; deleted the driver-license freeze; and replaced a mandatory DCWP workforce-

development program with a plan that need only consider compensation. (Compare Ex. 1 with Ex. 2.)

134. State law on the computation of time confirms the shortfall. A calendar day runs from midnight to midnight. N.Y. Gen. Constr. Law § 19. A period of days "means such number of calendar days exclusive of the calendar day from which the reckoning is made," and "[t]he day from which any specified period of time is reckoned shall be excluded in making the reckoning." *Id.* § 20. Excluding October 14, the day the final text first existed, and Sunday, October 18, only six full calendar days — October 15, 16, 17, 19, 20 and 21 — elapsed before October 22, the day of final passage. Charter § 36 and Municipal Home Rule Law § 20(4) require seven "prior to . . . final passage."

135. ***Notice to OMB and the Council's cost estimate (Charter § 33)***. No committee hearing "shall be held," and no proposed local law "shall be voted on," unless the Director of Management and Budget has received at least eight days' notice of the hearing or of the Council's intent to vote, absent a mayoral certificate of necessity, and the bill is accompanied by a fiscal impact statement. N.Y.C. Charter § 33(a). Notice was therefore due by July 7, 2026 for the hearing and by October 14 for the vote. No such notice appears on the Council's legislative website, in the committee reports, in the fiscal impact statements or anywhere else in the public record; upon information and belief, none was given. The Charter excuses the absence of an OMB estimate only where OMB fails to provide one at least three days before the hearing or vote, *id.* § 33(c) — an excuse that presupposes the notice that triggers OMB's obligation. It excuses nothing on the Council's side: the fiscal impact statement for Int. 943-A contains no Council estimate of the cost of the transition and compensation programs the Local Law directs the City to consider, stating only that the cost "would depend on the resources needed to implement the plan, including any

assistance or compensation programs." (Ex. 7; *see* Ex. 6.) Section 33(f) saves an "inaccurate" estimate, not a missing notice or a missing estimate. The Mayor issued no certificate of necessity.

136. ***Thirty days' notice (Charter § 33-a)***. A proposed local law "relating to the public safety operations of the police department" may not be voted on unless the Council gave the public, the Mayor and the Police Commissioner written notice at least thirty days earlier, absent a written mayoral waiver. N.Y.C. Charter § 33-a(a), (d). As amended, the bill adds "the police department" to the agencies whose humane-treatment enforcement the subchapter preserves (Admin. Code § 17-334(b), as relettered and amended by § 8). That language first appeared in the text of Int. 943-A completed at 5:35 p.m. on October 14, 2026, eight days before the vote; it is not in Int. 943 as introduced. (Exs. 1–2.) Provisions the Local Law amends also refer to inspection and enforcement by police officers (§§ 17-330(j), 19-175(d)). Notice was due by September 22, 2026. None appears on the Council's legislative website or elsewhere in the public record, and no written waiver does either; upon information and belief, neither exists.

137. ***Open Meetings Law.*** Records scheduled to be the subject of discussion at an open meeting must be made available on request, and posted on the public body's website, "to the extent practicable at least twenty-four hours prior to the meeting." N.Y. Pub. Off. Law § 103(e). The EAS was such a record: the Committee on Health discussed, amended and approved the bill at 10:15 a.m. on October 22, 2026, and the full Council passed it that afternoon. The copy of the EAS posted on the Council's legislative website is a PDF file whose embedded metadata records that it was created at 9:17 a.m. on October 22, 2026, using "Microsoft: Print To PDF," under the title "Intro 0943-A of 2026.pdf" (Ex. 13.) A file cannot be posted before it exists, so the EAS could not have been posted before 9:17 a.m. that morning — fifty-eight minutes, not twenty-four hours, before the committee met. Earlier posting was practicable: the Negative Declaration that rests on

the EAS was signed on October 20, two days before the meeting, so the analysis was complete by then. The Council's legislative website does not show when the Negative Declaration or the October 22 committee report was posted, and that information is not otherwise in the public record. The Council handled the written testimony on the bill the same way. It received written testimony for its October 22 proceedings — including an email dated September 2 and a statement dated October 14, 2026 — but posted none of it before the vote. The file it eventually posted, "Hearing Testimony 10/22/26," was created at 3:50 p.m. on November 4, 2026, according to its embedded metadata: thirteen days after the vote, and on the day the Mayor held his public hearing on the bill. Upon information and belief, the Mayor did not have copies or access to these documents prior to or during his one and only public hearing. It is not among the attachments the legislative website listed on November 1. (Exs. 3, 16.)

138. The facts that decide whether the Local Law was validly enacted are in the City's exclusive possession. They include: when the final text of Int. 943-A was uploaded to the Council's legislative system and made available to members; whether, and when, the Director of Management and Budget received notice under Charter § 33 and the Police Commissioner received notice under Charter § 33-a; whether any mayoral waiver or certificate of necessity issued; when the EAS, Negative Declaration and committee report were posted; when written testimony submitted for the October 22 proceedings was received, distributed to members and posted; when the Local Law was presented to the Mayor; when and how DCAS received, published and archived the notice of the Mayor's hearing; and whether any newspaper notice ran under Admin. Code § 3-208. None of these facts appears in the public record. The same is true of DCWP's Medallion transfer files and its handling of transfer applications since enactment. The same is true of the City's records of the industry's requests for hitching posts and of its response

to them, and of its records of the electrical conditions and the footing at Cherry Hill before and after June 17, 2026. (¶¶ 87–89, 93.) Those records bear directly on whether the hazards the Local Law invokes can be controlled by regulation, and records of the site's electrical conditions may be altered or lost as the site is maintained and repaired.

**L. Two Decades of Ban Bills, Proposed as Animal-Welfare Measures, and the Council's Repeated Choice to Regulate**

139. The allegations in Parts V.L through V.O rest on the public records annexed as Exhibits 15 and 24 through 26, the City email annexed as Exhibit 27, the public records and Council video recordings cited in the footnotes, and the news reports cited, which are cited for the fact that the matters they describe were publicly reported.

140. The Council dates the Local Law's origin to 2007. Its release on passage states that it "first introduced legislation to ban horse-drawn carriages in 2007."[57]

141. The bills that followed were framed principally around the horses, and none was enacted:

a. Int. 44-2006 (horse-drawn cabs) was never heard;

b. Int. 658-2007 proposed "repealing all provisions allowing for the operation of horse drawn cabs," and was heard in 2009 and filed;

c. Int. 86-2010 proposed "replacing horse drawn carriages with alternative fuel powered classic cars," and was heard in 2010, with Int. 92-2010, which again proposed "repealing all provisions allowing for the operation of horse drawn cabs," and Int. 93-2010, and filed;

[57] Press Release, N.Y.C. Council, "Speaker Julie Menin and the New York City Council Pass Historic Romanch's Law to Phase Out Horse Drawn Carriage Industry" (Oct. 22, 2026), https://council.nyc.gov/press/2026/10/22/3306/ (stating that the Council "first introduced legislation to ban horse-drawn carriages in 2007").

d. Int. 670-2011 addressed “the humane disposition of licensed carriage horses”;

e. Int. 573-2014, introduced at the Mayor’s request, became a park-only compromise in 2016 that never came to a vote;

f. Int. 573-2022, “Ryder’s Law,” was named for a horse and was never heard; and

g. Int. 967-2024 was voted down in committee (see n. 19).

142. Each time the Council itself acted, it regulated. In 2010 it imposed furloughs, area and hour limits and an indexed fare (Local Law 10 of 2010). In 2019 it barred work in specified heat conditions (Local Law 203 of 2019). (n. 25.) In 2016 the Council’s own committee staff reported that “there is no evidence to suggest that any carriage horse has been sent for slaughter or otherwise disposed of in an inhumane manner.”[58]

143. The organizations that pressed for abolition described their cause the same way:

h. NYCLASS was formed “with the core mission of saving New York City carriage horses and protecting animals” (Ex. 24, at 36), and describes itself to the Campaign Finance Board (“CFB”) as “a non-profit multi-animal welfare and advocacy organization”;[59]

---

[58] Committee on Transportation, Committee Report for the Jan. 22, 2016 hearing on Proposed Int. No. 573-A, at 3, https://legistar.council.nyc.gov/View.ashx?M=F&ID=4216703&GUID=61D5B786-ED09-474D-809A-6175F6DA65C1 (posted as a Word document; page 3 as printed). See n. 16.

[59] N.Y.C. Campaign Finance Board, Independent Spender Profiles: NYCLASS (2013), https://www.nyccfb.info/VSApps/IndependentSpenderSummary.aspx?as_election_cycle=2013&cand_name=NYCLASS&spender_id=Z52; NYC Is Not For Sale (2013), https://www.nyccfb.info/VSApps/IndependentSpenderSummary.aspx?as_election_cycle=2013&cand_name=NYCN4S&spender_id=Z15; NYCLASS Animal Protection (2017), https://www.nyccfb.info/VSApps/IndependentSpenderSummary.aspx?as_election_cycle=2017&cand_name=NYCLASS+Animal+Protection&spender_id=Z81; New York Deserves Better PAC (2021), https://www.nyccfb.info/VSApps/IndependentSpenderSummary.aspx?as_election_cycle=2021&cand_name=New+York+Deserves+Better+PAC&spender_id=Z150. *See also* CFB, *By the People: The New York City Campaign Finance Program in the 2013 Elections* (2013 Post-Election Report) (2014), at 8, 78, https://a860-gpp.nyc.gov/concern/file_sets/0p096b96j.

i. the American Society for the Prevention of Cruelty to Animals ("ASPCA") told the Committee that its support "is rooted in" its "160-year history" of protecting horses (Hearing Tr. 240); and

j. NYCLASS's Executive Director said at the October 15, 2026 rally described below that NYCLASS "was founded on freeing these horses and retiring them to farms" (Rally Video at 8:47).[60]

144. Int. 573-2014, introduced at the Mayor's request, was referred to the Committee on Transportation. 19(n. 16.) On February 26, 2015, the Mayor's Director of City Legislative Affairs, the official responsible for the Administration's dealings with the Council,[61] sent senior members of the Mayor's staff an "[u]pdate for the Mayor before he calls Nislick." (Ex. 27.) It reported that he and a colleague had spoken with Mr. Nislick ("SN") two days earlier and that "CH" — City Hall — "and NYCLASS will continue our short term focus on persuadable Transportation Committee members for the horse carriage bill." It named six members of the Committee and stated, "We need 3 of them to get a majority of the committee." It also reported that Mr. Nislick was "very concerned that DOHMH missed an opportunity to shine a negative light on the industry in wake of suspicous [*sic*] carriage horse death last week," and that the two staff members "agree and are following up with DOHMH and City Hall Comms to make sure it doesn't happen again." (*Id.*) The update did not mention public safety. DOHMH licenses and inspects the carriage horses

[60] New York City Council, "LIVE: Speaker Menin holds rally on upcoming vote to end horse-carriage industry" (streamed live Oct. 15, 2026, on the Council's official YouTube channel), https://www.youtube.com/watch?v=koHZloP65f0 ("Rally Video"). Cited by elapsed time. In the recording, speakers refer to the Council vote as taking place "next Thursday," October 22, 2026.

[61] Press Release, Office of the Mayor, "Mayor de Blasio Names Jon Paul Lupo as Director of Intergovernmental Affairs" (Jan. 11, 2018), https://a860-gpp.nyc.gov/concern/nyc_government_publications/zc77ss781 (stating that Mr. Lupo was previously Director of City Legislative Affairs and "responsible for managing the Administration's interactions with the City Council").

(¶ 48), and the Local Law gives its commissioner the power to designate, without any stated standard, the "inhumane purpose[s]" against which every owner must certify (¶ 115). Int. 573 never came to a vote. (¶ 45.) The email was produced in response to a request under New York's Freedom of Information Law. Plaintiffs seek it, and similar communications concerning a ban on horse-drawn carriages or real estate transactions involving the carriage horse stables, by expedited discovery.

145. On November 14, 2025, the Committee on Health took up Int. 967 under Council Rule 7.110, without public testimony, and voted it down: one vote in favor, four against and two abstentions. The Committee's Chair, Council Member Schulman, abstained. Council Member Menin, then a member of the Committee, was called and did not vote.[62] Eleven months later, three Committee members who had voted against Int. 967, or who had abstained, voted for Int. 943-A. (Ex. 15.)[63]

**M. The Stated Rationale Shifts to "Public Safety," 2025–2026**

146. On September 17, 2025, seven weeks before a general election in which he was a candidate, then-Mayor Adams issued Executive Order 56 and a Message of Necessity for Int. 967,

[62] Transcript, Committee on Health meeting of Nov. 14, 2025, https://legistar.council.nyc.gov/View.ashx?M=F&ID=15013280&GUID=76662C6D-6FF0-4D0A-B7F2-5A43E3F8E362, at 2, 6 (meeting held "[p]ursuant to Council Rule 7.110"), 12 (Council Member Brannan), 17–19 (roll call); Legistar action record, "Defeated by Committee" (1 affirmative, 4 negative, 2 abstentions), https://legistar.council.nyc.gov/HistoryDetail.aspx?ID=35404975&GUID=38C719D5-C63C-4C02-8856-0ACB4191886A; Committee Report for the Nov. 14, 2025 meeting, https://legistar.council.nyc.gov/View.ashx?M=F&ID=14951797&GUID=08727330-44CB-4D46-AA52-A45FD65E0AD9; meeting record and video, https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1350928&GUID=FA4CCE71-DD44-4731-9480-FCB2D2011C74.

[63] Legistar action record, Committee on Health, "Approved by Committee," Proposed Int. No. 943-A (6 affirmative, 3 negative), Oct. 22, 2026, https://legistar.council.nyc.gov/HistoryDetail.aspx?ID=37978412&GUID=C5A3B66C-04BC-4244-A43F-3F0D8C94DA24. *Compare* the Nov. 14, 2025 roll call on Int. 967 (n. 59). The Council's roll call (40–7–2) is Ex. 15 and is also at https://legistar.council.nyc.gov/HistoryDetail.aspx?ID=37958245&GUID=ABC40324-45AE-4543-9A6E-EFBFC1D3E7B5.

citing "public safety and animal welfare concerns."[64] As a candidate in 2021, when Local 100 endorsed him, Mr. Adams had appeared to oppose a ban.[65] His First Deputy Mayor, who had previously represented NYCLASS, publicly supported the call.[66]

147. The Council's spokesperson responded that the Mayor was "politically using it for his reelection campaign" and that it was "opportunistic and not helpful."[67] At the November 14, 2025 meeting, Council Member Brannan said the Mayor had "suddenly woke[n] up a month ago and started caring about the horses." (n. 59, Tr. at 12.)

148. On June 9, 2026, Council Member Marte and the president of Voters For Animal Rights ("VFAR"), a registered lobbying organization, issued a joint statement. It listed a Council staff member as its media contact and announced that Marte would introduce the bill that Thursday. ***Its stated reason was that horses "deserve dignity and compassion" and "should not be forced to navigate the noise, traffic, and demands" of City streets***.[68] Int. 943 was introduced on June 11. Mr. Mahajan died on June 17.

