**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------------X

**JOHN CHIARELLO, as PRESIDENT OF TRANSPORT WORKERS UNION OF GREATER NEW YORK, LOCAL 100, AFL-CIO;**
**JOHN SAMUELSEN, as PRESIDENT OF TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO;**
**MEDET FIDAN**, individually, and on behalf of a Class of Central Park Horse Carriage Medallion Owners and Central Park Horse Carriage Owners Similarly Situated;
**CHRISTINA HANSEN**, individually and on behalf of all Central Park Horse Carriage Lessees Similarly Situated, and Central Park Horse Owners Similarly Situated; and
**DAVID KOCH**, individually and on behalf of all Central Park Licensed Driver Horse Carriage Drivers Similarly Situated,

**Plaintiffs,**

–against–

**CITY OF NEW YORK**;
**NEW YORK CITY COUNCIL**;
**ZOHRAN MAMDANI, as MAYOR of the CITY OF NEW YORK;**
**SAMUEL A.A. LEVINE, as COMMISSIONER of the NYC DEPARTMENT OF CONSUMER AND WORKER PROTECTION;**
**ALISTER MARTIN, as COMMISSIONER of the NYC DEPARTMENT OF HEALTH AND MENTAL HYGIENE;**
**MIKE FLYNN, as COMMISSIONER of the NYC DEPARTMENT OF TRANSPORTATION;**
**JESSICA TISCH, as COMMISSIONER of the NYC POLICE DEPARTMENT;**
**VILDA VERA MAYUGA, as COMMISSIONER and CHIEF ADMINISTRATIVE LAW JUDGE of the NEW YORK CITY OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS; and**
**YUME KITASEI, as COMMISSIONER of the NYC DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES,**

**Defendants.**

-----------------------------------------------------------------------------X

Civil Action No. 26-10154

**DECLARATION OF ATTORNEY Z. SCHWARTZ IN SUPPORT OF PROCEEDING BY ORDER TO SHOW CAUSE AND ISSUANCE OF TEMPORARY RESTAINING ORDER WITH EXPEDITED INITIAL DISCOVERY**

Arthur Z. Schwartz declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an attorney admitted to practice before this Court and a principal of Advocates for Justice Chartered Attorneys.

2. For the first time in its history, the City of New York is seeking to terminate a profession which was lawful and licensed, and is seeking to do so without any compensation for those who own property connected with the profession (including medallions, horses, carriages, and associated equipment), those who have contracts involved in the profession, and those who make a living from the profession. Additionally, the City is seeking to do so without any declared public health emergency, in a profession which is heavily regulated: the City's horse drawn carriage industry, which largely exists in New York City's Central Park. The law doesn't bar the commercial use of horses, generally, in NY City (like riding stables), including the stable that leases horses to ride in Central Park or the use of horses in parades, circuses, or at a racetrack.

3. This is a lawsuit seeking declaratory and injunctive relief, and damages, addressed to Local Law 165 of 2026 (Int. No. 943-A) (the "Local Law") (Ex. 1) , which the New York City Council has styled "Romanch's Law," which abolishes the City's licensed horse-drawn carriage trade. Under the terms of the Local Law, every horse drawn carriage license and plate expires on May 31, 2028 (the "Sunset Date").

4. There are presently between 208 and 211 drivers with licenses to drive a horse drawn carriage, and 63 owners who own 68 medallions to operate horse drawn carriages, and between 132 and nearly 160 horses; counting stable workers, the City puts the number of people affected at 297 to 309. (See infra Part V.B.) The City's own figures for each of these numbers conflict, and the City never reconciled them. (See infra Part V.J.)

5. The Local Law does not wait for the Sunset Date to take effect and have a negative impact effective immediately. The Law:

a) bars the Department of Consumer and Worker Protection ("DCWP") from issuing any horse drawn carriage license or plate (each license with its plate, a "Medallion"), or accepting any application for one — under existing law, the only way a license changes hands (Local Law §§ 25–26) (which we call the "Freeze"); and

b) Forbids the sale or transfer of any licensed rental horse "for use in a horse drawn cab business" — anywhere in the country, including to another licensed operator in the City — and requires every owner to certify by June 1, 2027 that the horse will not be transferred for that use, for slaughter, or for "any inhumane purpose as designated by the commissioner" (Local Law § 4, amending Admin. Code § 17-329) (the "Disposition Regime").