[64] Press Release, Office of the Mayor, "Mayor Adams Calls on City Council to Ban Horse-Drawn Carriages, Signs Executive Order Strengthening Oversight and Enforcement of Industry and Ensuring City Agencies Are Preparing for Eventual City Council Ban" (Sept. 17, 2025), https://www.nyc.gov/mayors-office/news/2025/09/mayor-adams-calls-on-city-council-to-ban-horse-drawn-carriages--; Executive Order 56 (Sept. 17, 2025), https://www.nyc.gov/content/dam/nycgov/mayors-office/downloads/pdf/executive-orders/2025/eo-56.pdf; Letter of Necessity for Int. 967-2024, https://www.nyc.gov/content/dam/nycgov/mayors-office/downloads/pdf/press-releases/2025/letter-of-necessity-int-967-2024-horse-carriages.pdf (citing "public safety and animal welfare concerns"); Message of Necessity as filed with the Council, https://legistar.council.nyc.gov/View.ashx?M=F&ID=14814926&GUID=C887B3B5-501D-487F-AB38-B19B4B4ED1F0.

[65] "Mayor Adams reverses course on horse carriage ban," *Amsterdam News* (Sept. 25, 2025), https://amsterdamnews.com/news/2025/09/25/mayor-adams-reverses-course-on-horse-carriage-ban/.

[66] "All the major NYC mayoral candidates want to ban horse-drawn carriages," *City & State* (updated Sept. 19, 2025), https://www.cityandstateny.com/policy/2025/09/where-do-nyc-mayoral-candidates-stand-banning-horse-drawn-carriages/408211/.

[67] "As NYC Mayor Eric Adams calls for carriage horse ban, TWU calls him a backstabber and liar," *CBS New York* (Sept. 17, 2025), https://www.cbsnews.com/newyork/news/nyc-mayor-eric-adams-carriage-horse-ban.

[68] Voters For Animal Rights, "Statement on the Death of a NYC Carriage Horse, June 2026" (June 9, 2026), https://vfar.org/statement-on-the-death-of-a-nyc-carriage-horse-june-2026/ (joint statement of Council Member

149. As we stated above, on June 17, 2026, the driver of the carriage in which Mr. Mahajan and his family were riding stepped away from it to photograph them, and the horse bolted. (¶ 91.) Local 100 publicly condemned the driver's conduct and supported an investigation; the carriage's owner suspended the driver indefinitely and retired the horse; and Local 100 voluntarily suspended carriage operations to retrain drivers and review safety procedures. (¶ 22; nn. 8, 32; Chiarello Decl. ¶ 13.)

150. Five days later, on June 22, Council Member Marte held a vigil for Mr. Mahajan at the Cherry Hill fountain in Central Park, near where the horse had broken away (n. 32). There he announced that his pending bill to ban the trade — until then called "Ryder's Law," after a horse which had died (¶ 46) — would be renamed "Romanch's Law," and he read aloud statements from Mr. Mahajan's family addressed to the Mayor. One said that the death *"was not an unpredictable accident. It was a direct result of a severe safety violation and systemic failure to protect tourists."* The family called on the Council and the Mayor "to take immediate, decisive action." Marte then stated: "*What happened last week is a stain to our city*." Answering Local 100's proposed safety measures, he said: "The only way you get Vision Zero in Central Park is by having no horse carriages here."[69]

---

Marte and VFAR's president, announcing that Marte would introduce the bill "this Thursday," and listing a Council staff member as media contact).

[69] The events of June 22, July 14–15 and October 2026 described in this Part are cited to the following public statements and reports, the reports for the fact that the statements were publicly reported. June 22, 2026 vigil: "Vigil held for crash victim as carriage horses set to return to Central Park," *ABC7 NY* (June 22, 2026), https://abc7ny.com/post/vigil-planned-romanch-mahajan-carriage-horse-training-resumes-central-park/19353878/ (Cherry Hill Fountain; "stain to our city"; renaming); Ethan Stark-Miller, "'Zero' sum game? Manhattan pol says horse carriage industry must be banned in NYC after teen's death, despite drivers' union safety efforts," *amNY* (June 22, 2026), https://www.amny.com/news/horse-carriage-industry-ban-push-teen-death-union/ (statements addressed to the Mayor; "Vision Zero"; "no training"); Lisa Rozner, "Vigil held for tourist killed in Central Park horse carriage crash is part of latest push for citywide ban," *CBS News New York* (updated June 23, 2026), https://www.cbsnews.com/newyork/news/vigil-for-horse-carriage-crash-victim-central-park/ (family statement); Erin White, "Renewed legislation would ban horse-drawn carriages in Central Park following teen tourist's death," *1010 WINS* (June 22, 2026), https://www.audacy.com/1010wins/news/local/renewed-legislation-would-ban-horse-drawn-carriages-in-central-park-following-teen-tourists-death. July 15, 2026 rally and hearing: N.Y.C. Council,

151. On July 14, 2026, Speaker Julie Menin announced her support *"for the safety of New Yorkers, visitors from around the world, and the horses themselves."* Her announcement said that Mr. Mahajan's death "was heartbreaking, and it was preventable," and that "***[t]hat tragedy is why I have decided to support Romanch's Law***."[70]

152. The next day, the Speaker and Marte joined Mr. Mahajan's family at a rally on the steps of City Hall before the Committee's hearing. Testifying at the hearing, Mr. Mahajan's father said that his son's death *"was not an unpredictable accident"*; that "*[i]t was a safety violation, a system failure to protect the people who visit our city*"; and that "*everyone responsible has admitted the driver should never have left that carriage."* He asked the Committee: *"Let our son be the last victim of* the *industry."* (Hearing Tr. 27–28.) At the hearing, the Speaker said that *"passing his law is one way to seek justice for him and his family.*" (Hearing Tr. 17.) Marte later told the Committee that "[t]he preventable death of Romanch has proven that we can't reform our way out of this." (Hearing Tr. 24.)

153. The family's testimony remained central through the period leading up to passage. Two days before the vote, the Speaker said that the family's testimony "*really was, I think, a game*

---

"Council Member Carl Wilson Rallies in Support of Romanch's Law and Questions the Administration on Implementation," https://council.nyc.gov/carl-wilson/council-member-carl-wilson-romanchs-law/ (rally on the steps of City Hall with the Mahajan family, the Speaker and the sponsor) (July 16, 2026); "Father of Indian teen killed in New York horse carriage accident pleads for ban on vehicle," *IANS* (July 16, 2026), https://ianslive.in/father-of-indian-teen-killed-in-new-york-horse-carriage-accident-pleads-for-ban-on-vehicle--20260716085103; Jacqueline Gordon, "Horse Carriage Ban Edges Closer After 9 Hour City Council Hearing," *West Side Spirit* (July 17, 2026), https://www.westsidespirit.com/news/horse-carriage-ban-edges-closer-after-9-hour-city-council-hearing-BE6035407 ("last victim of this industry"); Nicole Rivard, "NYC carriage horse trade has no future but FoA will make sure the horses do," *Friends of Animals* (July 28, 2026), https://friendsofanimals.org/?p=556509 (quoting the sponsor). October 2026: Ethan Stark-Miller, "EXCLUSIVE | Speaker Menin talks with amNewYork about what made her support historic end to Central Park horse carriages," *amNY* (Oct. 20, 2026), https://www.amny.com/news/speaker-menin-horse-carriage-phase-out-central-park/; Ethan Stark-Miller, "The 'neighs' have it: City Council approves bill to ban 168-year-old horse carriage industry in Central Park," *amNY* (Oct. 22, 2026), https://www.amny.com/nyc-transit/city-council-approves-horse-carriage-ban/ (family members present for the vote).

[70] Press Release, N.Y.C. Council, "Speaker Julie Menin Announces Support for Romanch's Law to End Horse-Drawn Carriages in Central Park" (July 14, 2026), https://council.nyc.gov/press/2026/07/14/3175/.

*changer for so many*." Members of the family attended the vote. On passage, the Speaker said that "*[t]he tragic and preventable death of 18-year-old Romanch Mahajan this summer underscored the need for urgent action*"; Council Member Marte credited "the courage of the Mahajan family"; the Committee's Chair said that the death "underscores why we can no longer ignore these risks"; and the **Council's release quoted NYCLASS's Executive Director:** "*They turned their heartbreaking loss into a powerful call for change. Today, our city is answering that call …*" (nn. 54, 66.) After passage, the Speaker wrote the bill's supporters that "[c]alls for change intensified in 2022 following the collapse of a carriage horse named Ryder," and that Mr. Mahajan's death "made it painfully clear that an urgent change was needed." (Ex. 19.)

154. The Local Law contains no findings. The Council made no finding about the cause of the bolting; none that any licensee other than the one driver had violated any rule; and none that his conduct was typical of a trade whose compliance record the City's own witnesses described (Part V.E). Nor did the Council address the family's claims against the City, which, as reported, fault the City's failure to install hitching posts and to prevent stray voltage (¶¶ 89, 92–93). Having named the Local Law for a death that its sponsor publicly tied to one driver's violation of a rule the City already enforces — and that the family attributes in part to the City's own failures — the Council ended the licensed vocation of every Medallion holder and driver in the City.

155. On October 22, before the Stated Meeting, the Speaker described the Local Law as the culmination of *"a fight we have been engaged in since 2007*," a *fight "for animal welfare and for public safety."* (Press Conference Video at 0:41.)[71] A week earlier, at an October 15, 2026 rally

---

[71] Video recording, "LIVE: Speaker Menin and Council Members Discuss Today's Stated Meeting," posted by the New York City Council on its official YouTube channel (Oct. 22, 2026), https://www.youtube.com/watch?v=49sstS8f0Mw (the "Press Conference Video"). Citations are to elapsed time in the recording.

with NYCLASS and People for the Ethical Treatment of Animals ("PETA"), Speaker Menin acknowledged that the policy predated the safety rationale:

> "*While the issue was always a question of animal welfare, we also understand that human lives are at stake here as well."* (Rally Video at 3:09)

156. Council Member Marte told the Committee, before its October 22 vote, that the ASPCA "*was started to address one specific issue,*" the condition of the carriage horses, and that "[*n]ow we are here, nearly two centuries later, to complete this mission*." (Health Committee Video at 3:58; *see* Stated Meeting Video at 01:30:52.)[72] (*See also* Part V.P.)

157. The Council Members who led the Local Law advocacy tied it to the advocacy organizations, to elections and to polling. At the October 15, 2026 rally the Speaker said that "we know how New Yorkers feel about the issue," and on the floor she thanked NYCLASS and PETA. (Rally Video at 0:46; Stated Meeting Video at 00:44:19.) At the rally she also said:

> *"I want to also recognize the amazing activists who have been on the front lines of this battle: NYCLASS, PETA, ASPCA … Without their partnership and their tireless efforts, we would not be here today". (*Rally Video at 0:46.)

158. Council Member Marte told the Committee: "***We've seen the polls. … Elections have been decided because of this, but it's all been talk."*** He thanked NYCLASS: "*This could not have been possible without your organization … Because of you, we will free the horses*." (Health Committee Video at 3:58.) On the floor he thanked NYCLASS's Executive Director,

[72] Video recording of the meeting of the Committee on Health of October 22, 2026, at which the Committee amended and approved Proposed Int. No. 943-A, https://vbfast-vod.viebit.com/counciln/PGLqkCJa9XSZuvvI/NYCC-PV-CH-CHA_261022-Health.mp4. The recording is accessed through the "Video" link on the Council's official record of that meeting, https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1455920&GUID=3BD37871-5730-4F5C-B23B-01FE59BF20DE&Options=ID|Text|&Search=int+943 (together, the "Health Committee Video"). Citations are to elapsed time in the recording (minutes:seconds).

PETA and VFAR, and members of the public who had responded to a telephone poll: "You guys made this happen." (Stated Meeting Video at 02:21:04.)

159. Other members spoke in the same terms (Health Committee Video at 0:36, 7:28, 12:21):

k. Council Member Epstein, chair of the Council's Animal Welfare Caucus, said: "*We're standing with animal rights organizations to help this transition*";

l. the Chair described the Local Law as being about "public safety," "the well-being of the horses" and the workers; and

m. Council Member De La Rosa, who had voted against Int. 967 in 2025, explained that her votes "have never been about not caring for the … animals"; "they center around workers' rights."

160. Council Member Gennaro, voting "no", told the Committee that in 2013 NYCLASS had "*crushed*" the Speaker then in office with *"a million dollars*" in spending; that NYCLASS "*does have the ability to determine winners and losers*" in mayoral and borough-wide elections; and that "*I don't think that fact has been lost on the speaker and our political advisors and people who want to run for borough offic*e." (Health Committee Video at 14:49.)

161. The advocacy organizations claimed credit in the same terms:

n. NYCLASS led a chant at the October 15 rally: "Julie Menin led the way. Carriage ban is on the way." (Rally Video at 8:47);

o. the Council's October 14 release quoted NYCLASS's president thanking the Speaker for "leading this coalition" (n. 47);

p. PETA reported that, working alongside NYCLASS, it "rallied support from hundreds of thousands of PETA supporters";[73]

q. PETA, which says it has fought for the bill "for over four decades," joined the Speaker at a news conference just before the vote and pledged $50,000 toward the horses' care (n. 70);

r. VFAR told the Committee that it represents more than "100,000 New York City voters" for whom animal protection is "a top priority at the ballot box" (Hearing Tr. 238); and

s. the Majority Leader announced his support in a July 6, 2026 social-media video and in a statement NYCLASS released.[74]

162. The 68 percent figure supporters cited (¶ 100) came from a poll sponsored by the Central Park Conservancy and fielded June 30 to July 4, 2026, and the reasons for support it reports begin with "[p]rotecting horse welfare."[75] **The Council made no finding, before October 22, 2026, that the regulation it had enacted in 2010 and 2019 had failed, or that safety required abolition rather than regulation. (**Part V.G.)

## N. The Advocacy Campaign: Election Spending, Enforcement Findings, Reported Investigations and Lobbying

---

[73] People for the Ethical Treatment of Animals, "Victory! NYC to Put Carriage Industry Out to Pasture; PETA Pledges $50K Toward Horses' Retirement" (news release, Oct. 22, 2026), https://www.peta.org/media/news-releases/victory-nyc-to-put-carriage-industry-out-to-pasture-peta-pledges-50k-toward-horses-retirement/; *see also* PETA, "BREAKING: NYC to End Horse-Drawn Carriage Rides, PETA Pledges $50,000" (Oct. 22, 2026), https://www.peta.org/news/new-york-city-bans-horse-drawn-carriages/.

[74] "Horse carriage ban legislation gains steam as Council Majority Leader Abreu jumps on board," *amNY* (July 2026), https://www.amny.com/nyc-transit/horse-carriage-ban-legislation-abreu-support/.

[75] Zenith Research, Memorandum, "New Poll: New Yorkers' Views of Horse-Drawn Carriages" (July 9, 2026) (stating "Poll Sponsored By: The Central Park Conservancy"; field dates June 30–July 4, 2026), https://s3.amazonaws.com/assets.centralparknyc.org/media/documents/2026_Zenith-Research-x-CPC-Horse-Drawn-Carriage-Poll-Memo.pdf; *see also* Central Park Conservancy, Press Release (July 9, 2026), https://www.centralparknyc.org/press/new-poll-more-than-two-thirds-of-new-yorkers-support-ending-horse-drawn-carriages-in-new-york-city.