6. Furthermore, the new statute addresses compensation only through "[c]onside ration of whether to establish" a program to compensate owners for "the value of their horse drawn cab businesses, horse drawn cab licenses, and equipment," and of whether to establish a horse-disposition program that may include "potential compensation," in a plan due April 1, 2027. For drivers, the plan need offer only workforce services: referrals, counseling, training, hiring events, civil-service resources, educational opportunities and entrepreneurship guidance. The Local Law requires no compensation, appropriates nothing and sets no deadline for a decision. (Local Law § 23) (the "Transition Plan").

7. The City's approach can be summarized in twelve words: immediately cripple the owners, ignore property interests and contracts, and maybe compensate. Two days before signing

the Local Law, the Administration confirmed that approach: it announced “a goal of facilitating medallion buybacks,” with a full transition plan to follow “by April 2027.” (Ex. 18, at 1–2; ¶ 109.)

8. As we describe in our complaint, this law was passed as a result of years of lobbying, with millions of dollars in spending, by a multi-millionaire funded ani-horse carriage group, which jumped on the fact that a young man riding in a carriage died in June 2026 after a horse, which had been shocked by stray electrical voltage, reared. Public hearings filled with false testimony about carriage drivers beating their horses, forcing them to work 7 days a week, in all sorts of weather, alongside auto traffic, did not provide a public health or safety premise for wiping out an entire industry, and doing it with no compensation for people with millions of dollars, and lives, invested in Medallions, horses, and carriages, or the stable owners, who operate in nearby to Cetral Park buildings. In fact, as it turned out the industry in recent years had become heavily regulated, and the simple act of installing a hitching post (which the plaintiff union had recommended) would have avoided the death.

9. We move by Order to Show Cause, and seek a TRO, because of the immediacy of the injury. For example, some of the Plaintiffs, like many of the class they seek to represent, spent hundreds of thousands of dollars on one of the 68 Medallions issued by the City. The Mayor signed the bill today, and those Medallions become worthless – with no compensation plan set out in the statute. The law also limits where, to whom and for what purpose horses owned by Plaintiffs can be sold.

10. The City (without evidence) asserts that a safety issue is involved, but it does not totally ban the industry until July 2018. As we just saw with President Trump’s golf course plan in Washington DC, the government here is yelling “safety, safety,” but not acting like there is truly something unsafe about the horse carriage industry.

**NOTICE AND REASONS FOR PROCEEDING BY ORDER TO SHOW CAUSE**

11. On November 19, 2026, at 8a.m., I gave email notice of this application to the Steven Banks Corporation Counsel of the City of New York, counsel for Defendants, stating that Plaintiffs would apply for an order to show cause and a temporary restraining order this afternoon, after reading that the Mayor was planning to sign the bill this morning. Copies of the papers were sent by email.

12. As we described above, Plaintiffs proceed by order to show cause rather than by notice of motion because the provisions they ask the Court to restrain operation of the law now. Since the Local Law took effect, DCWP may not accept a Medallion transfer application or issue a license to a buyer, and owners of licensed horses must comply with the Local Law's notice, transfer and certification requirements. A motion on the schedule set forth in Local Civil Rule 6.1(b) would not be fully submitted for about three weeks, during which those provisions would continue to operate.

13. No previous application for similar relief has been made in this or any other court.

**II. REQUEST FOR LEAVE TO EXCEED THE WORD LIMIT**

14. Local Civil Rule 7.1(c) limits a memorandum of law in support of a motion to 8,750 words. Plaintiffs respectfully request leave to file a memorandum of law in support of this motion of up to 10,500 words, an additional 1,750 words.

15. The additional length is needed for three reasons. First, the Local Law does several distinct things at once: it bars the Department of Consumer and Worker Protection from accepting Medallion transfer applications or issuing licenses; it places every licensed carriage horse under a notice, transfer and certification regime; and it ends the licensed trade on May 31, 2028, without

compensation. The motion asks the Court to restrain the transfer and licensing freeze (Local Law §§ 25–26) and the horse-disposition provisions (§ 4) and rests on numerous constitutional and claims pleaded in the Complaint, under both federal and state law. Second, for each claim on which Plaintiffs rely, the memorandum must address likelihood of success, irreparable harm, the balance of hardships and the public interest. Third, the motion rests on a substantial record: the 22 exhibits to the Complaint and the declarations of four Plaintiffs and other witnesses.

16. Plaintiffs have kept the memorandum as short as these issues allow. It cites the Verified Complaint and the supporting declarations for the facts rather than restating the record in full.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
November 19, 2026

ARTHUR Z. SCHWARTZ