163. ***2013 spending.*** In 2013 NYCLASS reported $554,000 in contributions. It spent $189,440 in City elections: $123,797 opposing Speaker Quinn, who had declined to advance a ban, and $65,643 supporting other candidates. (n. 56.) A separate committee, "NYC Is Not For Sale" ("NYCN4S"), whose three-member board in 2013 included NYCLASS's founders Steve Nislick and Wendy Neu, spent $856,762 opposing Speaker Quinn under an "Anybody But Quinn" banner. (n. 56; Ex. 24, at 33.) The CFB reported that NYCLASS and NYCN4S together devoted nearly $1 million to defeating her. (n. 56 (Post-Election Report at 8, 78).)

164. ***2013 mailer and contributions***. NYCLASS's 2013 mailer presented its slate under the heading "Phase out cruel horse carriages." NYCLASS also reportedly supported and donated to Mr. de Blasio's 2013 campaign after he vowed to ban the horses.[76]

165. ***Enforcement findings***. Election and lobbying regulators found violations in connection with the campaign:

t. ***October 2013***. NYCLASS and its authorized representative, Allison Feldman, were held jointly and severally liable for a $1,560 penalty for running a phone bank without a "paid for by" notice, using a script that described the caller as "with the Yetta Kurland Campaign." (Ex. 24, at 4–5.)

u. ***May 2014.*** The CFB treated NYCLASS mailers supporting two Council candidates as over-the-limit in-kind contributions and assessed penalties of $8,686 and $7,868 against their campaigns. (Ex. 24, at 14.)

[76] "Is New York City ready to say 'neigh' to Central Park's carriage horses?," *Gothamist* (2025), https://gothamist.com/news/is-new-york-city-ready-to-say-neigh-to-central-parks-carriage-horses.

v. ***December 2014***. The CFB assessed $26,054 against NYCLASS and Ms. Feldman, jointly and severally, for "cooperating in expenditures reported to be independent" and for "material misrepresentation." (Ex. 24, at 6–10.)

w. ***The consultant***. The CFB found that NYCLASS's consultant, The Advance Group ("TAG"), acted as NYCLASS's agent and that NYCLASS operated from its office, and assessed TAG $15,000; the Attorney General separately obtained $10,800. (Ex. 24, at 11–16, 26.)[77]

x. ***Earlier lobbying finding***. In its 2010 annual report, which also addressed complaints of unreported lobbying on the carriage ban, the City Clerk found that the League of Humane Voters of New York had engaged in unreported lobbying in 2007 and 2008 and assessed $104,290 in late-filing fees. (Ex. 24, at 1–3.)

166. ***CFB audit of the de Blasio campaign***. The audit traced $50,000 from a campaign intermediary, through NYCLASS to NYCN4S. Those funds were later refunded, with $227,000 contributed by individuals and entities associated with or controlled by NYCLASS, Mr. Nislick and Ms. Neu. The CFB found that "the amount and pattern of these contributions indicates cooperation between the contributors, NYCN4S, NYCLASS, and TAG." (Ex. 24, at 32–33.)

167. ***Reported federal inquiry.*** In April 2014 the *New York Daily News* reported that the FBI was examining Mr. de Blasio's March 2013 pledge, the anti-Quinn advertising, and a reported threat by NYCLASS's consultant to undermine Speaker Quinn's campaign unless she backed a

[77] N.Y.C. Campaign Finance Board, Final Board Determination No. 2015-1, *In the Matter of The Advance Group, Inc.* (Oct. 8, 2015), https://www.nyccfb.info/law/advisory-opinions/2015-1-matter-advance-group-inc/.

ban.[78] NYCLASS dropped the consultant in May 2014.[79] In March 2017 the U.S. Attorney announced that, absent additional evidence, no federal charges would be brought in the City Hall fundraising investigation; the statement does not name NYCLASS.[80]

168. ***Lobbying-law settlement***. In 2018 NYCLASS, Mr. Nislick and Ms. Neu settled with the State Joint Commission on Public Ethics. They admitted that in 2014, while they lobbied the Mayor and City officials "on issues relating to the horse carriage industry," the Mayor "directly asked Nislick to donate" to the Campaign for One New York, a nonprofit supporting the Mayor's agenda. Ms. Neu gave $25,000 that year, and each gave $50,000 in 2015. NYCLASS admitted that it failed to register and report as a lobbyist from January to July 2014 and paid $10,000. (Ex. 24, at 36–38.)[81]

169. ***2017 spending***. In 2017 "NYCLASS Animal Protection" spent $231,456 supporting six Council candidates. The CFB assessed it $38,566 for six failures to file required disclosures of $237,284.50 in transactions in the two weeks before the primary. (n. 56; Ex. 24, at 34–35.)

---

[78] Greg B. Smith, "Exclusive: FBI Investigation of Mayoral Race Includes de Blasio's Pledge to Ban Carriage Horses," N.Y. Daily News (Apr. 25, 2014), https://www.nydailynews.com/2014/04/25/exclusive-fbi-investigation-of-mayoral-race-includes-de-blasios-pledge-to-ban-carriage-horses/.

[79] "NYCLASS Drops Advance Group Amid Mounting Bad Press," *Times Union*, Capitol Confidential (May 2014), https://blog.timesunion.com/capitol/archives/213376/nyclass-drops-advance-group-amid-mounting-bad-press/.

[80] Press Release, U.S. Attorney's Office, S.D.N.Y., "Acting U.S. Attorney Joon H. Kim Statement on Investigation into City Hall Fundraising" (Mar. 16, 2017), https://www.justice.gov/usao-sdny/pr/acting-us-attorney-joon-h-kim-statement-investigation-city-hall-fundraising.

[81] Press Release, N.Y. State Joint Commission on Public Ethics, "JCOPE Settles Allegations of Lobbying Act Violations Related to Donations to Campaign for One New York" (Apr. 9, 2018), archived at https://web.archive.org/web/20260717172947/https://ethics.ny.gov/news/jcope-settles-allegations-lobbying-act-violations-related-donations-campaign-one-new-york.

170. ***2021 spending***. In 2021 "two founders of NYCLASS" reportedly paid for advertising against a mayoral candidate that was leading Eric Adams in the polls.[82] A committee formed to oppose him spent $153,500. (n. 56.)

171. ***Lobbying, 2021–2026.*** From 2021 through August 2026, NYCLASS reported $1,243,216.89 in City lobbying compensation and expenses, across subjects that include the carriage bills.[83] In 2026 alone, through August, its reports include $100,000 to JMG Strategies on Int. 967 and then Int. 943; $20,000 to Geto & de Milly on Int. 943, naming the Majority Leader as a target; and $97,729.89 in July–August advertising in the *New York Post*, on Spectrum Reach, in *City & State* and on Facebook, reported against Int. 943 and other animal bills. Its target lists named Speaker Menin's staff, Council Members, the Manhattan Borough President and the Comptroller. (See n. 80.)

172. ***In 2026*** VFAR reported $24,999.98 in City lobbying, including a retained lobbyist who listed Speaker Menin and Council Member Marte as targets on Int. 943. PETA reported $12,663.69, including outdoor advertising, on reports naming Int. 943. The ASPCA, the Animal Legal Defense Fund (including paid patch-through calls) and the Central Park Conservancy also reported lobbying on Int. 943 or a carriage ban. (Ex. 25; n. 80.)[84]

**O.** Pledges, Endorsements and the Mayor's Office of Animal Welfare

---

[82] "De Blasio Is Making Another Push To Ban Horse Carriages In NYC," *Gothamist* (Nov. 26, 2021), https://gothamist.com/news/de-blasio-is-making-another-push-to-ban-horse-carriages-in-nyc-heres-what-you-need-know.

[83] N.Y.C. City Clerk, eLobbyist Data (report years 2021–2026), https://data.cityofnewyork.us/City-Government/City-Clerk-eLobbyist-Data/fmf3-knd8. Individual periodic reports may be retrieved by report number at https://lobbyistsearch.nyc.gov/: NYCLASS in-house reports #471725, #625405, #641734, #646462, #651762 and #656966; JMG Strategies Inc. for NYCLASS, #642339, #646973, #650809 and #656036; Geto & de Milly Inc. for NYCLASS, #651184 and #657565; PETA, #641760, #646574, #652140 and #656813; ASPCA, #625177 and #656504; Animal Legal Defense Fund, #657474; Central Park Conservancy, #640431 and #645018. The 2026 reports of Voters For Animal Rights and its retained lobbyist are annexed as Ex. 25.

[84] Totals are as reported in the eLobbyist filings identified in n. 80 and in Ex. 25.

173. ***The 2021 questionnaire.*** Candidates sought the abolitionists' endorsements by pledging to abolish the trade. VFAR's 2021 Council questionnaire described only the horses' welfare: their "working and living conditions," long days in extreme weather, a horse "euthanized after collapsing," and horses "sent or sold to slaughter." It then asked: "Would you cosponsor and vote for legislation to ban horse carriages in New York City?" (Ex. 26.)

174. ***Answers of members who voted for the Local Law.*** At least twelve of the forty members who voted for the Local Law answered "YES" in writing in 2021, and at least one who answered "NO" voted for it. (Ex. 26.) The individual answers include:

y. the sponsor, Council Member Marte, answered "YES" (Ex. 26, at 8);

z. the Chair, Council Member Schulman, answered: "Yes. I am committed to the banning of horse carriages" (Ex. 26, at 12);

aa. Council Member Epstein, now chair of the Animal Welfare Caucus, answered "Yes" when VFAR's 2020 and 2022 State questionnaires asked whether he would co-sponsor and vote for a carriage ban (Ex. 26, at 59–60, 63–64); and

bb. the Speaker, then a candidate, wrote that she would work "to end the horse carriage industry in NYC"; on the ban question itself she marked neither answer and wrote that she was "committed to the safety of the animals," and she answered "YES" to "stronger protections for all working horses" (Ex. 26, at 4–5).

175. ***Mayoral pledges***. In the 2025 primary, Mayor Mamdani answered NYCLASS's questionnaire: "Horse-drawn carriages are inhumane and unnecessary." He pledged to support legislation and efforts to shut the industry down.[85]

[85] *See* n. 63.

176. ***2025 endorsements***. VFAR's 2025 primary and general-election endorsements included fourteen of the forty members who voted for the Local Law, among them the Speaker, the sponsor, the Chair and Council Member Epstein. VFAR ranked Mayor Mamdani first in a competitive primary.[86]

177. ***The MOAW Director***. The Director of MOAW is Allison ("Allie") Feldman Taylor. (Written Test. Pt. 1, at 1.) According to her public professional profile, she has served as:[87]

cc. Lead Organizer of NYCLASS, June 2011 to April 2013;

dd. Director of NYCLASS, April 2013 to December 2016;

ee. Founder and President of VFAR, August 2016 to April 2026;

ff. a member of VFAR's board, April 2026 to June 2026; and

gg. Director of MOAW, July 2026 to the present.

178. As NYCLASS's authorized representative, she was held jointly and severally liable for the CFB penalties assessed in October 2013 and December 2014. (Ex. 24, at 4–10.)

179. VFAR's City lobbying reports for January–February and March–April 2026 list "Feldman Taylor, Allie" as VFAR's President and as an employee lobbying for it. The matters lobbied include a local law "prohibiting the operation of horse drawn cabs." (Ex. 25, at 1, 30.) VFAR's June 9, 2026 joint statement with the sponsor was issued while she sat on VFAR's board.

---

[86] Voters For Animal Rights, "2025 New York City Primary Elections," https://vfar.org/?vfar_endorsement=2025-new-york-city-primary-elections; Voters For Animal Rights, "2025 General Election Candidate Endorsements," https://vfar.org/?vfar_endorsement=2025-general-election-candidate-endorsements.

[87] Allie Taylor, LinkedIn profile, https://www.linkedin.com/in/alliefeldman (viewed and saved Nov. 14, 2026). The profile lists the following positions, with dates as stated there: "Director, Mayor's Office of Animal Welfare," NYC Office of the Mayor, "July 2026 – Present"; Voters For Animal Rights, "Board Member," "April 2026 – June 2026," and "Founder & President," "August 2016 – April 2026"; and NYCLASS, "Director," "April 2013 – December 2016," and "Lead Organizer," "June 2011 – April 2013." It lists the contact address "allie@vfar.org." LinkedIn may require a sign-in to view the full profile; a copy as saved on Nov. 14, 2026 is retained by counsel.

(n. 65.) VFAR continued to lobby the City on Int. 943 after she became Director of MOAW. (Ex. 25, at 84–147.)

180. MOAW submitted the Administration's only stated reason why regulation could not work (¶ 101). It did so on July 15, 2026, the month Allie Taylor became its Director. Under the Local Law, MOAW receives the advance notice every owner must give before disposing of a licensed horse. (Local Law § 4, amending Admin. Code § 17-329.)

181. Taylor's public professional profile, which identifies her as Director of MOAW, gives her contact email as allie@vfar.org. That is an address at the registered lobbying organization she founded and led, which lobbied for the Local Law and continues to lobby the City. (n. 84; Ex. 25.) Upon information and belief, her continued access to and use of that organization's address while serving as the City official responsible for animal welfare shows an inappropriate commingling of a City office with a registered lobbyist that advocated for the Local Law.

**P. The Council's One-Sided Vilification of a Licensed Trade**

1. The standard applied in DoorDash.

182. In *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268 (S.D.N.Y. 2023), a court of this District sustained Contracts Clause, takings and police-power claims against a local law whose sponsors had disparaged the businesses it regulated. The court relied on:

aaaa. a legislative history showing "a certain hostility" to the plaintiffs and a "not-so-veiled purpose" of "antagonism" toward them (*id.* at 292 (quoting *Melendez v. City of New York*, 16 F.4th 992, 1040 (2d Cir. 2021)));

bbbb. a sponsor's charge, as alleged in the complaint there, that the plaintiffs "knowingly and willingly took advantage of small business, and the pandemic highlighted this abuse" (*id.* at 283);

cccc. the absence of "studies, data, or other analyses" behind the characterizations (*id.* at 280–81; *see id.* at 293–94, 299); and

dddd. "the statements by the council members who sponsored the legislation evinced a hostility toward them as out-of-state actors" (*id.* at 299).

183. The record here has each of those features, in stronger form. The prime sponsor accused Plaintiffs not of commercial "abuse" but of animal cruelty, a crime under N.Y. Agric. & Mkts. Law § 353. A week before the vote, the Council convened and broadcast an official event at which an advocacy organization told the public that the drivers beat horses for money. Members who voted for the Local Law repeated the accusations, two as things they had personally seen, without reporting them to any regulator, and members acknowledged on the floor the hostility of the campaign. No study, finding or enforcement record supported the accusations, and the City's own regulators testified to the contrary. (¶¶ 197–201.)

*2. "Legalized animal cruelty": the sponsor's accusations.*

184. ***"Legalized animal cruelty."*** At the July 15 hearing the prime sponsor, Council Member Marte, called the licensed trade "*this inhumane industry*" and asked his colleagues to "*finally put an end to this form of legalized animal cruelty.*" (Hearing Tr. 24–25.) He repeated the phrase at the committee vote, where he told the advocates, "*Because of you, we will free the horses,*" and again on the floor before final passage. (Health Committee Video at 3:58; Stated Meeting Video at 01:30:52.) Council Member Shahana Hanif echoed the charge on the floor, calling the trade "*the dangerous and inhumane horse-drawn carriage industry*." (Stated Meeting Video at 02:11:13.) The charge has no basis in fact:

eeee. Upon information and belief, no Plaintiff, and no member of the classes they represent, has ever been convicted of animal cruelty.

ffff. The prosecution arising from Ryder, the horse for which the bill was first named, ended on July 21, 2025 in the driver's acquittal. That was eleven months before the bill was introduced as "Ryder's Law."[88]

gggg. DCWP has suspended or revoked no driver's license or Medallion in recent years. (¶ 199.)

185. ***"Excuses" and "refused to comply."*** Before the Committee had heard from any member of the trade, the sponsor told it that "[e]very time an incident occurs, we are given an excuse"; that "[i]t was the industry that refused to comply"; that "[e]ither the owners have ignored training their drivers, or the training has not been working"; and that it would "hear a lot of more excuses." (Hearing Tr. 21–23.) The regulators testified otherwise. DCWP inspects each carriage three times a year; no stable has required a corrective action plan; and DOHMH's summonses since 2023 have concerned paperwork, not mistreatment. (Hearing Tr. 50–51; ¶¶ 198–199.)

186. ***"Covered in scarring" and "stables too small."*** Council Member Chris Marte also told the Committee that "the workers refused to allow them to test their horses" and that a DOHMH veterinarian "found horses stuck in stables too small, covered in scarring, and exhibiting signs of many medical issues that could disqualify them from working." (Hearing Tr. 23.) He omitted the following:

hhhh. *A limited pilot.* The examinations were a twelve-horse pilot, and DOHMH said "there were some limitations." (Hearing Tr. 69.)

[88] *See* "New York carriage driver acquitted of overworking horse that collapsed," Associated Press via NY1 (July 21, 2025), https://ny1.com/nyc/manhattan/news/2025/07/21/new-york-carriage-driver-acquitted-of-overworking-horse-that-collapsed; "NYC carriage horse handler found not guilty of animal abuse in 2022 collapse," CBS New York (July 21, 2025), https://www.cbsnews.com/newyork/news/nyc-carriage-horse-collapse-ian-mckeever-trial-verdict.

iiii. *Healed scars.* The veterinarian's own report states that the scars "were currently healed and not going to impact the horses on that day." Of the dental needs he observed, he wrote, "I did not find that a reason to call a horse unfit to work." (Written Test. Pt. 1, at 89.)

jjjj. *No violation.* Upon information and belief, neither the Code nor DOHMH's rules requires the trotting and blood work that owners declined. DOHMH testified to no violation by any owner in connection with the pilot. (Hearing Tr. 68–70.)

kkkk. *The Council's own stall rule.* Stall size is set by the Council's own law. Since 2010 the Code has required stalls "sixty square feet or larger, with a minimum width of seven feet," configured so that a horse can "turn around and safely lay down within the stall." (Admin. Code § 17-330(c); ¶ 77(a).) DOHMH enforces those "minimum stall dimensions," and no stable has required a corrective action plan. (Hearing Tr. 52–53.)

*3. The Council's official rally: "beaten by cruel people."*

187. On October 15, 2026, one week before the vote, the Speaker convened an event that the Council streamed live on its official YouTube channel as *"LIVE: Speaker Menin holds rally on upcoming vote to end horse-carriage industry*." (Rally Video, n. 57.) By every measure it was an official communication of the Council. The Speaker convened and opened it, the Local Law's sponsor and the chair of the Council's Animal Welfare Caucus spoke, and the Council published it on its own YouTube channel. The Speaker announced that "the Council will vote on [Romanch's] law, and it is set to pass." (Rally Video at 1:07.)

188. The event was one-sided. Every speaker supported the Local Law; no driver, owner, stable worker or union representative spoke. The Speaker opened by recognizing "the amazing

activists who have been on the front lines of this battle" (NYCLASS, PETA and the ASPCA): "Without their partnership and their tireless efforts, we would not be here today." (*Id.* at 0:46.) Menin closed by inviting the audience to *"a big celebration in the chambers now, really celebrating animal rights, animal welfare, celebrating this historic moment,"* a week before any member had voted. (*Id.* at 20:22.)

189. Speaker Menin introduced PETA's spokesperson as "someone who has also been on the front lines of this fight for so many years, doing tremendous work." (*Id.* at 14:41.) From the Council's podium, on the Council's broadcast, PETA's speaker called the trade "*this cruel, dangerous industry*." She told the public that New Yorkers would no longer have to "*read horror stories about horses collapsing in the street and being beaten by cruel people who just want to wring every last cent out of their bodies.*" (*Id.* at 15:02.) No speaker answered or disavowed the accusation, for which the record contains no support. (¶¶ 197–201.)

*4. The advocates' accusations in the Legislative Record.*

190. At the July 15 hearing:

llll. PETA told the Committee that "[t]he carriage operators fight and flout the most mild and common-sense rules" and that "***[l]ame, sick, emaciated, elderly horses are regularly documented being forced to pull carriages***." It said the horses spend their nights "in cramped, solitary parking garage-like buildings." (Hearing Tr. 110–11.)

mmmm. NYCLASS asked why the union would represent "wealthy millionaire carriage owners who misclassify their workers." (*Id.* 126.) In its written testimony it said it had submitted videos "*to show the continued reckless disregard for life that carriage drivers are continuing to display*." (Written Test. Pt. 1, at 59.)

nnnn. Animal Wellness Action's president compared Plaintiffs' trade to *"cockfighting"* and to *"dogfighting here in New York."* He told the Committee that *"[t]here were 10,000 cockfighters" in Oklahoma and that, when cockfighting was outlawed, "[t]here was no support for the people to get money."* (Hearing Tr. 235–36.)

The regulators' testimony supported none of these accusations (¶¶ 197–201), and the stalls PETA called "cramped" are of the size the Council itself prescribed by law. (¶ 186(d)). Upon information and belief, no agency has found that any Plaintiff misclassified a driver.

191. The public testimony the Council placed in its record was harsher still. It included:

oooo. "proponents of horse abuse," whose defense of their work was said to show "sociopathy" and "selfish narcissism" (Hearing Tr. 335–36);

pppp. carriage drivers "have been making blood money for all these years with no remorse" (Written Test. Pt. 1, at 484);

qqqq. "These people are really not interested in the welfare of these animals, they are just a way to make a quick buck. If they had an education they would undoubtedly be doing something else" (*id.* at 600);

rrrr. "we need prison sentences for these people" (Written Test. Pt. 2, at 234);

ssss. "a handful of greedy and exploitative people," "the evil humans," and "the few affected horse whippers" (*id.* at 308); and

tttt. "Ryder's abuser, Ian McKeever, was acquitted," and "an industry of liars and bullies." This proponent acknowledged the acquittal and still called the driver an abuser. (*Id.* at 249.)

*5. Council Members repeating the accusations.*

192. ***Council Member Wilson: "horses limping and collapsing."*** After NYCLASS's Director testified that drivers routinely left horses unattended (Hearing Tr. 129–31), Council Member Carl Wilson put that account to the drivers as established fact: *"we heard testimony earlier that it is very common for drivers to leave the carriage*." (*Id.* 185.) On the floor he told the Council, *"I have seen the consequences of the industry on the streets: horses limping and collapsing."* (Stated Meeting Video at 02:44:13.) Those are the words of PETA's accusation: horses "limping and lame" and "collapsing in the street." (Rally Video at 15:02.) Upon information and belief, Council Member Wilson did not see what he described, and if he did he failed to report what he saw to DOHMH, DCWP, the ASPCA or the NYPD, which has had primary responsibility for enforcing the animal-cruelty laws in the City since the ASPCA transferred that role to it in 2014.

193. ***Council Member Epstein: "I've seen how the horses are treated."*** Council Member Harvey Epstein, chair of the Council's Animal Welfare Caucus, told the Council on the day of the vote: "I've been to the stables. I've seen how the horses are treated. I see how they walk through New York. I know this industry must end." (Stated Meeting Video at 01:22:55.) The equine surgeon who met him at the stable testified that they spent "close to an hour" together; that "[t]he stalls were clean. There was fresh water. There was hay in every stall."; and that the next day Council Member Epstein "showed a picture of a healthy horse in the stall, that it's in jail." (Hearing Tr. 166–67.) In reply, Council Member Epstein did not dispute that description; he said only that "we have a right to disagree about issues." (*Id.* 168.) Upon information and belief, Council Member Epstein did not report any violations to DOHMH, DCWP, the ASPCA or the NYPD.

194. ***"Horses collapsing in the hot … streets."*** Speaker Menin told the hearing that "there have been **many incidents** involving horses collapsing in the hot, congested environment of our streets," and Council Member Oswald Feliz spoke of "horses literally **dying in our streets.**" (Hearing Tr. 16, 99.) Heat is something the Council itself regulates. Since 2019 the Code has barred work at 90°F, or at 80°F when the equine heat index reaches 150. (Admin. Code § 17-330(o).) DOHMH imposed 102 weather-related suspensions in the three years before the hearing and has issued no violation for working a horse during one. (Hearing Tr. 53–54.) **Nor do the carriage horses work in the "congested environment of our streets": their time on City streets is ordinarily one trip each way between stable and park.** (¶ 53.)

***6. The Council's own acknowledgments.***

195. Two members who voted for the Local Law acknowledged the inaccurate and hateful tenor of the campaign for the Law.

uuuu. ***Council Member Althea Stevens***. Before voting aye, Council Member Althea Stevens told the Council that she "would be remiss if I didn't call out some of the unacceptable behavior of some of the advocates who resorted to harassment, hateful, and racist rhetoric." (Stated Meeting Video at 02:41:39.)

vvvv. ***Council Member Frank Morano***. Council Member Frank Morano told the Council, "I don't believe every carriage driver mistreats animals." That statement presupposes the accusation then before the Council. (*Id.* at 02:23:19.)

***7. What the drivers faced.***

196. The drivers are, in the Speaker's words, "hardworking immigrant New Yorkers." (Hearing Tr. 14–15.) They told the Council what the campaign had meant for them:

wwww. Angel J., a driver and father of two: "I wouldn't do anything wrong to one of my horses ever, ever. A lot of these people, they said that we abuse the horses, that we don't take care of the horses, and that's not true." (Hearing Tr. 150.)

xxxx. Conor McHugh, a driver for 40 years, testified that the campaign "has taken various forms over the years, between reporting us to ICE and the IRS … and animal rights volunteers who have come to Central Park to harass our drivers." (Hearing Tr. 141.)

yyyy. Robert Boyle, who came from Ireland at twenty and has worked in the trade since 1985: people "call us animal abusers, and harass us while we are simply trying to do our jobs. Some have even gone as far as calling ICE on our drivers, many of whom came to this country seeking the same opportunities that generations of immigrants before them found in New York City." (Written Test. Pt. 2, at 486.)

*8. What the record actually showed.*

197. ***The City's own Mayor's Office of Animal Welfare.*** MOAW is led by the founder and former president of Voters For Animal Rights (VFAR), which lobbied for the Local Law. (¶¶ 177–181.) Its testimony was the Administration's only stated reason why regulation could not protect the horses. (¶ 101.) Yet it identified no horse that had been mistreated and no driver or owner who had mistreated one. It described the **horses as healthy and well cared for**: "Even healthy, well-cared-for horses remain vulnerable to injury, illness, fatigue, and fear in ways that can compromise animal welfare." (Written Test. Pt. 1, at 1.) The concern MOAW identified was the City's streets, not the people who work with the horses. (*Id.*) Even the City official closest to the campaign did not accuse the drivers of anything.

198. ***DOHMH,*** which licenses and inspects the horses, testified that "[t]he stables have not required corrective action plans"; that its summonses from 2023 through April 2026 concerned missing or untimely examination records and missing proof of furlough; that it had issued no violation for working a horse during a weather suspension; and that its counts of incidents came from the news: "There have been counts in the press of incidents, and we would have those same counts based on our review of … the news that we monitor." (Hearing Tr. 53–54, 89, 102.) DOHMH so testified although, in 2015, members of the Mayor's staff had undertaken, at the urging of NYCLASS's president, to make sure the agency did not again miss "an opportunity to shine a negative light on the industry." (¶ 144.)

199. ***DCWP, which licenses the drivers and the Medallions,*** testified that in recent years it had suspended or revoked no driver's license and no Medallion. (Hearing Tr. 40–41.)

200. ***The equine surgeon*** who examines many of the horses testified: "**These horses are not abused. They are not neglected. They are not starved. They are not overworked**." (Hearing Tr. 147.)

201. ***No finding.*** No part of the Legislative Record, including the Local Law and the Committee report, contains a finding that any Plaintiff, any member of their class, or any licensee, mistreated a horse. As in *DoorDash*, the accusations came without "studies, data, or other analyses" to support them, 692 F. Supp. 3d at 280–81, and here, the City's own regulators contradicted them. The Mayor did as well. On November 4, 2026, the day of his public hearing on the bill and after visiting the carriage-horse stables, he said of the drivers: "These are not drivers that should be demonized. These are drivers who care deeply for their horses and have built their

livelihoods through this work." He added that many of them "are still in debt from buying their medallion."[89]

## VI. INJURY

202. The Local Law injures each Plaintiff now and will destroy each Plaintiff's interest in the trade on the Sunset Date:

a. ***Owner Plaintiffs***. On enactment, the Owner Plaintiffs lost the ability to sell their Medallions. By the City's own estimate, the 68 Medallions were worth about $4.8 million in license value alone; at the prices Medallions actually sold for, they were worth $20.4 million to $27.2 million (Part V.C). The Local Law provides no compensation for any of it. Plaintiff Fidan, who bought his Medallion in 2021, has received no offer since the Local Law was enacted and can make no sale. Medallion owners Fatih Bagirgan and Alberto Virzi likewise report that since the Council passed the Local Law there has been no resale market for Medallions. (Bagirgan Decl. ¶ 21; Virzi Decl. ¶ 17.)

b. ***Contracts.*** The boarding agreements have lost their only lawful purpose as of the Sunset Date. The Medallion leases, relief-driver arrangements and employment agreements under which drivers operate carriages become unlawful to perform after it. Agreements to sell horses to carriage businesses anywhere are barred now.

c. ***Horses***. Every owner who must sell a horse — because it cannot be kept profitably until 2028, because the owner cannot afford its care, or because the owner wishes to leave the trade — must give ten business days' notice, may not sell to a lawful carriage business in the City or

[89] Ethan Stark-Miller, "Horse carriage workers beg Mamdani to veto industry ban bill, but mayor says he's still signing it," amNewYork (Nov. 4, 2026), https://www.amny.com/news/horse-carriage-workers-mamdani-veto-industry-ban-bill/; Chris Glorioso, Andrew Siff & Jennifer Vazquez, "Mamdani plans to sign horse carriage ban, create transition for drivers: 'They should not be demonized,'" NBC New York (Nov. 4, 2026), https://www.nbcnewyork.com/news/local/mamdani-plan-horse-carriage-ban-transition/6567728/.

any State, and must certify against an “inhumane purpose” standard the commissioner may define at any time. Until DOHMH issues the certification form, which the Local Law does not require before March 1, 2027, no owner can give a compliant notice at all, because the notice must include “a copy of the certification required pursuant to subdivision b.” (Admin. Code § 17-329(a)–(b).) The same compliance is a condition of keeping a cab working: until May 31, 2028, an owner may replace a horse that “is lame or suffers from a physical condition or other illness making it unsuitable for work, or that retires,” only if the owner is “in compliance with the requirements of section 17-329.” (Admin. Code § 17-327(e)(2).) An owner who must retire a horse before the form exists must therefore keep a horse that can no longer work, at the owner’s expense, or dispose of it on a notice that cannot include the required certification — risking suspension or revocation of the license, suspension of the horse from work (*id.* § 17-332(b)) and the loss of the right to replace it. The owners already provide for horses that leave the trade: Plaintiff Fidan, for example, sold a horse to a farm upstate. Such a placement would now require prior notice to two agencies, be exposed to an undefined “inhumane purpose” designation and have to be certified, and a sale to a carriage operator in Pennsylvania or anywhere else is forbidden. Plaintiff Hansen already pays $800 a month to board two retired carriage horses on a farm upstate. She would sell her own horse to one of two carriage operators she has long known, in Texas and in Kentucky, each equipped to care for him for the rest of his life. The Local Law forbids both sales, and the only way he can continue the work he is trained for is for her to leave New York. If he cannot work, keeping him will cost her about $10,000 a year. (Hansen Decl. ¶¶ 10, 25.)

d. ***Drivers***. On the Sunset Date, the Driver Plaintiffs’ licensed occupation ends. No workforce plan existed when the Council acted; § 23 defers one to April 1, 2027. The Driver Plaintiffs must plan their families’ futures around a fixed end date with no assurance of any help.

Plaintiff Hansen's carriage is her business: she pays $38,400 a year to lease it, owns one of the three horses that pull it, and shares its fares with a relief driver whose work ends with hers. Plaintiff Hansen is her household's sole earner; walking tours, the other work for which she is licensed, would not cover her rent and the care of the five horses she supports. Plaintiff Koch, who is 72, is not sure he can complete the training offered or who else would hire him, and no City agency has contacted either Plaintiff Hansen or Plaintiff Koch about job training, other work or compensation. (Hansen Decl. ¶¶ 3–4, 9, 26–27; Koch Decl. ¶¶ 5–6.)

e. ***Stables***. On the Sunset Date, each stable loses the only use to which its premises have been put, together with its boarding business; its workers, who include members of Local 100, lose their jobs; and owners who board horses there, including Plaintiffs Fidan and Hansen, lose the stalls where their horses are kept.

f. ***Local 100***. Local 100's members who hold driver licenses, Medallions and stable jobs suffer each of these injuries. Local 100's members in the trade include the holders of its 68 Medallions, about 150 of its 208 to 211 licensed drivers, and 50 to 60 stable workers and horse handlers (see supra ¶¶ 22, 48–55; Chiarello Decl. ¶¶ 3–4).

g. ***The Sunset Date***. Every Medallion and horse license then expires, and driver licensing is repealed the next day; carriages, harness and equipment lose their market; the goodwill and going-concern value of the Owner Plaintiffs' businesses are destroyed; and anyone who continues faces a penalty of not less than $10,000 per violation.

## IRREPARABLE INJURY

203. These injuries are irreparable. The transactions the Freeze forecloses cannot be recreated once the market has collapsed; a horse sold or given away cannot be recovered; a licensed livelihood cannot be restored by a later award; and businesses wound down over nineteen months

cannot be rebuilt. The Local Law provides no compensation, and the City has committed only to consider whether to pay any. The Administration's November 17, 2026 announcement does not change this. It states a goal, not a commitment; it promises a plan, not a payment, as late as April 2027; and it offers drivers and stable hands training and stipends of unstated amount, not employment or replacement income. (¶ 109(b)–(d).) The ongoing violation of Plaintiffs' constitutional rights is itself an irreparable injury. Plaintiffs have no adequate remedy at law.

## THE CITY IS A PROPER DEFENDANT

204. The Local Law was enacted by the Council and signed by the Mayor; it is the official policy of the City. In enacting and enforcing it, the City acts under color of state law, and is liable under 42 U.S.C. § 1983 for the federal constitutional violations alleged below, which proximately cause Plaintiffs' injuries. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). An actual controversy exists between Plaintiffs and Defendants on each claim below, and a declaratory judgment is necessary and appropriate.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Taking Without Just Compensation —**
**U.S. Const. amends. V, XIV; 42 U.S.C. § 1983; N.Y. Const. art. I, § 7**
**(By the Owner Plaintiffs)**

205. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

206. The Fifth Amendment, applicable to the City through the Fourteenth Amendment, and Article I, Section 7 of the New York Constitution forbid the taking of private property for public use "without just compensation."

207. Each Medallion is property: exclusive, because the City held the number at 68 and, before the Local Law, added licenses only pro rata to existing holders; transferable, by private sale

that DCWP approves and records; revocable only for cause, after notice and a hearing; and valued by the City's own witness from bills of sale in DCWP's files, which record DCWP-approved sales at four to five times that witness's figure (¶¶ 60, 63–66). The Owner Plaintiffs' horses, carriages, harness and equipment are also property. (Part V.C–D.)

208. The Local Law takes that property. It extinguishes the only use a Medallion authorizes; the Freeze has already destroyed its alienability; the Disposition Regime restrains the alienation of every licensed horse; and the Local Law ends the only use to which the carriages have been put. On the Sunset Date, nothing of the Medallion remains.

209. In the alternative, the Local Law effects a Regulatory Taking. Its economic impact is total. The Owner Plaintiffs bought at market prices, with the City's approval of each transfer (Plaintiff Fidan as recently as 2021), while the City kept approving transfers and renewals and the Committee on Health voted down the last ban bill to reach a vote. And the Local Law does not adjust the benefits and burdens of economic life; it forces about 300 people to bear alone the cost of a public policy choice. It does so on the strength of accusations of cruelty that the City's own regulators did not support. (Part V.P.) That policy was one that officials had pledged for years to the organizations campaigning for it. (Parts V.N–V.O.) Members of the Council acknowledged as much: Council Member Schulman urged the Council to recognize "the significant investments they have made in their carriage licenses," and the bill's sponsor, Council Member Marte, said the Council could "compensate the owners." (Hearing Tr. 20, 24.) The Mayor has acknowledged that many owners "are still in debt from buying their medallion." (¶ 201.)

210. The Local Law makes no "reasonable, certain and adequate provision for obtaining compensation." Section 23 requires only "consideration of whether to establish" a compensation program, with no mandate, no funding and no deadline. (Part V.H.) A program the City need not

create, and for which the only valuation in the record is one that DCWP's own files contradict (¶¶ 66–67), is not such a provision. Nor is the Administration's November 17, 2026 announcement such a provision. (¶ 109(b)–(c), (e).) A "goal of facilitating medallion buybacks," stated in a press release, with no price, method or date of valuation, appropriation, source of funds or date of payment, is neither certain nor adequate; and no plan, let alone any payment, will exist until as late as April 2027, while the Freeze operates now. Because the Freeze bars every private sale, the City would also be the only possible buyer, pricing the Medallions in a market its own law has closed.

211. Nor is the interval before the Sunset Date a reasonable amortization period: the Freeze ended the Medallions' market value on enactment, and the Owner Plaintiffs have not recouped their investment. Whether a phase-out avoids a compensable taking turns on its effect on each owner. In the alternative, if the Local Law is otherwise valid, Plaintiffs are entitled to just compensation for the property it takes. The figures alleged here are a baseline; just compensation should be fixed by an independent valuation of each interest taken, which the City never undertook.

**SECOND CAUSE OF ACTION**
**Impairment of Contracts —**
**U.S. Const. art. I, § 10, cl. 1; 28 U.S.C. § 2201; 42 U.S.C. § 1983**
**(By the Owner Plaintiffs and the Driver Plaintiffs)**

212. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

213. The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." It binds the City.

214. The Local Law substantially impairs the contracts described in Part V.D:

zzzz. The Local Law defeats the purpose of the boarding agreements under which Plaintiffs stable their carriage horses, which lose their only object on the Sunset Date.

b. After the Sunset Date, performance of the Medallion and carriage leases, relief-driver arrangements and employment agreements under which the Driver Plaintiffs and other drivers operate carriages is unlawful, on pain of a penalty of not less than $10,000. The Local Law does not adjust the rent, fare-sharing or wage bargain on which those arrangements rest; it forbids the work. That an arrangement is oral or terminable at will does not take it outside the Contracts Clause.

c. The Disposition Regime bars performance of any agreement to sell a horse to a carriage business anywhere.

215. The impairment is total and permanent, and nothing in the Local Law permits any Plaintiff to safeguard or reinstate the rights it extinguishes.

216. The impairment was not foreseeable. The City licensed and regulated the trade for decades but never prohibited it; every ban bill introduced since 2006 failed; the Council chose regulation in 2010 and 2019; the Committee on Health voted down the last ban bill on November 14, 2025; and the City kept approving transfers until the day the Local Law took effect. In 2003, NYCIDA itself financed the Clinton Park stable and bound its owner to operate it as a carriage-horse stable through June 30, 2029.

217. The Local Law is not a reasonable and necessary means of serving a legitimate public purpose. It responds to no emergency: its operative date is nineteen months away, and the City had no "concerns necessarily with the phase-out timeline itself." (Hearing Tr. 48.) It is permanent rather than temporary; its exceptions keep horses on the same streets; it rests on no record linking its means to its ends; it ignores the measures that address the hazards it invokes (¶ 97); it is not conditioned on need or any individualized finding of risk; it provides no compensation; and it places the cost of a public policy on a few shoulders. The record also shows that abolition was pursued for nearly two decades as an animal-welfare measure; that the Council

chose regulation each time it acted; and that "public safety" became the stated ground only in 2025–2026, with no finding that regulation had failed. (Parts V.L–V.M.) A shifting rationale supports an inference that the public purpose offered is pretextual. *DoorDash*, 692 F. Supp. 3d at 292. And, as in *DoorDash*, the statements of the Local Law's two principal proponents — its sponsor and the Speaker — tie it to a single incident and to the organizations that had campaigned for abolition for two decades, not to any finding that regulation had failed (Parts V.M–V.O). *See id.* (relying on "numerous comments by the two principal sponsors of the legislation"). The legislative history also shows "a certain hostility" toward Plaintiffs: the sponsor's repeated charge of "legalized animal cruelty"; the Council's broadcast of an accusation that the drivers beat horses for money; and members' repetition of accusations that no regulator supported. (Part V.P.) *DoorDash*, 692 F. Supp. 3d at 292 (quoting *Melendez*, 16 F.4th at 1040).

## THIRD CAUSE OF ACTION
## Vagueness and Unlawful Delegation —
## U.S. Const. amend. XIV; 42 U.S.C. § 1983; N.Y. Const. art. I, § 6;
## N.Y. Separation of Powers
## (By the Owner Plaintiffs and Plaintiff Hansen)

218. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

219. The Disposition Regime requires every owner to certify that a licensed horse will not be sold or transferred for "any inhumane purpose as designated by the commissioner," without defining the term, stating any standard or requiring notice of a designation, and backs its requirements with criminal penalties, including imprisonment, and with license revocation (Admin. Code § 17-332(a)–(b)). It gives owners no fair notice of which dispositions are forbidden and invites arbitrary enforcement. That risk is not abstract: the designation power belongs to DOHMH's commissioner, and in 2015 members of the Mayor's staff, at the urging of

NYCLASS's president, undertook to make sure DOHMH would not again miss "an opportunity to shine a negative light on the industry." (¶ 144.) The certification is due on a date the statute fixes, before the commissioner has designated anything, and the promise it exacts has no end date; the Local Law also makes compliance with § 17-329 a condition of the right to replace a horse (Admin. Code § 17-327(e)(2)). The Owner Plaintiffs' injury is the forced choice the statute imposes now — give an open-ended promise or risk their licenses and their ability to keep their cabs working — and it does not depend on any later designation or enforcement.

220. By leaving the commissioner free to decide what counts as "inhumane," the Local Law hands DOHMH a policy choice that New York's separation of powers reserves to the Council. The Local Law's drafting defects (Part V.H) compound the uncertainty.

**FOURTH CAUSE OF ACTION**
**Procedural Due Process —**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983; N.Y. Const. art. I, § 6**
**(By the Owner Plaintiffs and the Driver Plaintiffs)**

221. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

222. The Owner Plaintiffs' Medallions and horse licenses, and the Driver Plaintiffs' driver licenses, are property interests that the City may revoke only for cause after notice and a hearing. The Local Law terminates each of them, and destroys the Medallions' alienability now, without notice or hearing.

223. The Local Law operates on identified individuals on individual grounds: it extinguishes 68 numbered Medallions held by 63 identified holders; it requires each owner to give individual notice before disposing of each identified horse and to certify compliance by June 1, 2027; it lets the commissioner decide, case by case and without notice, hearing or standard, the purposes for which an owner must certify that a horse will not be transferred; and it exposes each

owner, now, to criminal prosecution, civil penalties and license revocation for violations (Admin. Code § 17-332(a)–(b)). It affords no process at all before a designation, before a transfer is barred, or before an owner is exposed to penalties.

**FIFTH CAUSE OF ACTION**
**Substantive Due Process —**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983; N.Y. Const. art. I, § 6**
**(By All Plaintiffs)**

224. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

225. The Due Process Clauses forbid arbitrary and irrational deprivations of property.

226. The provisions that operate now serve no conceivable safety or welfare purpose. The Freeze changes nothing on the street; its only operation is to extinguish the Medallions' value and alienability nineteen months before the trade ends. The Disposition Regime's bar on selling a horse to a carriage business — including another Medallion holder in the City, while the trade remains lawful — protects no one: before the Sunset Date the same horse works the same streets under the same rules whoever owns it, and a horse sold outside the City leaves its streets either way. The "inhumane purpose" designation has no standard. Read as written, § 17-327(a)(2) also bars anyone, after the Sunset Date, from hitching a horse to any vehicle anywhere in the City, for hire or not, with no permit available except for temporary events. And the post-Sunset penalty has a $10,000 floor and no ceiling. (Part V.H.) A law justified by the welfare of carriage horses repeals every welfare protection specific to them and leaves them, as a matter of law, worse off. (¶ 81.)

**SIXTH CAUSE OF ACTION**
**Equal Protection —**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983; N.Y. Const. art. I, § 11**
**(By All Plaintiffs)**

227. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

228. The Local Law singles out licensed horse-drawn carriage owners, drivers and stables for prohibition while leaving untouched those similarly situated with respect to every interest the Council invoked: special-event operators driving the same horses and vehicles on the same streets; the NYPD's mounted horses; riding-horse licensees; and pedicabs and tour helicopters, whose different treatment Council Member De La Rosa raised at the hearing (Hearing Tr. 96–98). (Part V.I.)

229. Nothing distinguishes a carriage horse driven under a Medallion from a carriage horse driven under a special-event permit on the same street, other than the identity of the persons the Local Law was enacted to remove. The Freeze and the Disposition Regime separately classify without any rational basis: the Freeze treats Medallion holders differently from the buyers to whom they could have sold, with no difference in the carriages that operate, and the Disposition Regime forbids selling a horse to a carriage business, in the City or in another State, while permitting its sale to anyone else. If § 17-327(a)(2) reaches only commercial use, it leaves privately owned horses free to draw private vehicles on the same streets; if it reaches all driving, it bars private, noncommercial driving with no permit available. Either way, the line it draws does not track any risk the Council identified.

**SEVENTH CAUSE OF ACTION**
**Dormant Commerce Clause, as to Admin. Code § 17-329 —**
**U.S. Const. art. I, § 8, cl. 3; 42 U.S.C. § 1983**
**(By the Owner Plaintiffs and Plaintiff Hansen)**

230. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

231. A local law is invalid under the Commerce Clause where the burden it imposes on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356

(2023) (rejecting a reading of *Healy v. Beer Inst.*, 491 U.S. 324 (1989), and related cases as establishing an "almost per se" rule against state laws with extraterritorial effects).

232. Section 17-329 forbids the sale of any licensed horse "for use in a horse drawn cab business" with no geographic limit, barring sales to lawful carriage operators in other States. Its practical effect is to control commerce occurring wholly outside New York, and its burden on the interstate market in horses is clearly excessive in relation to any local benefit: the horse leaves the City either way. Plaintiff Hansen would sell her horse to a carriage operator she knew and trusted in Texas or Kentucky but for § 17-329. (Hansen Decl. ¶ 25.)

**EIGHTH CAUSE OF ACTION**
**Bill of Attainder —**
**U.S. Const. art. I, § 10, cl. 1; 42 U.S.C. § 1983**
**(By the Owner Plaintiffs and the Driver Plaintiffs)**

233. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

234. A law is a bill of attainder if it falls within the historical meaning of legislative punishment, if, viewed functionally, it cannot "reasonably . . . be said to further nonpunitive legislative purposes," or if the legislative record evinces a purpose to punish. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473–78 (1977); *see Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 349–55 (2d Cir. 2002) (invalidating New York statute as a bill of attainder).

235. The Constitution forbids any State to "pass any Bill of Attainder," and the prohibition reaches municipal legislation. *Garner v. Bd. of Pub. Works*, 341 U.S. 716, 720–23 (1951) (considering an attainder challenge to a municipal ordinance and rejecting it on the merits). Among the historical forms of legislative punishment it forbids is "a legislative enactment barring designated individuals or groups from participation in specified employments or vocations." *Nixon*, 433 U.S. at 474; *see Consol. Edison*, 292 F.3d at 351; *Cummings v. Missouri*, 71 U.S. (4

Wall.) 277 (1867); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1867); *United States v. Lovett*, 328 U.S. 303 (1946); *United States v. Brown*, 381 U.S. 437 (1965). A legislature need not name those it punishes: the Clause reaches laws that apply "to easily ascertainable members of a group." *Lovett*, 328 U.S. at 315; *see SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 669–72 (9th Cir. 2002) (holding the specificity element met but rejecting the claim for want of punishment).

236. The Local Law bars a readily identifiable group from the vocation the City licensed it to pursue. Sections 25 and 26 fixed the holders of the 68 Medallions — 63 persons, among them the Owner Plaintiffs — on the day the Local Law took effect: no new license or plate may issue, and every license and plate then valid expires on May 31, 2028. The approximately 208 drivers DCWP had licensed when the Council acted, among them the Driver Plaintiffs, are identified in DCWP's own records. (Part V.B.) After the Sunset Date none of them may use a horse to operate a vehicle for hire except under a temporary-event permit (§ 17-327(a)(2)), and until then the Owner Plaintiffs may not sell their Medallions (§§ 25–26). The Local Law imposes those burdens by legislative act alone, without charging, hearing or making any finding against any Plaintiff.

237. The Local Law bears the name of a single incident that its sponsor, in naming it, publicly tied to the conduct of one member of that group. Five days after Mr. Mahajan's death, at a vigil near where the horse had broken away, the sponsor renamed his pending bill "Romanch's Law" and read aloud the family's statement that the death was "a direct result of a severe safety violation" — the driver's having left his carriage, conduct the City's rules already forbid and for which the driver had already been suspended. The Speaker adopted the name, called the death "preventable," and said that "[t]hat tragedy is why I have decided to support Romanch's Law"; she said that "passing his law is one way to seek justice for him and his family"; Mr. Mahajan's

father said that "everyone responsible has admitted the driver should never have left that carriage" and asked that his son "be the last victim of the industry"; and the Speaker called the family's testimony "a game changer." (Part V.M.) The Local Law contains no findings, and the Council found no violation by any other licensee. Rather than address the conduct of the one driver whose violation the Local Law's proponents invoked, the Council ended the licensed vocation of every person in the group to which he belonged.

238. The Local Law's burdens are not tailored to any nonpunitive purpose the Council stated. The same horses may draw the same vehicles on the same streets under the permits the Local Law preserves (§§ 2, 11). The Freeze destroys the Medallions' value now, nineteen months before any horse leaves the street (§§ 25–26). The bar on transfers "for use in a horse drawn cab business" reaches lawful operators anywhere (§ 4). The Council analyzed none of the less burdensome measures before it, including the hitching posts, footing and stray-voltage measures that address the very incident for which it named the Local Law (Parts V.F–V.G; ¶ 97). And the Local Law provides no compensation, requiring only "[c]onsideration of whether to establish" a program (§ 23(a)(2)(b)–(c)). *See Nixon*, 433 U.S. at 475 (provision for just compensation "undercuts even a colorable contention" of punitive confiscation), 482 (availability of "less burdensome alternatives"); *Consol. Edison*, 292 F.3d at 354 (burden "obviously disproportionate to the harm caused"). The Administration's November 17, 2026 announcement does not cure these defects. A "goal" stated in a press release two days before signing is not a statutory provision for compensation of the kind on which *Nixon* relied, 433 U.S. at 475; and the feasibility study of electric carriages that the Mayor directed only after the Council acted confirms that a less burdensome alternative was available and unexamined, *id.* at 482. (¶ 109(b), (f).)

239. The legislative record reflects a purpose to punish. The sponsor called the licensed trade "legalized animal cruelty" — conduct New York law makes a crime, N.Y. Agric. & Mkts. Law § 353 — and described the Local Law's purpose as to "free the horses" (Parts V.M, V.P; Health Committee Video at 3:58); said that the death "has proven that we can't reform our way out of this" (Part V.M); and, with the Speaker — who supported the bill because of "[t]hat tragedy" and described its passage as "one way to seek justice" for Mr. Mahajan and his family — presented the Local Law as the Council's answer to a death the family attributed to "a severe safety violation" and to "the industry" (*id.*). The statements of a local law's principal sponsors are evidence of its purpose, *DoorDash*, 692 F. Supp. 3d at 292 (relying on "numerous comments by the two principal sponsors of the legislation"), and a law enacted on a record showing a purpose to punish an identified person is a bill of attainder, *Foretich v. United States*, 351 F.3d 1198, 1209, 1225–26 (D.C. Cir. 2003). The Council also convened and broadcast an event at which Plaintiffs' trade was described as "cruel people" who beat horses "to wring every last cent out of their bodies," and its members repeated, as things they had seen, accusations that no regulator had found. (Part V.P.) By contrast, the statute upheld in *Nixon* provided for just compensation and judicial review. 433 U.S. at 475, 481–82.

**NINTH CAUSE OF ACTION**
**Excessive Fines —**
**U.S. Const. amends. VIII, XIV; 42 U.S.C. § 1983; N.Y. Const. art. I, § 5**
**(By the Owner Plaintiffs and the Driver Plaintiffs)**

240. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

241. The Excessive Fines Clause applies to the States, *Timbs v. Indiana*, 586 U.S. 146, 150 (2019), and so to their subdivisions, and forbids a punitive fine "grossly disproportional to the gravity of a defendant's offense," *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). A local

law that mandates a severe sanction for every violation, however minor, risks such disproportion. *Cf. County of Nassau v. Canavan*, 1 N.Y.3d 134, 140–41 (2003) (rejecting an as-applied excessive-fines claim, but observing that an ordinance reaching "many minor and technical violations that could not justify forfeiture" "risks violation of the Excessive Fines Clause").

242. Admin. Code § 17-332(c), as amended by the Local Law, imposes on anyone who, after the Sunset Date, uses a horse to draw a vehicle without a temporary-event permit (read literally, whether or not for hire, § 17-327(a)(2)), a civil penalty of "not less than $10,000," with no maximum — about 138 times the regulated fare for a twenty-minute ride — without regard to the gravity of the conduct, the harm it causes or the person's means. The conduct it punishes was licensed by the City for generations, and the penalty falls on people whose livelihood the Local Law has already ended. The penalty is grossly disproportional and excessive on its face.

**TENTH CAUSE OF ACTION**
**Ultra Vires: Exceeding the Delegated Police Power —**
**N.Y. Const. art. IX, § 2(c); N.Y. Mun. Home Rule Law § 10;**
**N.Y. Gen. City Law § 20(13); N.Y.C. Charter § 28(a)**
**(By All Plaintiffs)**

243. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

244. The City has only the police power the State delegates to it, and a local law within that power must be a reasonable means to a legitimate end. The City may prohibit a lawful, licensed business only where the abuses are general and difficult to control by regulation.

245. A local law must be "reasonably calculated to achieve a legitimate public purpose." *Original R. Tyson, Inc. v. Tyler*, 24 N.Y.2d 671, 674 (1969) (quoting *Good Humor*, 290 N.Y. at 317). An ordinance that, under the guise of regulating a lawful business, in fact prohibits it exceeds

the police power. *Trio Distrib. Corp. v. City of Albany*, 2 N.Y.2d 690, 696 (1957); *see Good Humor*, 290 N.Y. at 318–20.

246. The Local Law prohibits a lawful business that the City licenses and has comprehensively regulated for decades, on a record that shows compliance, not general abuse (Part V.E). The incident that prompted it is attributed by the victim's family to a City electrical hazard that the Local Law does not address, or else to a horse left unsecured — conduct already prohibited and addressed by hitching posts the City never installed (Part V.F). The Local Law's sponsor named it for that incident while reading aloud the family's statement attributing the death to "a severe safety violation." (Part V.M.) Rather than "restrict the activities of the wrongdoer alone," the Council prohibited the trade for every licensee, though nothing in the record suggests that it is "impractical to draw a line separating the malefactor from the honest merchant." *Bon-Air Estates, Inc. v. Building Inspector of Ramapo*, 31 A.D.2d 502, 506 (2d Dep't 1969). The City's own regime gave carriage horses protections that New York law gives no other horse and no worker (¶¶ 75–80, 83–84); the City repeatedly strengthened that regime when it saw a need (¶ 79); and the Local Law, rather than enforcing or strengthening it, repeals it and leaves the horses with none of it (¶ 81). Each hazard the record identifies (the absence of hitching posts, a conductive footing and untested electrical fixtures) can be controlled by regulation, and the City has addressed none of them. (¶ 97.)

247. *Good Humor* permits prohibition only where the threatened injury to the public is so serious that the legislature "might reasonably find it outweighs the harm that would be caused to some by complete prohibition." 290 N.Y. at 318. That balance cannot reasonably be struck without knowing the harm. The only valuation before the Council was DCWP's figure of about $70,000 per Medallion, which DCWP's own transfer files contradict by a factor of four to five,

and no agency valued the businesses, horses or equipment the Local Law would end. (¶¶ 60–67.) Whether DCWP never examined those files or knew what they showed, the Council acted on a figure that understated that harm. Where the validity of legislation depends on facts, those facts "may properly be made the subject of judicial inquiry," *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938), and a court "is not at liberty to shut its eyes to an obvious mistake," *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924).

248. The Local Law's means are not reasonably calculated to its ends: horses stay on the same streets under permit and in NYPD service; riding horses stay licensed; the Council analyzed no alternative and neither the Sunset Date nor the Freeze; the stated purposes include public-opinion polling; and the Freeze and the Disposition Regime bear no relationship to safety or welfare at all. The City's only stated reason that regulation could not control the conditions of City streets — that they "cannot be altered through licensing and operating rules" — rests on no study or finding and is contradicted by the City's own practice. The City routinely alters those conditions by rule: it closed the park drives to cars, moved boarding into the park to keep horses away from traffic, confines carriages by area and hour, allocates street space by lane, mode and time, and in 2016 itself proposed a stable inside Central Park. And it continues to use horses in the same conditions or worse, in the NYPD's service and under special-event permits, while the licensed carriage horses spend their working day on drives closed to cars. (¶¶ 53, 102(c)–(d); Part V.G.) A local law's stated purpose "is not conclusive" where the facts show another. *Good Humor*, 290 N.Y. at 318; *see People ex rel. Moskowitz v. Jenkins*, 202 N.Y. 53, 58 (1911); *People v. Cohen*, 272 N.Y. 319, 322 (1936). Where the "statements by the council members who sponsored the legislation evinced a hostility toward" those regulated — in *DoorDash*, "toward them as out-of-state actors" — the reasonableness of the measure is open to question. *DoorDash*, 692 F. Supp. 3d

at 299 & n.4. The sponsor's statements here did so, and the City's own regulators contradicted the accusations on which they rested. (Part V.P.) The record shows that abolition was the long-standing aim of an animal-welfare campaign; that the Council twice chose regulation to serve that aim; and that the safety rationale was adopted in 2025–2026 without any finding that regulation had failed. (Parts V.L–V.M.) The Local Law is ultra vires and void.

**ELEVENTH CAUSE OF ACTION**
**Inconsistency with State Law —**
**N.Y. Const. art. IX, § 2(c); N.Y. Mun. Home Rule Law § 10;**
**N.Y.C. Charter § 28(a); N.Y. Veh. & Traf. Law art. 34-B**
**(By All Plaintiffs)**

249. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

250. The City may adopt only local laws "not inconsistent with" the general laws of the State. A local law is inconsistent with State law where it "prohibit[s] what would be permissible under State law, or impose[s] prerequisite additional restrictions on rights under State law, so as to inhibit the operation of the State's general laws." *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 93 (2d Cir. 2017) (quoting *Eric M. Berman, P.C. v. City of New York*, 25 N.Y.3d 684, 690 (2015)). The Vehicle and Traffic Law grants a person "riding or leading a horse upon a roadway . . . all rights" of a vehicle driver, N.Y. Veh. & Traf. Law § 1261, and State law assumes that horse-drawn vehicles lawfully use public highways, N.Y. Agric. & Mkts. Law § 364. A local law that prohibits outright what State law permits — the use of horses in commercial service on City streets and, read as written, any use of a horse to draw a vehicle there without a temporary-event permit (Admin. Code § 17-327(a)(2)) — is inconsistent with State law and void.

251. *See also Jancyn Mfg. Corp. v. County of Suffolk*, 71 N.Y.2d 91, 97 (1987) (where the State has preempted the field, a local law is inconsistent with State law where it "prohibits

conduct which the State law . . . considers acceptable or at least does not proscribe"); *DJL Rest. Corp. v. City of New York*, 96 N.Y.2d 91, 95 (2001). In enacting Article 34-B, the Legislature found that the riding and leading of horses on highways "is a common occurrence," and that "both motorists and equestrians are entitled to drive and ride, respectively, in safety." L. 1988, ch. 559, § 1.

**TWELFTH CAUSE OF ACTION**
**Defective Notice of the Mayor's Public Hearing —**
**N.Y. Mun. Home Rule Law § 20(5)**
**(By All Plaintiffs, Against the City, the Office of the Mayor and DCAS)**

252. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

253. The Mayor may not approve a local law "until a public hearing thereon has been had before him." N.Y. Mun. Home Rule Law § 20(5). Public notice of the time and place of the hearing "shall be given by him within ten days after the local law shall have been presented to him and the hearing shall be held within twenty days after such presentation." *Id.* The hearing must be held "on such public notice of at least three days as has been or hereafter may be prescribed by a local law . . . or, in the event such a local law prescribing the length of notice is not adopted, upon five days' notice." *Id.* The City has prescribed no shorter period, so the five-day requirement governs. The notice "shall be published in the City Record and in such daily newspaper or newspapers, published in the city of New York, as shall be selected by the mayor for that purpose." N.Y.C. Admin. Code § 3-208. Only a departure in substance from these requirements invalidates a local law, *Alscot Inv. Corp. v. Laibach*, 65 N.Y.2d 1042, 1044 (1985), but a defect that thwarts their purpose is such a departure, *41 Kew Gardens Rd. Assocs. v. Tyburski*, 124 A.D.2d 553, 554 (2d Dep't 1986), *appeal denied*, 68 N.Y.2d 612 (1986). Notice published on Friday, October 30, 2026 for a hearing on Wednesday, November 4 gave the public no more than the statutory

minimum, two days of it a weekend. The notice ran once in print, as a "LATE NOTICE," and online it was "Archived" on publication, so that the City's own current-notice search did not find it. (Part V.G.) Upon information and belief, no notice was published in any daily newspaper. That notice did not satisfy § 20(5) and § 3-208 and was not reasonably calculated to inform the public; the Local Law was not validly approved.

**THIRTEENTH CAUSE OF ACTION**
**Passage Before Seven Days on Members' Desks —**
**N.Y.C. Charter § 36; N.Y. Mun. Home Rule Law § 20(4);**
**N.Y. Gen. Constr. Law § 20**
**(By All Plaintiffs, Against the City and the Council)**

254. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

255. The Local Law was passed before it had been in its final form and upon the desks of the Council members for seven calendar days, exclusive of Sundays, and the Mayor did not certify the necessity of immediate passage. (Part V.K.) The defect was one of substance: the text passed differed materially from the bill as introduced, and members did not have it until 5:35 p.m. on October 14. (*Id.*; compare Ex. 1 with Ex. 2.) A local law passed in violation of Charter § 36 and Municipal Home Rule Law § 20(4) is invalid.

**FOURTEENTH CAUSE OF ACTION**
**Hearing and Vote Without Notice to OMB or a Compliant Fiscal Impact Statement — N.Y.C. Charter § 33**
**(By All Plaintiffs, Against the City and the Council)**

256. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

257. The Committee on Health held its hearing, and the Council voted, without the eight days' notice to the Director of Management and Budget that Charter § 33(a) makes a condition of each, and on a fiscal impact statement containing no Council estimate of the costs the Local Law

directs the City to consider. (Part V.K.) A local law heard and passed in violation of those conditions is invalid.

**FIFTEENTH CAUSE OF ACTION**
**Vote Without Thirty Days' Notice —**
**N.Y.C. Charter § 33-a**
**(By All Plaintiffs, Against the City, the Council and the Office of the Mayor)**

258. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

259. Int. 943-A relates to the public safety operations of the police department, and the Council voted on it without the thirty days' written notice Charter § 33-a requires and without a written mayoral waiver. (Part V.K.) The Local Law is invalid.

**SIXTEENTH CAUSE OF ACTION**
**Permits Created Without Fixing Fees — N.Y.C. Charter § 28(f)**
**(By All Plaintiffs, Against the City, the Council, DOHMH and DOT)**

260. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

261. Local laws "in relation to licenses shall fix the license fees to be paid, if any." N.Y.C. Charter § 28(f). The Local Law creates a new special-event permit, Admin. Code § 17-327(a)(2), and amends the DOT special-event permit, *id.* § 19-175, making them the only lawful means of operating a horse-drawn vehicle after the Sunset Date, and fixes the fee for neither. The words "if any" allow the Council to decide that no fee is due; they do not allow it to leave the question unanswered. The DOHMH permit says nothing about a fee, and the DOT permit leaves the fee to the commissioner, "in an amount to be established by rule." *Id.* § 19-175(c). (Part V.I.) The permit provisions, and the Local Law to the extent it depends on them, are invalid.

**SEVENTEENTH CAUSE OF ACTION**
**Open Meetings Law — N.Y. Pub. Off. Law §§ 103(e), 107**
**(By All Plaintiffs, Against the City and the Council)**

262. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

263. The EAS — a record scheduled to be the subject of discussion — was not made available or posted before 9:17 a.m. on October 22, 2026, fifty-eight minutes before the committee discussed, amended and approved the bill, although earlier posting was practicable. Good cause exists to declare the Council's action void in whole or in part, and to award Plaintiffs costs and attorneys' fees. N.Y. Pub. Off. Law § 107(1)–(2).

**EIGHTEENTH CAUSE OF ACTION**
**State and City Environmental Quality Review — N.Y. Envtl. Conserv. Law art. 8; 6 NYCRR Part 617; Mayoral Executive Order No. 91 (1977); 62 RCNY ch. 5**
**(By All Plaintiffs,**
**Against the City, the Council and the Office of the Mayor)**

264. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

265. A local law is an "action" subject to SEQRA and CEQR; SEQRA's exemption for legislative acts excludes "actions of local legislative bodies." N.Y. Envtl. Conserv. Law § 8-0105(4)(ii); 6 NYCRR 617.5(c)(46). Every agency must prepare an environmental impact statement on any action "which may have a significant effect on the environment," which includes "existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character." N.Y. Envtl. Conserv. Law §§ 8-0105(6), 8-0109(2).

266. The "environment" includes existing patterns of population and existing community or neighborhood character, and the displacement of residents and businesses is an environmental effect that the lead agency must study. *Chinese Staff*, 68 N.Y.2d at 366–67. The lead agency must take a "hard look" at the relevant areas of environmental concern and make a

"reasoned elaboration" of the basis for its determination. *Jackson v. N.Y. State Urban Dev. Corp.*, 67 N.Y.2d 400, 417 (1986). The Court of Appeals has annulled a Council local law adopted without compliance with SEQRA. *N.Y.C. Coal. to End Lead Poisoning, Inc. v. Vallone*, 100 N.Y.2d 337 (2003).

267. The lead agency did not take a hard look at the economic effect of ending the trade. The City's own Short Form answered that the action would "[a]ffect conditions in a specific industry," yet the EAS called value information "limited," relied on a single 2014 news article and valued nothing (¶¶ 65, 128; Ex. 13, at B-19), although DCWP, a mayoral agency, keeps the transfer files, including the bills of sale, and its witness had told the Council that a Medallion was worth "maybe $70,000 approximately" — a figure those bills of sale contradict (¶¶ 60–67). A determination made without examining facts in the City's own possession is made "without regard to the facts" and is arbitrary. *Pell v. Bd. of Educ.*, 34 N.Y.2d 222, 231 (1974); *cf. Riverkeeper, Inc. v. Planning Bd. of Town of Southeast*, 9 N.Y.3d 219, 231–32 (2007). And if, as Plaintiffs allege in the alternative, the City knew what its files showed, describing value information as "limited" was not a reasoned elaboration of the basis for the determination. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("Accepting contrived reasons would defeat the purpose of the enterprise.").

268. The lead agency's own answers on the Short Form required more than it did. The Short Form asks whether an action would "[d]irectly displace more than 100 employees" or "[a]ffect conditions in a specific industry" because those are screening thresholds of the CEQR Technical Manual, the City's accepted methodology for environmental review. See Chinese Staff & Workers' Ass'n v. Burden, 88 A.D.3d 425, 429–30 (1st Dep't 2011), aff'd, 19 N.Y.3d 922 (2012). The lead agency answered "YES" to both. (¶ 127.) Under the Manual, when an action "would directly displace more than 100 existing employees," "assessments of direct business

displacement . . . and indirect business displacement . . . are appropriate," and "the type and extent of existing businesses and workers to be directly displaced by a project should be disclosed, whether or not there would be a significant displacement impact." CEQR Technical Manual ch. 5, at 5-3, 5-7 (Dec. 2025 ed.). Where an action may affect a specific industry — the Manual's example is "new regulations that prohibit or restrict the use of certain processes that are critical to certain industries" — "a detailed investigation is appropriate" unless the agency can answer "with a clear 'no'" whether the action would "significantly affect business conditions in any industry or any category of businesses" or "substantially reduce employment or impair the economic viability in the industry or category of businesses." Id. at 5-20 (§ 333.1). A law that ends a licensed category of business outright cannot be answered with a clear "no." The lead agency reached "no" only by redefining the category as the City's entire sightseeing sector (¶ 127), and it conducted no detailed investigation: it did not value the businesses, ask where their roughly 300 workers would go, or study the stables they would leave behind (¶¶ 128–129). Those answers also required an environmental impact statement. An EIS is required whenever an action "may include the potential for at least one significant adverse environmental impact," and a negative declaration may issue only if "there will be no adverse environmental impacts or . . . the identified adverse environmental impacts will not be significant." 6 NYCRR 617.7(a)(1)–(2). "Because the operative word for triggering an EIS is 'may,' there is a relatively low threshold for the preparation of an EIS." *Matter of S.P.A.C.E. v. Hurley*, 291 A.D.2d 563, 564 (2d Dep't 2002). The displacement of businesses and their workers is an effect on "existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character," N.Y. Envtl. Conserv. Law § 8-0105(6); Chinese Staff, 68 N.Y.2d at 366–67, and "the impairment of . . . existing community or neighborhood character" is an express indicator of significance, 6 NYCRR 617.7(c)(1)(v). Having

found that the Local Law would directly displace more than 100 employees and affect conditions in a specific industry, the lead agency was required to "thoroughly analyze the identified relevant areas of environmental concern" and to set forth "a reasoned elaboration" of why the effects would not be significant, id. 617.7(b)(3)–(4), and, unable to do so on this record, to issue a positive declaration and prepare an EIS. It did neither. At a minimum, the Negative Declaration could not issue without the displacement and specific-industry assessments that the City's own methodology prescribes.

269. The Negative Declaration was affected by error of law, arbitrary and capricious, and without a rational basis, for the reasons set out in Part V.J: the lead agency failed to take the required hard look or to make a reasoned elaboration of its determination. The Local Law, adopted without an environmental impact statement, is null and void.

270. Plaintiffs have standing. The Local Law directly restricts the use of Plaintiffs' own property: it ends the only use to which Plaintiff Fidan's Medallion, carriage and horses, and Plaintiff Hansen's horse, have been put, and it bars their sale to a carriage business anywhere. An owner whose use of its own property is directly restricted by the challenged action need not allege a distinct environmental injury. *See Har Enters. v. Town of Brookhaven*, 74 N.Y.2d 524, 529 (1989); *Gernatt Asphalt Prods. v. Town of Sardinia*, 87 N.Y.2d 668, 687 (1996). The Local Law also ends the use of the stables where Plaintiffs board their horses and where members of Local 100 work, and it displaces the trade's businesses and workers — effects on existing patterns of population and neighborhood character that the lead agency was required to study. *Chinese Staff*, 68 N.Y.2d at 366–67. (Hansen Decl. ¶¶ 4–5, 25; Ex. 23.)

## VIII. EXPEDITED DISCOVERY AND PRESERVATION

271. Plaintiffs ask the Court to order limited discovery before the hearing on their motion for a preliminary injunction, of the records described in Prayer ¶ 5 and set out in Schedule A to the proposed Order to Show Cause submitted with this Complaint; to grant leave to serve subpoenas under Fed. R. Civ. P. 45 on Con Edison and the Conservancy for the same categories; and to direct Defendants to preserve the documents and electronically stored information described in Schedule B to that Order. The facts in this Part show good cause for that relief.

272. ***Enactment.*** Whether the Local Law was validly enacted turns on facts about ministerial acts: when the final text of Int. 943-A was uploaded and made available to members (Charter § 36; Mun. Home Rule Law § 20(4)); whether the Director of Management and Budget received notice under Charter § 33, and the Police Commissioner under Charter § 33-a, and whether any waiver or certificate of necessity issued; when the EAS, the Negative Declaration, the October 22 committee report and the written testimony were posted (Pub. Off. Law § 103(e)); whether the lead agency coordinated with any other agency, and whether the Negative Declaration was filed or published; and when and how notice of the Mayor's hearing was published, including in any daily newspaper (Admin. Code § 3-208). (¶¶ 125, 130, 132–138.) Each is a yes-or-no question on which one or more of the Twelfth through Fifteenth, Seventeenth and Eighteenth Causes of Action depends, and each can be answered from the City's own files. (Prayer ¶ 5(b)–(e).)

273. ***Value and irreparable harm.*** DCWP's Medallion transfer files show what the Medallions that the Freeze has made unsaleable were worth. DCWP's witness told the Council that those files supported an average value**, over many years,** of about $70,000; the two DCWP-approved transfers Plaintiffs have documented were at $300,000 and $350,000. (¶¶ 63–67.) The

files bear on the economic impact of the Freeze, on the Owner Plaintiffs' investment-backed expectations and on the magnitude of the injury the Freeze inflicts. DCWP's handling of transfer applications since enactment, and the guidance DCWP, DOHMH and MOAW have issued to implement the Freeze and the Disposition Regime, bear directly on irreparable harm. (Prayer ¶ 5(a), (f).)

274. ***Whether the hazard can be controlled by regulation.*** The City may prohibit a lawful, licensed trade only where its abuses are "general and difficult to control by regulation." *Good Humor*, 290 N.Y. at 318. The hazards the record identifies — the absence of hitching posts, the footing at Cherry Hill and stray voltage on City infrastructure — are each ones the City can control by regulation. (¶¶ 87–89, 93–97.) The City's records of the requests for hitching posts and of its response to them, and its records of the electrical conditions and the footing at Cherry Hill before and after June 17, 2026, bear directly on that question. (Prayer ¶ 5(g)–(h).) Con Edison holds the results of its July 2026 testing at Cherry Hill. The Conservancy, which maintains Cherry Hill, holds the records of the 2025 change in footing, of the complaints about it and of the requests for hitching posts made to it. (¶¶ 87–88, 93–94.)

275. ***Purpose.*** The communications described in Prayer ¶ 5(i), including the email annexed as Exhibit 27, and the template of the form letter sent in the Speaker's name (Ex. 19; Prayer ¶ 5(j)), bear on the object of the Local Law, which is relevant to whether a prohibition is within the delegated police power, *Good Humor*, 290 N.Y. at 317, and on whether the Local Law was enacted to punish an identifiable group (Eighth Cause of Action). (¶¶ 7, 144.)

276. ***The records are the City's alone.*** None of these records is in the public record. (¶ 138.) Plaintiffs have pleaded each enactment fact on the public record, which shows no compliance, and on information and belief. Defendants can confirm or refute each from their own

files within days, and where no record exists, a certification of diligent search will suffice. Fed. R. Evid. 803(10).

277. ***No other means will produce them in time.*** Under the Freedom of Information Law, an agency has five business days to grant, deny or acknowledge a request, and an agency that acknowledges a request may take up to twenty additional business days to respond, or longer if it states in writing why it cannot respond sooner; a denial is subject to an administrative appeal and then to a proceeding under CPLR Article 78. N.Y. Pub. Off. Law § 89(3)(a), (4). FOIL does not reach Con Edison, a private utility. The Freeze and the Disposition Regime operate now (¶ 20), and a temporary restraining order lasts no more than fourteen days unless extended. Fed. R. Civ. P. 65(b)(2).

278. ***The records are at risk.*** Much of the enactment record exists only as system logs, audit trails, upload records and file metadata (¶¶ 133, 137), which routine retention may overwrite. The conditions at Cherry Hill are changing. After Con Edison found stray voltage there in July 2026, power to the fountain and nearby lampposts was shut off; the Con Edison employee handling the complaint wrote that "[t]he park depart[ment] should be making permanent repairs soon"; two lampposts remain dark and taped off; and in August 2026 Conservancy workers pumped water out of the fountain's pump room onto the concourse. (¶¶ 93–94; Hansen Decl. ¶ 23; Byrne Decl. ¶ 4 & Ex. A.) Records of the conditions before any repair, and of when power was turned on and off, may be altered or lost as the site is maintained and repaired. The City has been on notice of claims arising from those conditions since the Mahajan family filed its notices of claim on August 14, 2026. (¶ 92.) A preservation order costs Defendants nothing.

279. ***The requests are narrow and seek no legislative deliberation.*** Schedule A seeks records of when, whether and how documents were transmitted, posted, published, noticed or

presented; records the City keeps in administering its licenses; records of the City's response to the requests for hitching posts and of the conditions at Cherry Hill; communications between City personnel and four named private persons; and a form letter sent to members of the public. It does not seek communications among Council members, or between members and their staff, about the merits of Int. 943 or Int. 943-A. Any record withheld under a claim of privilege can be logged. Depositions under Fed. R. Civ. P. 30(b)(6) are sought only if the documents do not establish the matters listed in Schedule A, and would be limited to three hours each.

280. ***The balance favors the discovery.*** The burden of producing these records is slight. Without them, the Court would decide whether to restrain the Freeze and the Disposition Regime on a record that lacks facts in Defendants' sole possession, while the injury those provisions cause continues. (¶¶ 202–203.)

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

1. That this Court enter a declaratory judgment declaring that the Local Law violates the provisions of the United States Constitution, the New York Constitution and New York law set out above, and, separately, that Sections 2, 4, 23, 25 and 26 of the Local Law and Administrative Code §§ 17-329 and 17-332(c) are invalid;

2. That this Court declare that the Local Law was not validly enacted, because it was approved and passed in violation of Municipal Home Rule Law § 20(4)–(5), Charter §§ 28(f), 33, 33-a and 36, and the Open Meetings Law, and that the Negative Declaration (CEQR No. 27OOM001Y) is null and void;

3. That this Court enter a temporary restraining order and a preliminary injunction, pending the hearing and determination of this action:

a. restraining Defendants, their officers, agents and employees from enforcing Sections 25 and 26 of the Local Law, so that DCWP continues to accept applications for, and to complete transfers of, Medallions under Administrative Code § 20-374(b) as in effect before the Local Law; and

b. restraining Defendants from enforcing Section 4 of the Local Law (Administrative Code § 17-329); or

c. in the alternative, restraining Defendants from enforcing the Local Law in its entirety;

4. That this Court enter a permanent injunction on the same terms;

5. That this Court direct limited expedited discovery, before the hearing on Plaintiffs' motion for a preliminary injunction and as set out in Schedule A to the proposed Order to Show Cause, of (a) DCWP's Medallion transfer records, including the bills of sale on which its witness's valuation rested, and its treatment of transfer applications since enactment; (b) the Council's records of when Proposed Int. 943-A was placed upon members' desks and when its supporting documents were posted; (c) any notice, waiver or certificate under Charter §§ 33, 33-a and 36; (d) the records of the publication of notice of the Mayor's hearing in the City Record and in any newspaper; (e) the records of the environmental review, including any coordination, filing or publication of the Negative Declaration; (f) the implementation of the Freeze and the Disposition Regime; (g) requests to the City for hitching posts or other means of tethering carriage horses at the hack stands, the in-park boarding areas and Cherry Hill, including the carriage drivers' April 6, 2023 proposal to the Central Park Conservancy, and the City's consideration of and response to those requests, including any evaluation, cost estimate or design and any communications with the Central Park Conservancy about them; (h) the electrical conditions at Cherry Hill and along the

carriage routes in Central Park, including any testing for stray voltage; the findings of Consolidated Edison Company of New York, Inc. ("Con Edison") in July 2026 and the City's communications with Con Edison about them; maintenance and repair records for the Cherry Hill fountain's pumps and lighting and for nearby lampposts and underground cables; records of when power to them was turned on and off in 2026; records of the 2025 change in the concourse footing and of complaints about it and of the Conservancy's consideration of "the best path forward" for Cherry Hill in 2025 and 2026; (i) the email annexed as Exhibit 27 and similar communications between or among Steve Nislick, Wendy Neu, Allison Feldman Taylor and Edita Birnkrant, or between any of them and any City official or employee, relating to a ban on horse-drawn carriages or to any sale, lease or other real estate transaction involving a carriage horse stable; and (j) the template of the form letter sent in the Speaker's name to advocates who wrote in support of the bill (Ex. 19); together with leave to serve subpoenas under Fed. R. Civ. P. 45 on Con Edison and the Central Park Conservancy for the same categories; and that Defendants be directed to preserve all documents and electronically stored information relating to the Local Law and to the matters described in clauses (g) through (j), as set out in Schedule B to that Order;

6. That this Court award Plaintiffs just compensation, according to proof, for the taking of their property, and damages against the City of New York;

7. That this Court award attorneys' fees, expert fees and costs under 42 U.S.C. § 1988 and Public Officers Law § 107(2); and

8. That this Court grant such other and further relief as is just and equitable.

## X. DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated: New York, New York
November 19, 2026

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiffs*

By: /s/____________________
Arthur Z. Schwartz (AS-2623)
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@afjlaw.com

Benjamin J. Kallos
*Co-Counsel*
ben@kalloslaw.com

**VERIFICATION**

John V. Chiarello, President of Plaintiff Transport Workers Union of Greater New York, Local 100, AFL-CIO, declares under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that he has read the foregoing Verified Complaint and that it is true to his knowledge, information and belief, and that as to matters stated on information and belief, he believes them to be true.

Dated: New York, New York
November 19, 2026

John V. Chiarello

**VERIFICATION**

Each of Christina Hansen, Medet Fidan and David Koch, individually, declares under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that he or she has read the foregoing Verified Complaint and that it is true to his or her knowledge, information and belief, and that as to matters stated on information and belief, he or she believes them to be true.

Dated: New York, New York
November 19, 2026

/s/ ______________________
CHRISTINA HANSEN

/s/ ______________________
MEDET FIDAN

/s/ ______________________
DAVID KOCH

## INDEX OF EXHIBITS TO VERIFIED COMPLAINT

| | |
|---|---|
| Exhibit 1 | Int. No. 943-A (FINAL), as passed by the Council on October 22, 2026 |
| Exhibit 2 | Int. No. 943, as introduced on June 11, 2026 |
| Exhibit 3 | Legislative file for Int. 0943-2026 (“Details” and “Text” views), as printed on November 1, 2026 |
| Exhibit 4 | Plain-Language Summary of Proposed Int. No. 943-A (stamped “10/14/2026 6:12 PM”) |
| Exhibit 5 | Plain-Language Summary of Int. No. 943 |
| Exhibit 6 | Fiscal Impact Statement, Int. No. 943 (dated “July 8, 2025” [sic]) |
| Exhibit 7 | Fiscal Impact Statement, Proposed Int. No. 943-A (October 16, 2026) |
| Exhibit 8 | Report of the Committee on Health for its July 15, 2026 hearing |
| Exhibit 9 | Report of the Committee on Health for its October 22, 2026 meeting |
| Exhibit 10 | Transcript of the hearing of the Committee on Health, July 15, 2026 |
| Exhibit 11 | Written testimony submitted for the hearing of the Committee on Health, July 15, 2026, “Hearing Testimony 7/15/26 (1of2)” (626 pages) |
| Exhibit 12 | Written testimony submitted for the hearing of the Committee on Health, July 15, 2026, “Hearing Testimony 7/15/26 (2of2)” (621 pages) |
| Exhibit 13 | Environmental Assessment Statement and Negative Declaration, CEQR No. 27OOM001Y (October 2026) |
| Exhibit 14 | Agenda, Stated Meeting of the Council, October 22, 2026 |
| Exhibit 15 | Roll call vote on Int. No. 943-A, Stated Meeting of October 22, 2026 (40–7–2) |
| Exhibit 16 | “Hearing Testimony 10/22/26,” written testimony file attached to the legislative file (created November 4, 2026) |
| Exhibit 17 | Notice of the Mayor’s November 4, 2026 public hearing: The City Record, Vol. CLIII, No. 209 (October 30, 2026) (excerpts); City Record Online notice and search results; NYC.gov Hearing Testimony Registration page |
| Exhibit 18 | Office of the Mayor, Press Release, “Mayor Mamdani Announces Plan to Support Horse-Drawn Carriage Workers Through Industry Transition” (November 17, 2026) |
| Exhibit 19 | Letter of Speaker Julie Menin to “Animal Advocate/Activist,” as posted on Facebook in the Equine Advocacy Alliance group (posted November 10, 2026; captured November 17, 2026) |
| Exhibit 20 | Ed Shanahan, “Stray Voltage Played Role in Deadly Horse Carriage Runaway, Family Says,” The New York Times (August 14, 2026) |
| Exhibit 21 | Letter from John Samuelsen and John V. Chiarello to Elizabeth W. Smith, Central Park Conservancy (December 19, 2025) |

| | |
|---|---|
| Exhibit 22 | N.Y. State Department of Environmental Conservation, Environmental Notice Bulletin search results, negative declarations, Region 2, January 1 through November 2, 2026 |
| Exhibit 23 | Clinton Park Stables records: Bargain and Sale Deed (2003); NYCIDA Company Lease Agreement and Lease Agreement (2003); Certificates of Occupancy Nos. 103458740-T (2003) and 103458740 (2004) |
| Exhibit 24 | Enforcement findings and settlements concerning NYCLASS and related persons: City Clerk 2010 Annual Report (excerpt); Campaign Finance Board determinations and audit (2013–2017); Attorney General Assurance of Discontinuance No. 15-184 (2015); JCOPE Settlement Agreement (2018) |
| Exhibit 25 | Periodic lobbying reports filed with the City Clerk by Voters For Animal Rights and its retained lobbyist (2026) |
| Exhibit 26 | Candidate questionnaire responses published by Voters For Animal Rights (excerpts, 2020–2022) |
| Exhibit 27 | Email from Jon Paul Lupo, Office of the Mayor, to Elana Leopold and Emma Wolfe, “Nislick Call” (February 26, 2015) |

**Declarations Submitted Herewith**

| | |
|---|---|
| Hansen Decl. | Declaration of Christina Hansen |
| Koch Decl. | Declaration of David Koch |
| Bagirgan Decl. | Declaration of Fatih Bagirgan |
| Virzi Decl. | Declaration of Alberto Virzi |
| Byrne Decl. | Declaration of Cornelius Byrne |
| Chiarello Decl. | Declaration of John V. Chiarello |

**Exhibits to Declarations Submitted Herewith**

| | |
|---|---|
| Hansen Decl. Ex. A | Email from Christina Hansen to Erica Sopha, Central Park Conservancy, with earlier messages in the thread and the attached proposal, “Central Park Carriage Drive Usage Study: Suggested Improvements from the Horse-Drawn Cab Drivers” (April 6, 2023) |
| Hansen Decl. Ex. B | Photograph of the Cherry Hill concourse surface (April 2014), as posted in a WhatsApp group of carriage drivers (February 26, 2026) |
| Hansen Decl. Ex. C | Photographs of the Cherry Hill concourse during and after the change in footing, as posted in WhatsApp groups of carriage drivers (February 3–16, 2025) |
| Hansen Decl. Ex. D | Email threads between Christina Hansen and the Central Park Conservancy concerning Cherry Hill (March 6–18, 2025), with the photographs attached to the March 18, 2025 email |
| Hansen Decl. Ex. E | Email from Lauren Ullrich, Central Park Conservancy, to Christina Hansen concerning regrading of Cherry Hill (October 16, 2025) |

| | |
|---|---|
| Hansen Decl. Ex. F-1 | Audio recording of voicemail from Erica Sopha, Central Park Conservancy, to Christina Hansen (December 17, 2025) (audio file, submitted to the Court separately) |
| Hansen Decl. Ex. F-2 | Screenshot of the voicemail as displayed on Christina Hansen's iPhone (December 17, 2025) |
| Hansen Decl. Ex. F-3 | Transcript of the voicemail (December 17, 2025) |
| Hansen Decl. Ex. G | Photographs of the flooded Cherry Hill concourse, as posted in WhatsApp groups of carriage drivers (November 27–28, 2025) |
| Hansen Decl. Ex. H | WhatsApp post by Christina Hansen concerning the NYPD Mounted Unit's inspection of the carriage stands and park drives (January 29, 2026) |
| Hansen Decl. Ex. I | WhatsApp posts and photographs of the reworked Cherry Hill concourse (March 31, 2026) |
| Bagirgan Decl. Ex. A | Bill of Sale, Giuseppe Cirnigliaro and Basil Northam (d/b/a Biller Bees) to Yalcin Ozcelik and Fatih Bagirgan (May 30, 2017) |
| Virzi Decl. Ex. A | Photograph of Bill of Sale, Skyline Carriages, LLC to NYC Carriage, LLC (April 11, 2016) |
| Byrne Decl. Ex. A | Screenshots of text messages between Cornelius Byrne and a Con Edison employee concerning stray voltage at Cherry Hill (July 2026) |
| Chiarello Decl. Ex. A | Letter from John Samuelsen and John V. Chiarello to Elizabeth W. Smith, Central Park Conservancy (December 19, 2025) (same as Exhibit 21) |
| Chiarello Decl. Ex. B | Letter from Alexander Kemp, TWU Local 100, to Members of the New York City Council (August 21, 2026) |